

**FILED**

JUN 1 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Antoine Jones )
241912 )
1901 D ST SE, )
WDC 20003 )

(Enter your full name, prison number
and address)

v.

Det, Steve Kirchner )
FBI Agent Brooks )
Unknow FBI Technician )
Detective Joseph Soputa )

(Enter the full name and address(es),
if known, of defendant(s) in this
action)

Case: 1:07-cv-01063
Assigned To : Kennedy, Henry H.
Assign. Date : 06/15/2007
Description: PRO SE GEN. CIVIL

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### Instructions for filing a Complaint by a Prisoner
### Under the Civil Rights Act 42 U.S.C. §1983

This packet contains one copy of a complaint form and one copy of an application to proceed *in forma pauperis.* To start an action, you must file an original and one copy of this complaint form.

Your complaint must be clearly handwritten or typewritten and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use another blank page.

Your complaint can be brought in this Court only if one or more of the named defendants is located within the District of Columbia. Further, you must file a separate complaint for each claim that you have unless they are related to the same incident or problem. The law requires that you state only facts in your complaint.

You must supply a certified copy of your prison trust account, pursuant to the provisions of 28 U.S.C. §1915, effective April 26, 1996. The filing fee is $150.00.. If insufficient funds exist in your prison account at the time of filing your complaint, the court **must** assess, and when funds exist, collect an initial filing fee equal to 20 percent of the greater of:

RECEIVED

JUN 15 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(1)     the average monthly deposits to your prison account, or

(2)     the average monthly balance of your prison account for the prior six-month period.

Thereafter, you are required to make monthly payments of 20% of the preceding month's income. The agency having custody over you must forward payments from your account to the clerk of the court each time the amount in the account exceeds $10.00 until the filing fees are paid.

Therefore, before an assessment can be made regarding your ability to pay, you <u>must</u> submit a certified copy of your prison account for the prior six-month period.

When this form is completed, mail it and the copies to the Clerk of United States District Court for the District of Columbia, 333 Constitution Ave., NW, Washington, D.C. 20001.

I.      **SUCCESSIVE CLAIMS**

Pursuant to the Prison Litigation Reform Act of 1995, unless a prisoner claims to be in "imminent danger of serious physical injury," he or she may not file a civil action or pursue a civil appeal *in forma pauperis* "if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or they failed to state a claim upon which relief could be granted."

II.     **PREVIOUS LAWSUITS**

A.      Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?     Yes ( )        No (X)

B.      Have you begun other lawsuits in state or federal court relating to your imprisonment? Yes (X)     No ( )

C.      If your answer to A or B is Yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.      Parties to this previous lawsuit.

Plaintiffs: Antoine Jones, 241912

Defendants: Mrs Rachel Lieber - Government Prosecutor

2.      Court (if federal court, name the district; if state court, name the county)
United State, District of Columbia

3.      Docket number   Haven't Receive this information yet

4.      Name of judge to whom case was assigned: Haven't receive information.

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) *Haven't receive information.*

6. Approximate date of filing lawsuit: *Week of April 9 2007*

7. Approximate date of disposition: *Haven't receive any information*

## III. PLACE OF CONFINEMENT

*CDF - DC Jail 1901 D St SE WDC 20703*

A. Is there a prisoner grievance procedure in this institution?    Yes (X)    No ( )
If your answer is Yes, go to Question III B. If your answer is No, skip Question III B,C and D and go to Question III E.

B. Did you present the facts relating to your complaint in the prisoner grievance procedure?
Yes ( )    No (X)

C. If your answer is Yes to Question III B;

1. To whom and when did you complain? *N/A*

2. Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)    Yes ( )    No ( )    *N/A*

3. What, if any, response did you receive? (Furnish copy of response, if in writing.) *N/A*

4. What happened as a result of your complaint? *N/A*

D. If your answer is No to Question III B, explain why not. *These incident happen before My incarceration.*

E. If there is no prison grievance procedure in the institution, did you complain to prison authorities?    Yes ( )    No ( )    *N/A*

F. If your answer is Yes to Question III E:

1. To whom and when did you complain? _____ N/A _____

   _____

2. Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)    N/A

3. What, if any, response did you receive? (Furnish copy of response if in writing) _____ N/A _____

   _____

4. What happened as a result of your complaint? _____ N/A _____

   _____

   _____

## IV.  PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A.  Name of Plaintiff: _Antoine Jones  241912_

    Address: _1901 D St SE WDC  20003_

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B.  Defendant: _Detective Steve KIRCHNER_ is employed as _MPD Detective_ at _Safe Street Task Force_

    Address: _Washington DC_

    Defendant: _FBI Agent Brooks_ is employed as _Special Agent - FBI_ at _Federal Bureau of Investigation_

    Address: _Washington Field House_

    Defendant: _Unknow FBI Technician_ is employed as _FBI Technician_ at _Federal Bureau of Investigation_

    Address: _Washington Field House_

    Defendant: _Detective Joseph Sopota_ is employed as _MPD Detective_ at _Safe Street Task Force_

    Address: _Washington DC_

1.  To whom and when did you complain? _N/a_____

    _____

2.  Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)

3.  What, if any, response did you receive? (Furnish copy of response if in writing)
    _N/a_

4.  What happened as a result of your complaint? _N/a_____

    _____

    _____

## IV.  PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A.  Name of Plaintiff: _Antoine Jones 241912_
    Address: _1901 D St SE WDC 20003_

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B.  Defendant: _S A, Steve Nausle_____ is employed as
    _FBI Agents_ at _Federal Bureau Investigation_
    Address: _Washington Field House_
    _____

    Defendant: _SA, Jon Snow_____ is employed as
    _FBI Agents_ at _Federal Bureau Investigation_
    Address: _Washington Field House_

    Defendant: _CR-1 Craig Wallace_____ is employed as
    _____ at _____
    Address: _____

    Defendant: _SA Gregg Warner_____ is employed
    as _FBI Agents_ at _Federal Bureau Investigation_
    Address: _Washington Field House_
    _____

1.  To whom and when did you complain? _N/A_

2.  Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)

3.  What, if any, response did you receive? (Furnish copy of response if in writing) _N/A_

4.  What happened as a result of your complaint? _N/A_

## IV.    PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A.    Name of Plaintiff: _Antoine Jones 241912_
      Address: _1901 D St SE WDC 20003_

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B.    Defendant: _SA Joseph Lowry_ is employed as _FBI Agent_ at _Federal Bureau Investigation_
      Address: _Washington Field House_

      Defendant: _SA, Angela McCravy_ is employed as _FBI Agent_ at _Federal Bureau Investigation_
      Address: _Washington Field House_

      Defendant: _SA, Brian Mumford_ is employed as _FBI Agents_ at _Federal Bureau Investigation_
      Address: _Washington Field House_

      Defendant: _SA, Timothy Pak_ is employed as _FBI Agent_ at _Federal Bureau Investigation_
      Address: _Washington Field House_

1. To whom and when did you complain?  _N/a_____

2. Did you complain in writing?  (Furnish copy of the complaint you made, if you have one.)

3. What, if any, response did you receive?  (Furnish copy of response if in writing)
   _N/a_____

4. What happened as a result of your complaint?  _N/a_____

## IV. PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A. Name of Plaintiff: _Antoine Jones_____
   Address: _1901 D St SE WDC 20003_____

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B. Defendant: _SA, James Wise_____ is employed as
   _FBI Agents_____ at _Federal Bureau Investigation_
   Address: _Washington Field House_____

   Defendant: _SA, Sergey Kaluzny_____ is employed as
   _FBI Agent_____ at _Federal Bureau Investigation_
   Address: _Washington Field House_____

   Defendant: _SA Kevin Wolf_____ is employed as
   _FBI Agent_____ at _Federal Bureau Investigation_
   Address: _Washington Field House_____

   Defendant: _SA Kate Beaton_____ is employed
   as _FBI Agent_____ at _Federal Bureau Investigation_
   Address: _Washington Field House_____

## V.    STATEMENT OF CLAIM

State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include the names of other persons involved, dates and places. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra sheets if necessary. I attack
A complaint sheet. Briefly the FBI Agents and Detective
from M.P.D sakestreat task force. Broke the law, was
contempt to court and violate my constitution Rights.
The tresspass on my Jeep cherokee, violates a court
order and enter in my House before 6 AM, violating
My constitution Rights and violating Rule 41.
                See Attachment

## VI.    RELIEF

State briefly exactly what you want the Court to do for you. I Requesting the courts
to Do AN internal investigation, And get the defensants
to AWARD me monatary Damages, of $1,000,000.

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED
BEFORE ME THIS    DAY OF
NOTARY PUBLIC FOR THE DISTRICT OF COLUMBIA
MY COMMISSION EXPIRES JULY 31ST 200

Signed this ___ day of ___May___    2007

_Antoine Jones_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_5/7/07_
(Date)

_Antoine Jones_
(Signature of Plaintiff)

**Complaint filed by Antoine Jones (pro se)**

10870 Moore Street, Waldorf, Maryland (residence), and 2001 Jeep Cherokee
Trespassing, Intrusion, Illegal Search

**Complaint 1:**

I, Antoine Jones, hereby submit this complaint based on the following information.  The FBI agents
violated my constitutional rights by invading my privacy and the privacy of my wife and son.  On
October 24, 2005 FBI agents along with DC police entered and searched of our residence (10870
Moore Street, Waldorf, Maryland).  During this search, the agents never showed me, my wife or son a
Search Warrant or Attachment A, nor did they leave a copy of a Search Warrant or Attachment A at
the residence at the conclusion of the search.  The fact of the matter is that I requested a copy of a
search warrant and was not presented with one until approximately six months after being arrested and
detained.  If in fact a search warrant existed before the FBI agents and DC police entered the residence,
this is a clear violation of my (our) constitutional rights because (a) the warrant was supposed to be
presented while the agents/police were inside the premise, and (b) a signature was supposed to be
obtained by the occupants of the premise, (c) a copy of the warrant and Attachment A was supposed to
be left at the premise, (d) even if the agents had a search warrant "in hand" prior to entry, the search
warrant clearly states that they can enter the residence between the hours of 6:00 a.m. and 10:00 p.m.,
and (e) I should have been given a copy of this when I requested the discovery in the case.

While I (we) do not dispute the fact that my wife was told to sign five inventory sheets detailing items
the agents/police removed from the house; they did not present her with a search warrant or
Attachment A which is required by law.  Further, in the other locations which were searched on that
same morning, a search warrant was not only presented to the occupants, the search warrant was also
photographed at the location and a photographed copy of each search warrant was included with the
discovery when it was turned over to defense counsel.  Therefore, I am hereby charging that the FBI
agents and the DC police entered my (our) residence at 10870 Moore Street, Waldorf, Maryland
unlawfully, at 4:45 am on October 24, 2005, dragged me, my wife and son out of bed and searched and
removed approximately 40 boxes of personal property from our residence.

**Complaint 2:**

I, Antoine Jones charge that the FBI agents and DC police illegally entered my private residence at 10870 Moore Street, Waldorf, Maryland on October 24, 2005 at 4on October 24, 2005 at 4:45 a.m. and proceeded to search the premise and removed items from the premise and throughout the search the agents/police failed to present a search warrant nor did they leave a search warrant or Attachment A with me, my wife or son, violating Rule 41.

No showing, presenting or leaving of a Search Warrant at the Moore Street address. During the entry and the search, I asked numerous times to see a search warrant. None of the agents responded. Throughout the search, one agent (an Asian gentleman) repeatedly asked the other agents if he should photograph of the search warrant. (The lead agent – who seemed irritated by the question -- sent him into the garage until the end of the search when he came back into the house and photographed each room of the house and placed the signed inventory sheets on the dining room table and photographed the inventory sheets.)  I was then taken by one of the agents to FBI headquarters in Washington, DC. The other agents continued to search and seize over 40 boxes of personal and private documents and personal property. A search warrant was never presented to my wife or son. At the conclusion of the search, my wife was given five pages of inventory receipt to sign. There was no Attachment A and no search warrant presented or left at the premises. **Rule 41 (F)** mandates the officer executing the warrant must give a copy of the warrant and receipt for the property taken to a person from whom, or from whose premises, the property was taken, or … leave a copy of the warrant, Attachment A, and receipt at the place where the officer took the property.

In an e-mail from Ms. Rachel Lieber (prosecutor) to Mr. Eduardo Balarezo (defense attorney for Mr. Jones), Ms. Lieber stated the Jones' "we took over 40 boxes of items; the Jones' save everything". This has nothing to do with the fact that the agents did not present a search warrant, leave a search warrant nor obtain a signature on the search warrant. *United States v. Martinez Fuente, US v. Chadwich, Michigan v. Tyler, without a warrant the occupant has "no way of knowing the lawful limits of the inspectors power to search, and no way of knowing, whether the inspector himself is acting under proper authorization (quoting Camara v. Municipal Court).* At no point did the agents present or leave either my wife or son a copy of search warrant or Attachment A, to inform the scope of the warrant, nor did the agents photograph a copy of the warrant in hand of any of the occupants, neither was a copy left at the premise. This failure to provide a copy of the warrant with Attachment A

merits suppression of any evidence recorded as results.  See <u>United States v. Gantt</u> 194F.3D987 (9th Cir 1999).

### Evidence List

(1) There was no photo of search warrant nor Attachment A; only a photo of inventory sheets and receipt.

(2) Brandywine Road house – There was a photo of child occupant holding the search warrant in his hand.

(3) Potomac Drive – Search Warrant and Attachment A, with inventory sheet was posted on the wall.  A close-up shot and a distance shot.

(4) Residence of Michael Huggins – Search Warrant and Attachment A and three inventory sheets on the table with teenage son present in the photo.

(5) Residence of John Adams – Search warrant and Attachment A, and two inventory sheets and receipt page photographed in close-up shot on the sofa.   A second photograph showing Mr. Adams and wife in handcuffs from the back along with the completed search warrant in between both persons.

(6) Residence of Demetrius Johnson – On Mr. Johnson's table two photos of the Search Warrant, Attachment A and inventory sheet.

(7) Club Levels – No photograph of Search Warrant, Attachment A or inventory sheet.

Conclusion – Until this present date, the Government has not presented evidence showing a Search Warrant or Attachment A was presented before or during the search of 10870 Moore Street; only the inventory sheets/receipt which itemized the items taken from the house were presented to and signed by my wife, Mrs. Jones.

Responding to the Government's Rebuttal <u>The defendant's consent was voluntary.</u>  After viewing and reading the motion Mr. Balarezo (my attorney) submitted to the courts, I explained the truth of the matter.  Mr. Balarezo communicated to the government, in fact, defendant Jones' position is that he did not sign that consent form at all, but rather the signature is a forgery.  I further suggested calling a handwriting expert to resolve this matter.

From the moment the agents entered the house, pulled me, my wife and son out of bed and then handcuffed each of us (in the usual hands behind his back position), we remained cuffed throughout

the search.  We were later brought downstairs and sat in chairs in the "family room" where I was able to view the agents in the garage through the open door.  The agents said they did not find any drugs but they did find cash money in the Jeep Cherokee.  The other agents responded "that's better than nothing."

I challenge the forged consent form, as well as statements made by lead Agent Norma Horne.  Agent Horne testified under oath before the Grand Jury, "he directed agents when they let him know that it was a search, that he had money in his vehicle, and he took them out to the vehicle."  Here we have a lead agent testifying under oath to the Grand Jury on January 26, 2006, Jones took the agents out to the Jeep Cherokee and pointed out the money, never mentioning any signed consent nor mentioning that they had to remove the handcuffs so that I could point out the money in the vehicle.

My argument here is, if I was handcuffed behind my back, how could I sign a consent form or go into the garage and point out the money in the Jeep Cherokee while in handcuffs.  Did the agents remove the cuffs and have me (Mr. Jones) sign the consent and/or did they remove the cuffs again and take me (Mr. Jones) to the garage and ask to "show them the money"?

I further argue the Grand Jury testimony of Agent Norma Horne is perjury and the signature on the consent form is a forgery.

Quoting from the Government's response, Jones' criminal history makes clear that this wasn't his first encounter with police, rather his extensive criminal history of drug trafficking demonstrates his familiarity with his Constitutional Rights, including the Rights to Consent...  I argue "why would I give up my Rights and sign a consent form, or go out to the Jeep Cherokee and point out cash money especially when it is my contention that the cash was legally obtained proceeds from Club Levels.

I further assert, "the only time any law enforcement officer discussed or read me my Rights was Agent Yanta at the FBI Headquarters."  I declined to talk with the agents and asked for an Attorney.  At that point, Agent Yanta gave me a Miranda Rights Card and a one-page inventory sheet to sign.

**Complaint 3:**

I, Antoine Jones charge that the FBI agents and DC police illegally entered my residence at 10870 Moore Street, Waldorf, Maryland on October 24, 2005, using an unauthorized door key.  The

- 4 -

agents/police entered through the front door of the house at 4:45 a.m. I further assert that even if they had first obtained a search warrant to enter the premise, the time of entry at 4:45 a.m. is a violation of Rule 41.

### Complaint 4:

By their own admission, the FBI agents and DC police removed over 40 boxes of personal, private and business property from my private residence on October 24, 2005. I hereby charge that this is a violation of my (our) 4th Amendment Rights. While the prosecution admittedly refused to go through the items taken and further only used less than one-tenth (1/10) of the items in trial. This intrusion into our private lives is a clear case of vindictiveness and unreasonable search and seizure.

### Complaint 5:

I, Antoine Jones, hereby charge that the agents/policed illegally went into my wife's Jeep Cherokee without a search warrant or permission from me or my wife.

### Complaint 6:

I charge that the FBI agents trespassed on the Jeep Cherokee while it was parked on a private parking lot and illegally placed an electronic surveillance device (GPS) on the vehicle. The FBI agents did in fact obtain a court order to place the GPS on the Jeep however, the court order had expired prior to the device being put on the vehicle. I further charge that the GPS was placed on the vehicle while it was parked in Largo, Maryland which is a violation of 3117, out of their jurisdiction.

### Complaint 7:

I charge that the FBI agents violated my (our) Constitutional Right to an expectation of privacy by monitoring the Jeep 24 hours a day with an illegal tracking device.

*I cite US v. Karo, because the residents had a justifiable interest in privacy in their home. US v. Karo, states a search began at the moment Karo brought the car into his house and hence concealed it from the public view. As a general mater, the private citizen is entitled to assume, and in fact does assume that his possessions are not infected with concealed electronic devices. The concealment of such items on personal property significantly compromises the owner interest in privacy, by making it impossible to conceal that item's possession and location from the Government, despite the fact that the Fourth Amendment protects the privacy interest in the location of personal property not exposed to public*

view. I find little comfort in the courts notion that no invasion of privacy occurred until a listener obtained some significant information. By use of the device, the expectation of privacy should be measured from the stand point of the citizen whose privacy is at stake, not the Government. _It is compromised, the moment when the invasion occurred._ The agent did not know who was in possession of the property or when, once it entered Karo's house. Because the beeper enabled the agent to learn the location of the property otherwise concealed from public view, it infringed a privacy interest protected by the Fourth Amendment.

_US v. Knotts_ – was reversed finding for the defendant. The monitoring of the beeper was prohibited by the Fourth Amendment because its use had violated respondent's reasonable expectation of privacy, and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring. When a police agent, track, bugged personal property without first obtaining a warrant, they must do so at the risk that this enhance surveillance intrusive at its best, might push fortuitously and unreasonably into private sphere, prohibit by the Fourth Amendment. The Fourth Amendment protected against Government invasion of a person's reasonable expectation of privacy, even _when the thus invasion are not accomplished by physical intrusion._

It is certainly true that a home owner has reasonable expectation of privacy in the contents of his home, _Alderson v. US._

On September 27, 2005, the FBI agents knowingly installed a GPS on the Jeep Cherokee violating (18§3117 Code) and the (Judge Friedman 10 days execution order). The agent never applied for a search warrant during this time. Monitoring the GPS and with the physical surveillance from the agents, the agent surveyed and knew that the Jeep Cherokee was "always" parked inside the garage of the 10870 Moore Street residence.

The agents allege that they applied for a search warrant on October 22, 2005, planning to execute the search warrant on October 24, 2005 at the Moore Street house (again, bringing up the issue of not obtaining a signature on the search warrant or photographing the search warrant at the premise during the search). Further, the agents are required by law to obtain permission to search the Jeep Cherokee once the vehicle, with the warrantless and expired GPS attached entered the garage at 10870 Moore Street, and once the garage door was closed to the public view, concealing what the agents believed to be contraband inside the Jeep Cherokee. With this sophisticated GPS tracker, the agents

knew the Jeep Cherokee and any suspected contraband were stationary, located in the garage of the 10870 Moore Street house.   US v. Berry – The Supreme Court might conclude however that the new technology is so intrusive that the police must obtain a court order before its use.

The FBI agent's testimony and evidence show the Jeep had entered 10870 Moore Street garage before 6 a.m. on October 24, 2005, further violating the rules of a valid search warrant by Entering the house before 6 a.m. During trial, the FBI agents testified under oath that they disconnected the GPS device on the Jeep Cherokee in the garage, the morning of October 24, 2005 (the morning of the "Big take down"). The agent specified in his testimony that the device was taken off of the vehicle October 24, 2005, 5:21 a.m. for the last entry of the GPS data. Evidence demonstrates and was put in record the agents did indeed enter the Moore Street house before 6 a.m. early morning October 24, 2005, violating Rule 41.

Further, my wife testified under oath, that the agents entered the house at 10870 Moore Street before 6 a.m. My wife specifically testified she recalled the agents entered the house at 4:45 a.m. I would surmise that the agents entered the house and spent the time from 4:45 a.m. until 5:21 a.m. securing the occupants (me, my wife and son) in handcuffs, turning off the alarm and making sure no other persons were in the house before going into the garage and removing the GPS at 5:21 a.m.

I also noted my son was available to testify that the agents entered the house before 5 a.m. because they entered the house before his alarm clock signaled his daily 5 a.m. wake-up. My son, who attended college in Baltimore, was accustomed to getting up at 5 a.m. and leaving the house at 6 a.m.

I surmise that I have again and again, clearly demonstrated a violation of Rule 41 by the FBI agents and DC police.

In conclusion, every affidavit and every Government document stated the vehicle was registered (solely) to Mrs. Jones (my wife) and belonged to Mrs. Jones. My wife purchased the Jeep Cherokee in early 2001 before we were married, and in fact, while I was away in prison. The argument here is: "Why didn't the agents ask my wife for permission to search the vehicle which was registered in her name and belonged to her?" The agents searched the Toyota Sequoia (registered to both Mr. & Mrs. Jones) and the Cadillac (registered to Mr. Jones) without obtaining a signature on a consent form. I contend the vehicle searches were conducted by the agents without consent or permission.... For the

record, any child with knowledge of graphic arts, can take a graphics art software program and duplicate a signature. The consent form was not signed by me, and, the signature is in fact a forgery.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

F
07-1063
HHK

## I (a) PLAINTIFFS

Antoine Jones

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 11001
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE (DC)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
# 241-912

## DEFENDANTS

Detective Steve Kirchner, et al.,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

THE

Case: 1:07-cv-01063
Assigned To : Kennedy, Henry H.
Assign. Date : 06/15/2007
Description: PRO SE GEN. CIVIL

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☒ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☒ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.  Habeas Corpus/ 2255** | ☐ **H.  Employment Discrimination** | ☐ **I.  FOIA/PRIVACY ACT** | ☐ **J.  Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.  Labor/ERISA (non-employment)** | ☐ **L.  Other Civil Rights (non-employment)** | ☐ **M.  Contract** | ☐ **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

✗ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** ○  Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ✗ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES ☐ NO  If yes, please complete related case form.

**DATE**   **SIGNATURE OF ATTORNEY OF RECORD**   M.D.

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

Invading privacy's intrusion
and Tresspassing on Jeep cherokee

(A) Contempt to court – violating Judge
freedman court order, 10 day expiration
and 18 § 3117

(B) Trial Transcript – Tresspassing
and intrusion on Sept 27 2005, oct 19 2005.

(C) Disconnection of G.P.S Device, oct
24 2005 5:21 Am

(D) copy of court order, authorizing the
installation and use of electronic
Tracking Device.

(E) copy of G.P.S Data, Sept 27 2005
Oct 19 2005, and the completion of
the G.P.S oct 24 2005 5:21am



G PS Warrant

**FILED**

FILED

SEP 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )
FOR AN ORDER AUTHORIZING THE )
USE OF AN ELECTRONIC TRACKING )
DEVICE IN A GOLD JEEP GRAND CHEROKEE )
AUTOMOBILE, MARYLAND REGISTRATION )
NUMBER M667480, VEHICLE IDENTIFICATION )
NUMBER 1J4GW48S71C683464 )

MISC. NO. 05 - 0346

**UNDER SEAL**

**EX PARTE APPLICATION FOR ORDER AUTHORIZING
USE OF AN ELECTRONIC TRACKING DEVICE**

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, pursuant to the All Writs Act (28 U.S.C. § 1651(a)), 18 U.S.C. § 3117

(Mobile Tracking Devices) and Federal Rule of Criminal Procedure 41, hereby moves for an Order

authorizing the use of an Electronic Tracking Device in a Jeep Grand Cherokee, Gold in color,

bearing Maryland registration number M667480 and Vehicle Identification Number

1J4GW48S71C683464 (the "subject vehicle"), for a period of ninety days in an investigation of

offenses being committed by Antoine Jones and others, using the above-listed subject vehicle, in

violation of 21 U.S.C §§ 841 and 846 and 18 U.S.C §§ 1956 and 1957.

We further request that the Order authorize the temporary appropriation and surreptitious

entry into the subject vehicle at any hour of the day or night in order to install the electronic tracking

device, remove the electronic tracking device, or to make necessary mechanical adjustments should

the device need mechanical adjustments or become inoperable.

We further request that the Order authorize the monitoring agents, in the event that the

CHECK    Law Library
¹28 U.S.C. § 1651(a) provides that the "Supreme Court and all courts established by Act
of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions
and agreeable to the usages and principles of law."

Need to see Affidavit

subject vehicle travels outside the territorial jurisdiction of the Court, to continue to use the electronic tracking device in any jurisdiction.

We further request that the Order authorize that Special Agents of the Federal Bureau of Investigation, and other law enforcement officers, are not required to leave copies of the Court's Order in any premises or vehicle entered due to the covert nature of this installation and investigation.

We further request that this Application, accompanying Affidavit, and the Court's Order be placed under seal until further order of the Court.

## POINTS AND AUTHORITIES

Use of A Mobile Tracking Device.

In United States v. Knotts, 460 U.S. 276, 281-82 (1983), the Supreme Court held that warrantless monitoring of an electronic tracking device does not violate the Fourth Amendment if it reveals no information that could not have also been obtained through visual surveillance. Monitoring of a device in a private residence to obtain "a critical fact about the interior of the premises" information that could not have been observed through physical observation—however, requires proper judicial authorization. United States v. Karo, 468 U.S. 705, 715-16 (1984); see also United States v. Jones, 31 F.3d 1304, 1310-11 (4th Cir. 1994). In order to obtain judicial approval, it is sufficient if the applicant "describes the object into which the beeper is to be placed, the circumstances that led the agents to wish to install the beeper, and the length of time for which the surveillance is requested." Karo, 468 U.S. at 718.

WHEREFORE, we request that this Court authorize the placement and monitoring of an electronic tracking device in the subject vehicle.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

By:

John V. Geise
Assistant United States Attorney
D.C. Bar No. 358-267
555 4th Street, N.W., Room 4126
Washington, D.C. 20530
(202) 616-9156

for in the Court order and outside the jurisdiction of the issuing judge renders the placement of

the tracker illegal and must be suppressed.

### A.    The tracker was placed after the ten days allowed by the Order

The Order stated that "this Order may be executed at any hour of the day or

night and must be executed no later than ten days from the date of issuance of this Order."

(Order at 2; Exh. 1).  Discovery discloses, and the government must concede, that the tracker

was placed on Jones' Jeep on September 27, 2005.  The first reading from the tracker, apparently

obtained immediately after installation reads "09/27/05 11:56:04 local; 38°54'16"N 76°50'16"W;

0; MD: 9726 APOLLO DR, Lake Arbor, USA_MD."  (See Exh. 2).  Thus, the tracker was

placed eleven days after the Order was issued, in violation of the ten day requirement.  Thus, the

government violated the terms of the Order and any evidence obtained as a result of using the

tracker must be suppressed.

### B.    The tracker was placed outside the issuing court's jurisdiction

Section 3117 of Title 18 of the United States Code, states:

> Mobile tracking devices – (a) In general.  If a court is empowered
> to issue a warrant or other order for the installation of a mobile
> tracking device, such order may authorize the use of that device
> within the jurisdiction of the court, and outside that jurisdiction if
> the device is installed in that jurisdiction. . . .
> Very Important

18 U.S.C. § 3117 (emphasis added).  On its face, the statute does not allow a judge to issue an

order for the placement of a tracker outside of that court's jurisdiction.  Furthermore, use of the

tracker can be authorized outside the court's jurisdiction only if it was placed in the court's

jurisdiction.  See Id.; United States v. Gbemisola, 225 F.3d 753, 757 (D.C. Cir. 2000) (D.C.

Circuit was inclined to agree that statute does not empower a court to authorize the installation of

4

In <u>Gbemisola</u>, the Court of Appeals held that the government did not need a warrant to authorize its conduct because the no warrant was required for the initial opening of the box , as it arrived at the border via international mail. <u>See</u> <u>Gbemisola</u>, 225 F.3d at 758; 759. Additionally, the installation of the tracking device in the packages did not require any additional intrusion because the defendant did not have a reasonable expectation of privacy in the mailed packages. <u>See</u> <u>United States v. Ramsey</u>, 431 U.S. 606, 619 (1977) (holding that neither warrant nor probable cause is required for search of letters sent through international mail).

Unlike, in <u>Gbemisola</u>, Jones did have a reasonable, although lessened, expectation of privacy in his Jeep and when the government seized his vehicle for the purposes of placing the tracker, there was an intrusion for the purposes of the Fourth Amendment. <u>See</u> <u>United States v. Karo</u>, 468 U.S. 705, 712-13 (1984) (holding that placement of tracker did not violate Fourth Amendment unless a reasonable expectation of privacy was infringed). That the police may have been able to view Jones' travels in the Jeep with their own eyes is irrelevant here, because the installation of the tracker was constitutionally defective to begin with. Additionally, the tracker allowed agents to literally follow Jones' every move even when the agents were not physically within sight of Jones. But for the illegal tracker, the agents would not have been able to do that.

*Stop*
*Defendant*
*Respond*

5. The agents did not violate Federal Rule of Criminal Procedure 41(f)

As noted above, once the agents completed their search of Jones's residence, and were leaving the premises, they left a copy of the warrant and the attachment, along with a copy of the search warrant return with Jones's wife, and explained to her what they were taking and why. This is all that Federal Rule of Criminal Procedure 41(f) requires, and thus his motion to suppress on this ground similarly fails.

Because the warrants themselves were valid and their execution was proper, the Court should reject the defendant's contentions that evidence seized during the searches of his home, his Jeep, and his nightclub Levels must be suppressed.

*Delete*
*Start here*    *Government respond*

## IX. MOTION TO SUPPRESS EVIDENCE OBTAINED FROM GLOBAL TRACKING DEVICE

The defendant has moved this Court to suppress the data obtained from a electronic tracking device – a GPS (Global Positioning System) – which was authorized pursuant to a court order by the Honorable Paul L. Friedman on September 16, 2005. As grounds for suppression, the defendant claims that Special Agent Stephanie Yanta's affidavit in support of the application for GPS authorization lacked probable cause to believe that "the Jeep bearing MD tags M667480 was in any manner being used for criminal activity." Def. Omnibus Mot. at 18. Because Jones lacked a reasonable expectation of privacy in the whereabouts of his vehicle, the placement of the GPS device was proper, even in the complete absence of a court order.[12]

---

[12]    On July 23, 2006, 13 days after this Court ordered the defendants to file their pretrial motions, the defendant filed a supplemental motions to suppress the GPS on the additional grounds that (1) Judge Friedman's September 16, 2005, order had expired, and (2) that order did not authorize installation of the device outside the District of Columbia. Setting aside

51    *Suppression issues*

While the government obtained a court order from Judge Friedman as an extra layer of precaution, the Fourth Amendment does not require it, and thus the agents were free to install the GPS device even without such an order. While the case law specific to GPS devices is limited, given the technology's relatively recent vintage, those courts that have squarely confronted the issue of whether or not a court order is required for the installation of a GPS device have uniformly held that such court authorization is not required. See United States v. McIver, 186 F.3d 1119, 1127 (9th Cir. 1999); United States v. Eberle, 993 F.Supp.794 (D. Mont. 1998); United States v. Moran, 349 F.Supp.2d 425, 467 (N.D.N.Y. 2005); cf. United States v. Garcia, 2006 WL 1294579 * 3-5 (W.D. Wisc. 2006) (no warrant used; no concern regarding lack of warrant; court finds that agents merely needed reasonable suspicion that defendant was using vehicle in furtherance of criminal activity for placement of GPS tracking device).[13]

These decisions begin with the basic premise that individuals have significantly reduced expectations of Fourth Amendment privacy in vehicles, because those vehicles serve largely as transportation, and only rarely serve as a residence or place for storing personal effects. John S.

_SUPPRESSION ISSUES_

the issue that the defendant's filing was untimely, based upon a review of the GPS data, and the defendant's supplemental motion, the government concedes that, though the violations of Judge Friedman's September 10, 2005, Order were technical, they were indeed violations, and thus the government confines its arguments to the issue of whether or not a court order was required, and asserts that it was not. See United States v. Gbemisola, 225 F.3d 753, 759 (D.C. Cir. 2000) (issue was whether a warrant for installation of mobile tracking device on package, though "perhaps invalid, was superfluous"; finding that warrant was indeed superfluous, and upholding installation of device and admissibility of evidence derived therefrom).

[13]    While the Court did not decide this issue in United States v. Berry, 300 F.Supp.2d 366, 367 (D.MD 2004), it raised concerns that the data stored by the GPS on the defendant's vehicle in that case might be a product of a search and seizure such that the protections of the Fourth Amendment are triggered. However, because not only did the Court not actually decide the issue, but also because the device in that case differed in significant respects from the GPS device in this case, that case is irrelevant to this Court's present analysis.

Ganz,"It's Already Public: Why Federal Officers Should Not Need Warrants to Use GPS Vehicle Tracking Devices," 95 J. Crim. Law & Criminology 1325, 1337-38 (Summer 2005) (hereinafter "Ganz"), *citing* New York v. Class, 475 U.S. 106, 112-13 (1986) ("cars, unlike homes, are subject to pervasive . . . continuing governmental regulation and controls, including periodic inspection and licensing requirements. . . . Police regularly stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise . . . are noted, or if headlights or other safety equipment are not in proper working order"). Further, as the Moran court noted, privacy expectations in a vehicle are further diminished by the fact that they are available to "public scrutiny." Moran, 349 F.Supp.2d at 467 (where law enforcement installed GPS on defendant's vehicle without a warrant, no Fourth Amendment violation because "law enforcement personnel could have conducted a visual surveillance of the vehicle as it traveled on the public highways"), *citing* United States v. Knotts, 460 U.S. 276, 281 (1983).

These recent GPS cases follow the earlier cases regarding electronic tracking, including Knotts, *supra*, and United States v. Karo, 468 U.S. 705 (1984), which dealt with "beeper" devices that were installed inside containers which were secreted in vehicles. In Knotts, the agents tracked a container of suspected drug-making chemical, which was located in the defendant's vehicle, to a cabin in a secluded area in Wisconsin. Based thereon, they obtained a search warrant, searched the cabin, and discovered both the container and a drug lab. Knotts, 460 U.S. at 279. In upholding the denial of the defendant's motion to suppress the drug lab evidence, the Supreme Court held that:

A person traveling . . . on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [the suspect] traveled over the public streets[,] he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property. . . . Visual surveillance from public places along [target] Petschen's route or adjoining . . . [the premises in question] would have reveal[ed] all of these facts to the police. The fact that the officers . . . relied not only on visual surveillance, but also on the use of the beeper . . . does not alter the situation.

Ganz, at 1334, *quoting* <u>Knotts</u>, 460 U.S. at 281-282 (internal citations and quotations omitted).

Similarly, in <u>Karo</u>, using a similar device, agents tracked to a house in Taos, New Mexico, a container of a different chemical which they suspected of being used to extract cocaine which was secreted in clothing. When they obtained and executed a search warrant based on this information, they recovered contraband. <u>Karo</u>, 468 U.S. at 709-710. Addressing the appellants' assertion that their Fourth Amendment rights were violated by the installation of the device, the Court found that the installation of the beeper did not interfere with their possessory interests, and was therefore not a search. <u>Id.</u> at 712, *cited in* Ganz at 1334. "At most, there was a technical trespass on the space occupied by the beeper . . . {But] a physical trespass is only marginally relevant to . . . whether the Fourth Amendment has been violated. Ganz at 1335, *quoting* <u>Karo</u>, 468 U.S. at 712-713. The <u>Karo</u> Court did, however, make a distinction between monitoring in public, versus private, space, holding that, while the data obtained from the tracker while on the public roads was admissible, that information that was obtained from the tracker while it was inside the private residence was not, because the residents had a justifiable interest in privacy in

54

their home. Karo, 468 U.S. at 715.[14]

Taken together, Knotts and Karo make clear that the installation of the GPS device on Jones's Jeep on September 27, 2005, did not violate his Fourth Amendment rights. Indeed, in United States v. Gbemisola, our Court of Appeals relied on this line of cases in upholding the warrantless installation and monitoring of a precursor device, a "mobile tracking device," on a package in the defendant's possession. 225 F.3d 753, 759 (D.C. Cir. 2000) ("[i]n sum, because no warrant was required for either the installation or use of the mobile tracking device, the fruits of that use were admissible at trial, regardless of the validity of the warrant obtained by the government"). In so ruling, the Court explained that "the device added nothing to what the agents could see with their own eyes. . . . [And further that t]he decisive issue . . . is not what the officers saw, but what they could have seen." Id., citing Karo, 468 U.S. at 713-714, and Knotts, 460 U.S. at 282, 285. Thus, they reasoned, "[a]s one cannot have a reasonable expectation of privacy concerning an act performed within the visual range of a complete stranger," – in Jones's case, the movement of his Jeep on public thoroughfares – "the Fourth Amendment's warrant requirement was not violated." Id., citing Katz v. United States, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment

---

[14]    While this may very well mean that the data obtained from the tracker when the Jeep was parked in the garage attached to Jones's Moore Street home should be suppressed, as a practical matter, this has little impact on the government's proof at trial. Under Karo, the government will be able to present evidence from the GPS as it moved down Moore Street, nearing his home, which the government will argue is sufficient to show where Jones was, for example, in the hours before the search warrant was executed on his home in the early morning hours of October 24, 2005. See generally Ganz, supra, at 1328-1330, for a fuller explanation of how beepers and GPS devices work (beepers are passive radio transmitters which neither store nor collect data, but rather permit real-time tracking; GPS devices utilize a network of at least 24 satellites, which pinpoint the device's longitude and latitude at a precise time, information which the GPS then stores in memory).

*[handwritten: very Important]*

55

FILED

SEP 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )
FOR AN ORDER AUTHORIZING THE        )    MISC. NO. 05 - 0346
USE OF AN ELECTRONIC TRACKING       )
DEVICE IN A GOLD JEEP GRAND CHEROKEE )    UNDER SEAL
AUTOMOBILE, MARYLAND REGISTRATION    )
NUMBER M667480 , VEHICLE IDENTIFICATION )
NUMBER 1J4GW48S71C683464             )

## ORDER AUTHORIZING THE INSTALLATION AND
## USE OF AN ELECTRONIC TRACKING DEVICE

Upon the Application of the United States of America, and the Affidavit of Special Agent

Stephanie Yanta of the Federal Bureau of Investigation, and full consideration having been given to

the matter, the Court finds as follows:

a. there is probable cause to believe that Antoine Jones and others have committed and are

committing violations of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 1956 and 1957.

b. there is probable cause to believe that the vehicle described in the Affidavit of Special

Agent Yanta, described as a Jeep Grand Cherokee, Gold in color, bearing Maryland registration

number M667480 and Vehicle Identification Number 1J4GW48S71C683464 (the "subject vehicle")

is being used by Jones to facilitate the distribution of controlled substances and related money

laundering, in violation of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 1956 and 1957.

c. there is reasonable cause to believe that providing immediate notification of the execution

of the warrant may seriously jeopardize an ongoing investigation pursuant to 18 U.S.C. §§ 3103(a)

and 2705(a)(B)(2).

WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41, and 18 U.S.C. §§ 3117

and 3103(a), it is hereby

**ORDERED** that Special Agents of the Federal Bureau of Investigtion, and other authorized officers, are hereby authorized to do the following:

*[handwritten: Check ??? Here X]*

a. Install and operate an electronic tracking device on the subject vehicle during any part of the day or night. The electronic tracking device may be operated and monitored continuously throughout the period of this Order and may be monitored when the subject vehicle is located in a place where there is a reasonable expectation of privacy.

*[handwritten: No Garages Private]*
*[handwritten: ? Important (When and where)]*

b. Remove the electronic tracking device upon attainment of the objective of the investigation or upon the expiration of this Order, including any extensions, whichever occurs first.

c. The agents and other authorized law enforcement officers are authorized to temporarily appropriate and surreptitiously enter the subject vehicle for the explicit purposes of installing and removing the electronic tracking device, and to temporarily appropriate and surreptitiously reenter the subject vehicle at any time to make mechanical adjustments which may be necessary.

*[handwritten: Rule 41 Here X]*
*[handwritten: Need A search warrant]*

IT IS FURTHER **ORDERED** that this Order may be executed at any hour of the day or night and must be executed no later than ten days from the date of the issuance of this Order.

*[handwritten: This application was sept 16 2005]*
*[handwritten: (They put it on the 27 of sept)]*
*[handwritten: They put the Device on, the 27 of sept, and this Application They Have to suppress all of this Data]*

IT IS FURTHER **ORDERED** that monitoring agents, in the event that the subject vehicle travels outside the territorial jurisdiction of the Court, are allowed to continue to use the electronic tracking device in any jurisdiction.

*[handwritten: Passion]*

IT IS FURTHER **ORDERED** that this authorization to operate the electronic tracking device as a physical surveillance aid must terminate when the objective of the investigation is reached or, in any event, at the end of ninety days from the date of this Order, whichever is earlier.

*[handwritten: However oct 24 2005]*

*[handwritten: Important
I should had Receive A search oct 24 2005.
THIS A CIVIL SUIT]*

*[handwritten: GPS IS DEAD And NO NEW APPLICATION
ORDER OR SEARCH WARRANT. APPLICATION EXPIRES
It WAS INSTALL AFteR executed date.
9726 APPOLO
DR LAke ArbA MS
9/27/05]*

2

IT IS FURTHER **ORDERED** that the Special Agents of the Federal Bureau of Investigation, and other authorized officers, are not required to leave a copy of this Order in any premises or vehicle entered due to the covert nature of this installation and investigation.

IT IS FURTHER **ORDERED** that notification of the surreptitious entry is delayed for a period of 90 days, or until the objectives of the investigation are reached, whichever occurs first.

IT IS FURTHER **ORDERED** that the Application, Affidavit in support thereof, and this Order shall be placed under seal until further order of this Court.

_____
The Honorable Paul L. Friedman
United States District Judge for the District of Columbia

DATED: Sept 16, 2005
Washington, D.C.

All of the cases the Government cites don't pertain to me because the FBI Broke into the Jeep and place an electronic Devices ( G.P.S.) with out a search warrant. Evidence use in a warrantless seizure should be suppress! Read Rule 41 and the 4th Amendment

3

*SEARCH WARRANT?? Affidavit*

**Postponement of the Notice Requirement under Fed. R. Crim. P. 41(d).**

Federal Rule of Criminal Procedure 41(c) states that the agent taking property under a warrant must provide a copy of the warrant to the person in charge of the premises or leave a copy at the place from which the property was taken. However, under 18 U.S.C § 3103(a) such notice may be delayed. See also United Stated v. Villegas, 899 F.2d 1324, 1336 (2d Cir. 1990) (holding prior to adoption of § 3103 that "covert entries without contemporaneous notice may be authorized.") There are two reasons why delayed notice is reasonable here: First, the search warrant is not fully executed at installation, and will not be executed until the device is removed and the authorization period has expired. Second, leaving a copy of the warrant at the place searched (i.e. the subject vehicle) would alert Jones to the presence of the device, completely defeating the purpose of the installation and seriously jeopardizing the ongoing investigation.

**Filing Under Seal.**

We ask that this Application, accompanying Affidavit, and the Court's Order be placed under seal. Inasmuch as this request is part of an ongoing covert investigation, disclosure would not only render this request for authority to place tracking devices moot, it would also endanger the other ongoing aspects of this investigation. Accordingly, these facts present an extraordinary situation and a compelling governmental interest which justify sealing of this Application, the accompanying Affidavit and Order.

4



To navigate within the results and the documents use the buttons below.

---

18 USC Sec. 3117, (Title 18, CRIMES AND CRIMINAL PROCEDURE),   Sec. 3117. Mobile trac

    Sec. 3117. Mobile tracking devices
      (a) In General. - If a court is empowered to issue a warrant or
    other order for the installation of a mobile tracking device, such
    order may authorize the use of that device within the jurisdiction
    of the court, and outside that jurisdiction if the device is
    installed in that jurisdiction.
      (b) Definition. - As used in this section, the term "tracking
    device" means an electronic or mechanical device which permits the
    tracking of the movement of a person or object.
      (Added Pub. L. 99-508, title I, Sec. 108(a), Oct. 21, 1986, 100
    Stat. 1858.)
                           CODIFICATION
      Another section 3117 was renumbered section 3118 of this title.
                           EFFECTIVE DATE
      Section effective 90 days after Oct. 21, 1986, and, in case of
    conduct pursuant to court order or extension, applicable only with
    respect to court orders and extensions made after such date, with
    special rule for State authorizations of interceptions, see section
    111 of Pub. L. 99-508, set out as an Effective Date of 1986
    Amendment note under section 2510 of this title.
                SECTION REFERRED TO IN OTHER SECTIONS
      This section is referred to in section 2510 of this title.

09/27/05 12:05:18 local; 38°54'17"N 76°50'15"W; 0; MD: 9722 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:05:28 local; 38°54'17"N 76°50'15"W; 0; MD: 9722 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:05:38 local; 38°54'17"N 76°50'15"W; 0; MD: 9722 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:05:48 local; 38°54'17"N 76°50'15"W; 0; MD: 9722 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:05:58 local; 38°54'17"N 76°50'15"W; 0; MD: 9722 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:08 local; 38°54'16"N 76°50'15"W; 3; MD: 9714 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:18 local; 38°54'16"N 76°50'15"W; 0; MD: 9714 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:28 local; 38°54'16"N 76°50'15"W; 0; MD: 9714 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:38 local; 38°54'16"N 76°50'15"W; 0; MD: 9714 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:48 local; 38°54'16"N 76°50'15"W; 0; MD: 9714 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:06:58 local; 38°54'16"N 76°50'15"W; 2; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:08 local; 38°54'16"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:18 local; 38°54'16"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:28 local; 38°54'16"N 76°50'15"W; 3; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:38 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:48 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:07:58 local; 38°54'17"N 76°50'15"W; 2; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:08 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:18 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:28 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:38 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:48 local; 38°54'16"N 76°50'15"W; 4; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:08:58 local; 38°54'16"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:08 local; 38°54'16"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:18 local; 38°54'16"N 76°50'15"W; 2; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:28 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:38 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:48 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:09:58 local; 38°54'16"N 76°50'15"W; 0; MD: 9716 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:08 local; 38°54'17"N 76°50'15"W; 2; MD: 9718 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:18 local; 38°54'17"N 76°50'15"W; 0; MD: 9718 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:28 local; 38°54'17"N 76°50'15"W; 2; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:38 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:48 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:10:58 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:08 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:18 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:28 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:38 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:48 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:11:58 local; 38°54'17"N 76°50'15"W; 2; MD: 9724 APOLLO DR, Lake Arbor, USA_MD
09/27/05 12:12:08 local; 38°54'17"N 76°50'15"W; 0; MD: 9724 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:07:45 local; 38°54'17"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:07:55 local; 38°54'16"N 76°50'14"W; 3; MD: 9706 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:08:05 local; 38°54'16"N 76°50'14"W; 0; MD: 9706 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:08:15 local; 38°54'16"N 76°50'14"W; 0; MD: 9706 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:08:25 local; 38°54'17"N 76°50'15"W; 3; MD: 9712 APOLLO DR, Lake Arbor, USA_MD

10/14/05 15:08:35 local; 38°54'17"N 76°50'15"W; 0; MD: 9712 APOLLO DR, Lake Arbor, USA_MD

10/19/05 12:58:07 local; 38°38'02"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:17 local; 38°38'02"N 76°56'03"W; 1; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:27 local; 38°38'03"N 76°56'02"W; 6; MD: 10949 MOORE ST, Waldorf, USA_MD

10/19/05 12:58:37 local; 38°38'03"N 76°56'02"W; 2; MD: 10949 MOORE ST, Waldorf, USA_MD

10/19/05 12:58:43 local; 38°38'03"N 76°56'03"W; 8; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:44 local; 38°38'03"N 76°56'03"W; 4; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:45 local; 38°38'03"N 76°56'03"W; 2; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:46 local; 38°38'03"N 76°56'03"W; 3; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:47 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:48 local; 38°38'03"N 76°56'03"W; 4; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:49 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:50 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:51 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:52 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:53 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:54 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:55 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:56 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:57 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:58 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:58:59 local; 38°38'03"N 76°56'03"W; 17; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:00 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:01 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:02 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:03 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:04 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:05 local; 38°38'03"N 76°56'03"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:06 local; 38°38'02"N 76°56'03"W; 14; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:07 local; 38°38'02"N 76°56'04"W; 5; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:08 local; 38°38'03"N 76°56'04"W; 2; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:09 local; 38°38'03"N 76°56'04"W; 5; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:10 local; 38°38'03"N 76°56'04"W; 0; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:11 local; 38°38'03"N 76°56'04"W; 3; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:12 local; 38°38'03"N 76°56'04"W; 8; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:13 local; 38°38'03"N 76°56'04"W; 5; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD

10/19/05 12:59:14 local; 38°38'03"N 76°56'03"W; 5; MD: 10998 BUENA VISTA CT, Waldorf, USA_MD



LAst entry GPS DAtA
While the FBI Agents AND
M.P.D. DEtective was illigally
seaching the modest house

Steven Kirschner - direct

**20**

```
 1   A   No, it isn't.
 2   Q   In essence, it's just used to see where someone might
 3   be; is that right?
 4   A   That is correct.
 5   Q   And you are only aware of one GPS system that was used
 6   in this case; is that right?
 7   A   That is correct.
 8       MR. McDANIEL:   Thank you.
 9       THE COURT:   Mr. Aaree?  No.  Anything else, Mr.
10   Geise?
11       MR. GEISE:   Court's indulgence.  Nothing, Your
12   Honor.
13       THE COURT:   Thank you, you may step down.
14       (Witness excused.)
15       THE COURT:   Call your next witness.
16       MS. LIEBER:   The Government calls Detective Steve
17   Kirschner.
18       STEVEN KIRSCHNER, GOVERNMENT WITNESS, SWORN
19                 DIRECT EXAMINATION
20   BY MS. LIEBER:
21   Q   Good morning, sir.
22   A   Good morning.
23   Q   In a nice, clear voice, can you please introduce
24   yourself to the jury and spell your last name for the Court
25   Reporter.
```

**30**

```
 1   A   I'm Detective Steve Kirschner, K-I-R-S-C-H-N-E-R.  I'm a
 2   detective with the Metropolitan Police Department,
 3   Washington, D.C.
 4   Q   Detective Kirschner, how long have you worked for the
 5   Metropolitan Police Department?
 6   A   Over 26 years now.
 7   Q   Where are you currently assigned?
 8   A   I'm assigned to the violent crime branch at the Safe
 9   Streets Task Force.
10   Q   How long have you worked for the Safe Streets Task
11   Force?
12   A   Around 14 years now.
13   Q   Detective Kirschner, remind the jury what is the Safe
14   Streets Task Force.
15   A   It's a Metropolitan Police Department and FBI task
16   force.  Sometimes we have some A.T.F. agents, U.S. marshals
17   and other agents on our squad, and our goal is to investigate
18   drug gangs and violent drug gangs in the Washington, D.C.
19   area.
20   Q   Now, Detective Kirschner, prior to joining the Safe
21   Streets Task Force, what else did you do for the Metropolitan
22   Police Department?
23   A   I was an officer at the Third District Drug Enforcement
24   Unit.  Before that uniformed patrol.  And I was a member of
25   the Repeat Offenders Unit, which fell under N.S.I.D., which
```

**31**

```
 1   is Narcotic and Special Investigations Division.
 2   Q   Have you done a lot of narcotics investigations in the
 3   course of your 26 plus years?
 4   A   Mostly about 23 years worth of narcotics.
 5   Q   Now, Detective Kirschner, I want to direct your
 6   attention to the Antoine Jones investigation.  Did you work
 7   on that in 2004 and 2005?
 8   A   Yes, I did.
 9   Q   And actually to this day?
10   A   Yes, Ma'am.
11   Q   Was there a team of agents that you worked with on this
12   investigation?
13   A   Yes.
14   Q   In the course of working with this team, did you develop
15   sort of one area that was your focus?
16   A   Yes, I took liaison role of working with the tech squads
17   with our GPS and our videos.
18   Q   Now, Detective Kirschner, did you also personally
19   conduct eyeball, visual surveillance from time to time?
20   A   Yes.
21   Q   Who did you generally work with on the visual
22   surveillance, who on your team?
23   A   It was Special Agent Stephanie Yanta, Detective Norma
24   Horne, Kellie, also Kellie O'Brien, and Special Agent Cliff
25   Swindell.
```

**32**

```
 1   Q   Now, Detective Kirschner, did there come a time that
 2   your team of investigators decided to employ a GPS device on
 3   a particular vehicle with respect to this investigation?
 4   A   Yes, there was.
 5   Q   What vehicle was that?
 6   A   It was a jeep that was used by Antoine Jones.
 7   Q   Why did you all decide that that might be a helpful
 8   investigative tool?
 9   A   He was very mobile, driving a car to a lot of meets and
10   stuff, which we picked up on the Title 3 wire.  And to do
11   physical surveillance it's too easy to get spotted.  When you
12   have all the time and energy invested in a Title 3, you try
13   to do the best you can.  So we went with the GPS so we could
14   mark and watch where he was going.
15       THE COURT:   Title 3, just to remind the jury, is
16   what please?
17       THE WITNESS:   Oh, I'm sorry.  It's the wire itself,
18   listening to Mr. Antoine Jones' cell phone.
19       THE COURT:   It's the statute, ladies and gentlemen,
20   that allows the law enforcement to obtain wiretaps among
21   other things.
22   BY MS. LIEBER:
23   Q   Detective Kirschner, give the jury a sense of this.
24   After you all installed the GPS tracking device on Mr. Jones'
25   jeep, were you able to monitor in real time where he was
```

25

1  in this particular case was ever checked?
2  A  We don't check the addresses. We just give a mapping
3  system and it plots it right on there.
4  Q  So you're basically saying you just trust the machine?
5  A  Right.
6        MR. BALAREZO:  I have nothing else. I'm sorry,
7  Your Honor.
8  BY MR. BALAREZO:
9  Q  In your experience with using this particular type of
10  device, let's say one was placed on a subject --
11       THE COURT:  A person or a car?
12       MR. BALAREZO:  It was placed usually on a car,
13  right, or a vehicle?
14       THE WITNESS:  Right.
15  BY MR. BALAREZO:
16  Q  Okay. As an example, let's say a device has been placed
17  on the vehicle and there happened to be a take down on
18  October 24, 2005, let's say as an example. Do the agents
19  normally disable the device at the time of the take down?
20  A  It all depends on the case agent. I couldn't tell you.
21  Everybody runs their operation a little different. So I
22  couldn't tell you how they disable their device.
23  Q  And is the device, you said, can it be disabled then
24  remotely?
25  A  Yes, it can.

26

1  Q  And you don't know whether or not that was the case in
2  this situation?
3  A  No.
4        MR. BALAREZO:  Nothing else, Your Honor.
5        THE COURT:  Mr. Norris, no?
6                    CROSS EXAMINATION
7  BY MR. McDANIEL:
8  Q  Good morning, sir.
9  A  Good morning.
10  Q  How many cases have you been responsible for the
11  application of a GPS system in connection with an
12  investigation?
13  A  Personally or supervised?
14  Q  Either.
15  A  Probably over 300.
16       THE COURT:  How does the device get in the car
17  again? I'm sorry. I may have missed that. You went over
18  that with Mr. Geise. Just remind me.
19       THE WITNESS:  The device is usually placed by a
20  technical agent on the vehicle.
21       THE COURT:  Where do you generally put it so people
22  don't know about it?
23       MR. GEISE:  Your Honor, if we might approach
24  briefly.
25       THE COURT:  Nevermind, I'll take back my question.

27

1  I guess this is information we don't even need or I shouldn't
2  ask. I'm just curious.
3        MR. GEISE:  You put your finger on it, Your Honor.
4        THE COURT:  I get it.
5        MR. McDANIEL:  We'll have everybody going back to
6  check their cars in a minute.
7        THE COURT:  Skip it. I withdraw the question.
8  BY MR. McDANIEL:
9  Q  You said 300 and this is since when? Which year did you
10  start?
11  A  1996.
12  Q  Can you explain to us the process by which a
13  determination is made to place a GPS system on a particular
14  car, in a particular location to attempt to track either an
15  individual or a vehicle?
16  A  That actually comes from the case agent. It doesn't
17  come from us.
18  Q  So, the process then is that the case agent will ask you
19  to apply a GPS system to a particular suspect or a vehicle;
20  is that right?
21  A  Right.
22  Q  Is there a permission that you need to get from the
23  Court before you can attach a GPS system to a vehicle?
24       MR. GEISE:  Objection.
25       THE COURT:  That's a very complicated issue and

28

1  it's a legal matter. So I would sustain that objection. I
2  think I even wrote on this, didn't I?
3        MR. McDANIEL:  Very well.
4  BY MR. McDANIEL:
5  Q  Are you familiar with the request for the GPS system to
6  be used in this investigation?
7  A  No, I'm not.
8  Q  Are you familiar with how the GPS system was used in
9  this case?
10  A  Familiar as in what?
11  Q  Have you reviewed any of the GPS information, any of the
12  analysis that was provided by way of discovery related to the
13  GPS system?
14  A  I've only reviewed probably a page.
15  Q  Now, the GPS system, and you said it was Wind Talk that
16  you all used, the FBI, is that right?
17  A  That was actually -- the mapping system is called Wind
18  Track.
19  Q  Wind Track, okay. And Wind Track, as a software system,
20  is able to identify addresses for you given the location of
21  the GPS system; is that right?
22  A  That's correct.
23  Q  But listening to your testimony, it doesn't sound like
24  an exact science, meaning, is this information used in the
25  verification of addresses for individuals say for instance?

**33**

1  going?

2  A  Yes.  We had a computer that had mapping software on it.

3  And when it connected on real time, we were able to monitor

4  where he was going.

5  Q  How does it, what does that look like?  How does it,

6  when you're sitting in the FBI field office trying to figure

7  out where Mr. Jones is at any particular point in time, how

8  can you tell?

9  A  On the computer screen it looks like a map like a

10 Microsoft street maps or even the A.D.C. books that you buy

11 with street maps on it.  And as he moves there's an icon  and

12 it leaves a little dot as it's moving.

13 Q  Did you actually watch that mapping software constantly

14 throughout the course of the time that the GPS was on

15 Mr. Jones?

16 A  No, we didn't.

17 Q  Did you check it from time to time?

18 A  Yes.  Even though you're not watching it, it records and

19 stores the movements of the GPS.

20      THE COURT:  In other words, you don't have to be

21 there?  You can go backwards and see?

22      THE WITNESS:  Yes, Ma'am  You can go back and look

23 historically where he's been.

24 BY MS. LIEBER:

25 Q  And what would cause you to go back and look

*Civil Suit*

**34**

1  historically to see where he was on a particular date and a

2  particular time?

3  A  Reviewing the phone calls that came in, if an important

4  call came in, we can go back.  If he was meeting somebody, we

5  can go back and see where he went to meet.

6  Q  Did you do that from time to time during the course of

7  the time that the GPS was live on Mr. Jones' Jeep?

8  A  Yes, we did.

9  Q  Since the case was taken down at the end of October of

10 2005, have you gone back personally and reviewed the entire

11 GPS data disk?

12 A  Yes, I have.

13 Q  How big is that data file?

14 A  It's very big.  Actually the text file is actually too

15 big to print out properly, but you can scan through it  and --

16 there was two different things.  There's the text that comes

17 out which has date and time, it's the Latin long coordinates

18 and a street map location.  And the other one was with

19 mapping software, which actually shows the icon on a map.

20 Q  And Detective Kirschner, just so everybody gets this,

21 just so I get it, do you take the disk full of the data with

22 all the latitude and longitude and pop it into the computer

23 that has the mapping software on it?

24 A  I don't.  The tech guys set it up.

25 Q  Okay.

*Civil Suit*
*No counter order*

**35**

*Civil Suit*

1  A  I'm not sure how it works.  But we have them set up with

2  both so you can find it on the text, which now you can search

3  for it on the mapping software.

4  Q  When you actually reviewed on the mapping software, was

5  that based on the data that you obtained from the GPS device

6  itself?

7  A  Yes, it was.

8  Q  When did you all begin the GPS surveillance on

9  Mr. Jones' truck?                              *Civil Suit*

10 A  The GPS was installed on September 27th, around noon.

11 Q  And did there come a time that you stopped receiving

12 data from the GPS?

13 A  Yes, the GPS, the one we used runs on batteries, and the

14 batteries died on October 14th around 3:00 P.M.

15 Q  Did there come a time that you all changed the

16 batteries?

17 A  Yes.                                    *Important*

18 Q  When was that?

19 A  It was, once again, the morning of October 19th close to

20 noon.

21 Q  Detective Kirschner, why did it take you all five days

22 to change a battery?

23      MR. BALAREZO:  Objection, Your Honor, relevance.

24      THE COURT:  No, overruled.

25      THE WITNESS:  It's to get the car isolated so the

*Need copy*

**36**

1  the tech guy can get underneath it and do the work he has to

2  do without getting spotted.  *very important*

3  BY MS. LIEBER:                  *Civil Suit*

4  Q  Did you make any attempts in that five-day period to get

5  the Jeep isolated?

6      MR. BALAREZO:  Objection.

7      THE COURT:  Overruled.

8      THE WITNESS:  Yes, in fact, the morning that we

9  were able to get a new battery pack on it, Detective Joe

10 Zapata was monitoring it.  And he called me, and said

11 the Jeep was isolated.  Through a phone call, we found out

12 Mr. Jones was going to the gym --  *Jeep was*

13      THE COURT:  Wait a minute.    *at the house*

14 BY MS. LIEBER:

15 Q  Without getting into all the details, did you learn,

16 based on interceptions of Mr. Jones' conversations, a

17 timeframe in which you thought the Jeep might be unattended?

18 A  Yes.

19 Q  Now, I want to talk to you a little bit about specific

20 data points.  You reviewed all the GPS data, is that right?

21 A  Yes, Ma'am

22 Q  Okay.  And were there times that you just couldn't

23 figure out where Mr. Jones was going?

24 A  Yes.

25 Q  Were there times when you could figure out where he was

*Need copy*

37

1  going?

2  A  Yes.

3  Q  And we'll talk in the coming weeks about some of these

4  other locations, but today I want to focus on 9508 Potomac

5  Drive in Fort Washington, Maryland, okay?

6  A  Yes, Ma'am

7  Q  And tell the jury, in your mind during the course of the

8  investigation, how did 9508 Potomac Drive become important to

9  you?

10  A  It became identified as the location where the supply of

11  drugs we believed were located.

12  Q  How did you actually pinpoint that specific residence,

13  9508?

14  A  I didn't actually pinpoint it, but I know the method

15  that was used.

16  Q  What method was used?

17  A  GPS through cell phones.

18  Q  Okay.  When you say "through cell phones," what does

19  that mean?

20  A  Through a cell phone company, you can, on certain

21  phones, maybe all by now, you can pinpoint --

22  MR. BALAREZO:  Objection again, personal knowledge.

23  THE COURT:  I don't think -- he's talking about a

24  system in general at the moment.

25

NEED COPY

38

BY MS. LIEBER:

1  BY MS. LIEBER:

2  Q  Right.  Let me just do this.  Did there come a time

3  that, through various technological measures, you pinpointed

4  the actual house, 9508 Potomac Drive?

5  A  Yes, through technical methods and also we went out and

6  checked the neighborhood and helped narrow it down just to

7  confirm it.

8  Q  Okay.

9  MS. LIEBER:  Your Honor, at this time I'm going to

10  show the defense what I've marked as 9508-GPS-2 through

11  9508-GPS-12.

12  THE COURT:  Is that the 031 exhibit list?

13  MS. LIEBER:  Yes.

14  THE COURT:  Two through 12, any objection?

15  MR. BALAREZO:  Not at the moment, Your Honor.  I'm

16  showing it to the rest of --

17  MS. LIEBER:  Your Honor, since I have the time,

18  I'll also show 9508-GPS-1, a separate exhibit.

19  MR. NORRIS:  No objection.

20  THE COURT:  Those will be admitted.  Did you offer

21  1, as well as 2 through 12?

22  MS. LIEBER:  Yes, Your Honor, I am going to offer

23  them all at the same time.

24  THE COURT:  All right.  I don't hear an objection

25  so they will all go in, all the GPS-1 through 12.

39

1  MS. LIEBER:  Thank you, Your Honor.

2  (Government Exhibit Numbers 9508-GPS-1

3  through 9508-GPS-12 were admitted into evidence.)

4  BY MS. LIEBER:

5  Q  Now, Detective Kirschner, before we start looking at

6  these things, did you identify, based on the GPS tracking

7  system each time Mr. Jones' Jeep went to 9508 Potomac Drive?

8  A  Yes, Ma'am.

9  Q  And were you able to identify times that he was there

10  between October 14th and October 19th when the tracking

11  device was dead?  Does that make any sense?

12  A  No, I wasn't able to, by GPS, no.

13  Q  Okay.  And using the mapping software that we've been

14  discussing, did you actually print off pictures, sort of

15  snapshots of what the GPS mapping software looks like at a

16  particular date and time?

17  A  Yes, Ma'am.

18  Q  Did you also, and I'll show you Government's Exhibit

19  9508-GPS-1, did you put together this summary exhibit of

20  calls that you intercepted on the wire and corresponding GPS

21  data?

22  A  Yes, Ma'am.

23  Q  Okay.  Let's just, if you will look at the first entry,

24  so we can sort of explain how this works to the jury.  On

25  September 27, 2005, that's the day that the tracker went on;

40

1  is that right?

2  A  Yes, Ma'am

3  Q  Was there a call that was intercepted that then

4  corresponded later to a GPS hit, in other words, Mr. Jones'

5  Jeep at 9508?

6  A  Yes, there was Call Number 2602 and the time of the call

7  was 8:54 P.M.

8  Q  What was the content of the call, the call summary?

9  A  Coming to see you later on.

10  Q  Okay.  That's something Mr. Jones said?

11  A  Yes.

12  Q  Did he, in fact, based on your review of the GPS map

13  data, did Mr. Jones' Jeep actually go to Potomac Drive later

14  that evening?

15  A  Yes, Ma'am

16  Q  What time did he arrive to Potomac Drive?

17  A  9:51 P.M.

18  Q  What time did he depart from Potomac Drive?

19  A  About 10:31 P.M.

20  Q  Without going through each of the rest of this, each of

21  the calls that you have noted here on the summary exhibit, do

22  they have a corresponding GPS snapshot?

23  A  Yes.  The ones that they went to the location, yes,

24  Ma'am

25  Q  Did you also include certain relevant calls that didn't

**73**

1        MR. BALAREZO: Time was?

2        THE WITNESS: Yes.

3        MR. BALAREZO: I think that was his example, Your

4 Honor. I don't think there was testimony that it was

5 actually a minute.

6        THE WITNESS: Yes, it was.

7 BY MR. BALAREZO:

8   Q  Now, with respect to the questions you got from the

9 prosecutor about Steed Road, you never saw Mr. Jones out

10 there, correct?

11   A  No, I have not.

12   Q  And when you talked about this mysterious airport, you

13 never saw Mr. Jones there, correct?

14   A  It's an airport. I know it's there, but, no, I never

15 saw Mr. Jones.

16   Q  You never saw him at the airport, right?

17   A  No.

18   Q  You never saw him unloading drugs? You never saw him

19 receiving drugs anywhere near that airport, correct?

20   A  No, sir.

21   Q  Now, during the course of the investigation, or at least

22 during the time that the tracker was in place, did you

23 maintain it in any way and I'm talking about you personally?

24   A  What do you mean by maintain?

25   Q  Did you make sure that the battery was fine? Did you

**74**

1 check it occasionally?

2   A  There is no way to do that. There is no way that I know

3 of to do that.

4   Q  Well, you did testify that at some point the battery

5 died, right?

6   A  Yes.

7   Q  And I believe you said that that was on October the 14th

8 at about 3:00 P.M.?

9   A  Yes, sir.

10   Q  And that it was dead until about October the 19th at

11 about 12:58 in the afternoon, around 1:00 o'clock in the

12 afternoon?

13   A  I said around noonish or so.

14   Q  Did you yourself change the battery or replace the

15 battery?

16   A  No.

17   Q  Do you know who did?

18   A  Yes.

19   Q  Who changed the battery?

20   A  Special Agent Brooks.

21   Q  And is Special Agent Brooks, to your knowledge, familiar

22 with the workings and/or maintenance of GPS trackers?

23   A  I don't know.

24   Q  Do you know where the jeep was at the time that the

25 battery was replaced?

*[handwritten: very important Civil suit]*

**75**

*[handwritten: Perjury]*

1   A  Yes.

2   Q  Where was that?

3   A  It was in front of Gold's gym in Waldorf.

4   Q  Gold's gym in Waldorf?

5   A  Yes.

6   Q  Now, being that you were the liaison during this period

7 of time with respect to the tracker, you are familiar with

8 that large document of data that the GPS gave, correct, all

9 the coordinates and the dates?

10   A  Yes.

11   Q  And that is about a 2,000, 2,300 page document?

12   A  I didn't attempt to print it out because it was just too

13 large, yes, sir.

14      MR. BALAREZO: Your Honor, could I consult with Ms.

15 Lieber for one second?

16      THE COURT: Yes.

17      (There was a pause in the proceedings.)

18      MR. BALAREZO: Your Honor, I'm going to show the

19 witness my laptop, in effect, for a screen shot. What I'll

20 do is a print it subsequently and mark it as an exhibit, and

21 I'll number it as an exhibit now. It's part of the text of

22 the data.

23      MS. LIEBER: If I may, Your Honor.

24      (There was a pause in the proceedings.)

25

**76**

1      MR. BALAREZO: This will be Number 18.

2      THE COURT: Do you have any objection to this

3 particular piece of paper?

4      MR. LIEBER: No, I don't. Your Honor, I don't

5 object to him subsequently printing off that snapshot page

6 and moving it in that way.

7      THE COURT: You want to move it into evidence?

8      MR. BALAREZO: I will move it in.

9      THE COURT: All right. Okay.

10 BY MR. BALAREZO:

11   Q  Now, sir, do you recognize what that page in front of

12 you is?

13   A  Yes.

14   Q  What is it?

15   A  It looks like a copy of the GPS text file.

16   Q  Do you see I've highlighted in red and bolden, so it's

17 easier to see, what are the two dates or the two coordinates

18 that I've bolden?

19   A  The first line is on 10-14-05 at 15:08, which is 3:08

20 P.M.

21   Q  And what significance does that time and date have?

22   A  That's the last coordinate before the batteries or

23 before the power died.

24   Q  What about the very next entry? What is that?

25   A  It says 10-19-05 at 12:58 hours.

*[handwritten: Civil suit]*

*[handwritten: Need copy]*

77

1  Q   What's the importance of that particular date and time
2  and coordinate?
3  A   Well, that date is the date that new batteries were put
4  on the GPS.
5  Q   So is it accurate then to say that that is the data from
6  the GPS tracker up until the point that the battery died and
7  up until the point that the battery was replaced?
8  A   Yes, but on 10-19 where it says 12:55, the unit was, the
9  power was put on before that.  I can only, it might have been
10 in sleep mode at the time or something.
11 Q   It might have been but you don't know, correct?
12 A   Well, I know where it was put on.  And I know it didn't
13 kick in right away because I sat out there and waited.
14 Q   Let me ask you this.  The entry for October the 19th at
15 12:55 P.M., where does the data indicate that the tracker was
16 at that point in time?
17 A   What entry?
18 Q   The October --
19 A   This one says, 10998 Buena Vista Court in Waldorf,
20 Maryland.
21 Q   And are you familiar with that area to sufficient to
22 know that that is basically the location where Mr. Jones
23 lived?
24 A   Which is right down the street from the Gold's gym.
25 Q   From Moore Street though, right?

*Civil suit*

*Very Important*

78

1  A   Yes.
2       THE COURT:  I'm sorry.  Are you familiar with the
3  area sufficiently to know that it's where Mr. Jones lived?
4  What is the area that he lives in?
5       THE WITNESS:  Moore Street.
6       THE COURT:  Where is that in relation to what?
7       THE WITNESS:  Well, to the gym it's around the
8  corner.  But this is, I believe, a street in the
9  neighborhood.
10      THE COURT:  What neighborhood?  In what
11 neighborhood?
12      THE WITNESS:  Mr. Jones's neighborhood.
13      THE COURT:  Okay.
14 BY MR. BALAREZO:
15 Q   Let me ask you specifically so the record is clear.
16 October the 19th at 12:55:07, with the coordinates that I'm
17 showing you, what address does the tracker indicate that it
18 was located?
19 A   10998 Buena Vista Court.
20 Q   Okay.  The next, let's say ten entries, approximately
21 how much time elapses in the next ten entries?
22 A   It's a minute or two.
23 Q   Where does the GPS tracker indicate this location?
24 A   Buena Vista.
25 Q   The same as where it came on?

*Very Important*

79

1  A   Yes, sir.
2  Q   For the next page or so, how much time has elapsed that
3  you can tell?
4  A   Now, it says 12:59.
5  Q   How much time is that from the --
6  A   From 12:55.
7  Q   Where does the tracker indicate that it was located?
8  A   Moore Street, at 10949 Moore Street.
9       THE COURT:  Is that his home?  Is that what you're
10 saying?
11      MR. BALAREZO:  I think the Government will
12 stipulate it was 10870 Moore Street was the address,
13 M-O-O-R-E.
14      THE WITNESS:  The tracking device doesn't give out
15 exact addresses.
16      THE COURT:  I know.  I understand, but I didn't
17 understand the Moore Street.  Okay.
18 BY MR. BALAREZO:
19 Q   So, based on your experience with this particular
20 tracker and the data that it gave out, isn't it fair to say
21 then that the tracker was located at Mr. Jones's home at the
22 time that it came back on, on October the 19th of '06, not at
23 Gold's gym?
24 A   At the time it kicked on, yes.
25 Q   It was at his house?

80

1  A   It was installed at Gold's gym.
2  Q   Well, you didn't install it, right?
3  A   I was there.
4  Q   What time was it installed at Gold's gym?
5  A   Approximately an hour or so.
6  Q   So it took it an hour to come back to life?
7  A   They were inside the gym working, they were in the gym.
8  Q   Who is they?
9  A   Mr. Jones and Mrs. Jones.
10 Q   But that's not what I asked.  What I asked is it took an
11 hour for the tracker to come back once the battery was
12 reinstalled?
13      THE COURT:  I'm not sure that's what he's saying.
14      MR. BALAREZO:  Well, that's what I'm asking, Your
15 Honor.
16      THE COURT:  Where was it in a parking lot?
17      THE WITNESS:  It was still in a parking lot.
18      MR. BALAREZO:  My question once again, and I know
19 English is not my first language, Your Honor, but I'm trying
20 to make it clear.
21 BY MR. BALAREZO:
22 Q   Did it take the battery an hour to kick in from the time
23 it was installed until that period at 12:55, where it shows
24 that it was at Buena Vista?
25 A   I'm not a tech guy, but you're saying the battery turn

81

```
 1   on. The battery was attached. The unit probably didn't turn
 2   on until then, the sleeper mode is what I've been told.
 3   Q   But you don't know because that's what somebody else
 4   told you, right?
 5   A   Yes.
 6   Q   All right. From the time that it was installed that you
 7   said it was about an hour prior to 12:58, wouldn't you have
 8   wanted the device to come on right away to make sure that it
 9   was working and that it was giving you a precision and giving
10   you data?
11   A   Yes, I was sitting there with the tech guys waiting for
12   it to engaged.
13   Q   So you sat there for an hour?
14   A   Probably more.
15   Q   Well, then did you follow it to the Buena Vista Street?
16   A   No.
17   Q   Okay. So, if you were waiting for it for more than an
18   hour, where were you at that time?
19   A   In the parking lot.
20   Q   Of what?
21   A   Gold's gym, that shopping center.
22   Q   What's the address of Gold's gym?
23   A   I don't know it off hand.
24   Q   But you would agree that it's not on Buena Vista or on
25   Moore Street, correct?
```

82

```
 1   A   No, it's down the street.
 2   Q   Now, do you know when the GPS tracker stopped
 3   transmitting for good?
 4   A   For good, you talking about at the end?
 5          THE COURT: When was it deactivated I guess?
 6          THE WITNESS: On the 24th?
 7          MR. BALAREZO: Right.
 8          THE WITNESS: No.
 9   BY MR. BALAREZO:
10   Q   Did you deactivate it?
11   A   No.
12   Q   Do you know who did?
13   A   No.
14   Q   Do you know whether it was deactivated before or after
15   the take down?
16   A   After.
17   Q   After the take down?
18   A   Yes.
19   Q   Do you know what time, specifically with respect to the
20   Moore Street address, Mr. Jones's address, do you know when
21   law enforcement entered that home?
22   A   Entered Moore Street?
23   Q   Yes.
24   A   No, I don't.
25   Q   Do you know if they had a search warrant?
```

83

```
 1          MS. LIEBER: Objection.
 2          THE COURT: Sustained.
 3   BY MR. BALAREZO:
 4   Q   Let me show you what I'll mark as Jones Exhibit Number
 5   11. You've indicated that the tracker was shut down or
 6   deactivated after the take down, right?
 7   A   Yes.
 8   Q   Do you recognize what I've shown you as Number 11?
 9   A   Yes.
10   Q   What is that?
11   A   That's a date and time and a location.
12   Q   And you said you were familiar with the data that the
13   GPS tracker gave out, correct?
14   A   Yes.
15   Q   All right. Now is it accurate then to say that that
16   last entry -- and can you tell us what that last entry was?
17   A   It's 10-24 at 8:21 A.M.        Illegal search
18   Q   Based on your knowledge and familiarity with the data        civil suit
19   from the GPS tracker, isn't it accurate that that particular
20   entry is the last one that was given out or made by the GPS
21   tracker?
22   A   It's the last one given out. When the vehicle was
23   seized, it was taken to a secret location. So that there's
24   more data, but it's cut off for that reason.
25          THE COURT: That's the last activation prior to
```

84

```
 1   seizure. Is that what you're saying?
 2          THE WITNESS: No, this was the last location of the
 3   vehicle. The rest of the data is on a different data disk.
 4          THE COURT: Okay. But that's because somebody else
 5   has the vehicle?
 6          THE WITNESS: We had possession of the vehicle at
 7   that time.
 8          THE COURT: That's the last one before the police
 9   got possession of the vehicle?
10          THE WITNESS: I'm not sure what time they got
11   possession of the vehicle, but there is more text, but it was
12   cut for that reason.
13          THE COURT: But the text relates to where the
14   police took the vehicle?
15          THE WITNESS: This could be where it went to sleep,
16   the equipment.
17          THE COURT: Okay.
18   BY MR. BALAREZO:
19   Q   The prior question that I asked you was, was the device
20   deactivated before or after the take down, and you indicated
21   that it was deactivated after the take down, right?
22   A   Yes.
23   Q   You don't know what time the take down happens?
24   A   No.
25   Q   The last entry that's on that particular sheet that I've
```

Very Important                    Very Important

85

1   shown you is at 6:21 in the morning on October the 24th,
2   right?                    *Civil Suit*
3   A   Yes.
4   Q   Now, if I were to tell you that that is the last entry
5   on the data that was provided by the Government to the
6   defense, would that be complete or incomplete?
7   A   I don't know.  I know there is more data to this.  I
8   know that.
9   Q   Have you provided that to the Government?
10  A   I don't know.  I'm not sure.
11  Q   Well, did you provide any of that data to the
12  Government?
13          MS. LIEBER:  Objection.
14          THE COURT:  Let's approach.
15          (Bench conference.)
16          THE COURT:  Where are we going here?
17          MR. BALAREZO:  What time is the take down again?
18  It was about six in the morning.
19          MS. LIEBER:  That's right.
20          THE COURT:  Where are we going?  You want to prove
21  there was some other piece of paper after the take down?
22          MR. BALAREZO:  That's what I found out for the
23  first time.  Exhibit Number 11 is the last page of the GPS
24  data that the Government provided to us.  Looking from that,
25  it indicates to me that it shut down or stopped transmitting

86

1   at that time.
2           THE COURT:  So he was not driving between 6:21
3   and --
4           MR. BALAREZO:  It was in the garage.  All I'm
5   trying to get is what time the actual device was deactivated,
6   it was not working anymore.  The data here indicated to me
7   that it was at 6:61.  All I'm trying to get at is that when
8   it actually stopped because it does make a difference.  The
9   police went in at 6:61 or 6:21 and deactivated the GPS
10  tracker.  The jeep was in the house.
11          This goes back to the suppression issue that I had
12  before.  I did not have that data before because the
13  Government didn't provide me the remainder of the sheets.  So
14  I can't tell if it stopped.  I'm trying to clarify something.
15          THE COURT:  He doesn't know.  But did you give him
16  incomplete discovery?
17          MS. LIEBER:  I gave him everything I had.  The
18  question I directed is did you give the Government the disks?
19  This is not a discovery fight.  He can testify based on what
20  he knows.  That's what he is doing.  This is the disk that
21  was provided to me.  This is the disk that I burned a second
22  copy of and gave to Mr. Balarezo.  So to repeatedly ask him
23  when does this tape, he doesn't know.  He said he doesn't
24  know.
25          MR. BALAREZO:  If the Government puts forth the

*Very Important*

87

1   person who basically ran the tracker during the
2   investigation.
3           THE COURT:  What's your question?  Is there other
4   data apparently relating to the seizure, which apparently has
5   nothing to do with this?  You keep asking him whether there
6   is something after this prior to the take down.  The answer
7   is no.
8           MR. BALAREZO:  The reason I asked is based on this
9   piece of paper that I printed out from the Government's disk.
10  It indicates 6:21 is when the thing stopped transmitting, was
11  turned off or whatever.  There is no more data here.  That's
12  the last page.
13          So I don't think it is a stretch for me to then
14  think, if the thing stopped, if they seized it or turned it
15  off, whatever they did to it at 6:21, that's before the time
16  that they said initially they went in for the search warrant.
17  Then I think I would have grounds to move to suppress
18  subsequent items.   *Civil Suit*
19          Your Honor, for the record, the Court is making a
20  face on my argument.  I think it is a legitimate argument I'm
21  making.  This is not information I had before.  Did not have
22  the information that comes after this particular time.
23          MR. GEISE:  Your Honor, I think the witness
24  testified that it is then moved to a secret location, the GPS
25  was still active.  And they simply don't want people to

88

1   know --
2           THE COURT:  I understand.
3           MR. GEISE:  -- where the particular location is.
4   So if Mr. Balarezo thinks he was actually entitled under
5   discovery to the movement to the secret location, I think I
6   have to reexamine Rule 16 because I doubt if he was.
7           If he says he was confused because we didn't
8   actually, because they were moving it to a secret location,
9   that's unfortunate, but it is hardly a discovery violation.
10          THE COURT:  Wait.  Let's just go back one second.
11          The next movement is some time after the take down
12  and it's the police moving it, right?
13          MR. GEISE:  As far as I know.
14          THE COURT:  You have no other data relating to this
15  prior to any police seizure?
16          MS. LIEBER:  Right.  What I suspect happened is
17  what Det. Kirschner suspects happened is it went to sleep at
18  that point, which is why that's the last data on point.
19          THE COURT:  My question is, is there any other data
20  you want besides this, why it happened or didn't happen?  Is
21  there anything else that happened after they seized the car
22  and moved it to a different location, yes or no?
23          MS. LIEBER:  I don't have anything.
24          MR. BALAREZO:  He says there is data.
25          THE COURT:  He said the data relates to the

*Very Important*

89

1  movement to the secret location. I don't believe you are
2  entitled to that.
3          MR. BALAREZO: Can the Government produce it to the
4  Court. Because I would like to have the data up until the
5  jeep left Moore Street.
6          THE COURT: All I want to know is, is there
7  anything prior to it leaving to police custody. Go look into
8  this. But if he doesn't know, he doesn't know. They say no
9  at the movement. Move on.
10         MR. BALAREZO: Can I have those documents produced
11 then?
12         MS. LIEBER: Yes, I'll give it to you.
13         THE COURT: All right.
14         (Open Court.)
15 BY MR. BALAREZO:
16 Q  So, Mr. Kiershner, the only thing that you can tell this
17 jury with certainty is that the GPS was on the jeep and that
18 the jeep moved to certain locations, right?
19 A  Yes.
20 Q  Nothing specific about Mr. Jones and his whereabouts on
21 any of these dates that we talked about, right?
22 A  From my personal eyes? Or from people I work with?
23 Q  Yes, from you. Your testimony.
24 A  No.
25         MR. BALAREZO: Thank you.

90

1          THE COURT: Anything else?
2  Mr. Norris, Mr. McDaniel, Mr. Acree?
3  MR. NORRIS: No.
4  MR. McDANIEL: No.
5  MR. ACREE: No.
6  MS. LIEBER: Court's Indulgence.
7          REDIRECT EXAMINATION
8  BY MS. LIEBER:
9  Q  Good afternoon, sir.
10 A  Good afternoon.
11 Q  Do you know how to install a GPS tracking device?
12 A  No.
13 Q  Why did you have a tech person come out and do it?
14 A  They're trained to do it. That's their jobs.
15 Q  And in the course of preparing the typewritten notes
16 that we've talked about, that I think you still have up
17 there, which I've labeled 9508-GPS-13, I believe. Do you
18 have that list still, sir?
19 A  Yes.
20 Q  Where was the jeep when the tracker was installed?
21 Q  When it was installed?
22 Q  On September 27th, the first time it got popped on the
23 jeep somehow, where was the jeep?
24         MR. BALAREZO: Objection. No knowledge, Your
25 Honor, no personal knowledge.

91

1          THE COURT: I don't know. Let's find out.
2          Does he know? I thought he said he was there when
3  they put it in? Was that the first time or the second time?
4  BY MS. LIEBER:
5  Q  Focusing on when the tracker was put on the jeep, did
6  you see, prior to the tracker getting put on the jeep, did
7  you, with your own two eyes, see the jeep in a particular
8  location?
9  A  When the equipment was installed?
10 Q  Yes.
11 A  No.
12 Q  Okay. Prior to the equipment being installed, did you
13 see a jeep shortly prior to that, did you see the jeep
14 stationary in a particular location?
15 A  No.
16 Q  There was a lot of talk about what happened on
17 October 4, 2005, and there was a question of surveillance.
18 What agent saw the jeep on October 4, 2005?
19         MR. BALAREZO: Objection.
20         THE COURT: He was -- you were not with the agent
21 that day?
22         THE WITNESS: Not that day.
23         MS. LIEBER: Your Honor, I think this clears up,
24 there was this call for hearsay that got all mushed up out
25 there. And I'm just asking to clarify.

92

1          THE COURT: I don't know that it's so mushy.
2          MS. LIEBER: It's a technical/legal term, Your
3  Honor.
4          THE COURT: I can understand October 8th because
5  he's in the car. You can approach on how you got that
6  information on the 4th, but it certainly leaves the doors
7  wide opened.
8          Let's approach.
9          (Bench conference.)
10         THE COURT: What is he going to say about the 4th
11 about some agent running into him? The doors get so far
12 open, I can't believe it.
13         MS. LIEBER: Your Honor, the question I believe
14 that Mr. Balarezo asked in cross examination was, was there
15 any surveillance of Mr. Jones. So the truthful answer is
16 yes, there was. It wasn't me but I learned from another
17 agent that he was surveilled. It will be married up by the
18 next witness.
19         THE COURT: Who is that Special Agent Kellie
20 O'Brien? Mushed up is not the most technical term but there
21 is a mess out there where it is not clear. I think, based on
22 the question that Mr. Balarezo asked, that called for
23 hearsay. He should be able to say I learned from another
24 agent that surveilled. They hear about it anyway. But I
25 think it is important. He doesn't know. It was because of

93

```
1    hearsay but he does know.
2           Talking about the 8th, the jeep was there.  It is
3    not the best he can say for the 8th at all.  It is a wide
4    open door.  I am going to let you go into the 8th.  He's in
5    the thing.  I assume somebody said to him there is Jones.
6           MS. LIEBER:  That's a present sense impression.
7           THE COURT:  That comes right in.  In terms of
8    Kellie O'Brien, she is going to come back on the stand anyway
9    to talk about the 4th?
10          MS. LIEBER:  Yes.
11          THE COURT:  She's going to say there was
12   surveillance?
13          MS. LIEBER:  Yes.
14          THE COURT:  We don't need it from him.
15          MS. LIEBER:  Well, you opened the door, you said the best that
16   he can say is the jeep was there.  That's not the best he can
17   say at all.  So that question is proper.  Okay.
18          (Open Court.)
19   BY MS. LIEBER:
20   Q    On October 8, 2005, did you personally see the jeep at a
21   particular location and time?
22   A    The jeep, I saw the back of it as it passed us.
23   Q    Where were you?
24   A    We were on Route 228.
25   Q    What is Route 228?
```

94

```
1    A    It's a road that goes between Route 210 and Route 301.
2    I believe that's Waldorf.
3    Q    Okay.  And did you personally see Mr. Jones driving that
4    jeep?
5    A    No.
6    Q    Were you in the presence of another law enforcement
7    agent?
8    A    Several.
9    Q    Did anyone on your team see Mr. Jones driving that jeep?
10   A    Yes.
11          MR. BALAREZO:  Objection, Your Honor.
12          THE COURT:  The objection is preserved.  Overruled.
13   BY MS. LIEBER:
14   Q    Who was that?
15   A    Special Agent Kellie O'Brien.
16   Q    How do you know that she actually saw Mr. Jones driving
17   the jeep?  What did she say?
18          MR. BALAREZO:  Objection.
19          THE COURT:  In your presence, correct?
20          THE WITNESS:  Yes.
21          THE COURT:  She said to you something?
22          THE WITNESS:  Yes.
23          THE COURT:  Overruled.
24          THE WITNESS:  She saw the driver of the jeep.
25
```

95

```
1    BY MS. LIEBER:
2    Q    Who was that?
3    A    Antoine Jones.
4           THE COURT:  Was she speaking as the jeep went by?
5           THE WITNESS:  Yes.
6    BY MS. LIEBER:
7    Q    Now, Det. Kirschner, you talked a lot about how you
8    reviewed all the data points on the GPS data disks; is that
9    right?
10   A    Yes.
11   Q    And you told the jury that to print out all those data
12   points would be just thousands of pages; is that right?
13   A    Yes.
14   Q    What you have before you there, 9500-GPS-13, is that
15   just some of the data points, just the relevant ones?
16   A    These are the ones that I took notes on to look further
17   into, yes.
18   Q    I want to just focus your attention on a couple of those
19   different ones if I may.  First, let me direct your attention
20   to September 28th.
21   A    Okay.
22   Q    September 28th in the evening, was there a time, based
23   on your analysis of the GPS data, that Mr. Jones's jeep went
24   to Barto Avenue in Suitland, Maryland, B-A-R-T-O?
25          THE COURT:  What date again?
```

96

```
1           MS. LIEBER:  September the 28, 2005?
2           THE WITNESS:  Yes.
3    BY MS. LIEBER:
4    Q    What time did the jeep arrive at Barto Avenue?
5    A    20:11 hours, which is about 8:11 P.M.
6    Q    Who lives at Barto Avenue?
7           MR. McDANIEL:  Objection.
8           THE WITNESS:  Overruled.
9           THE COURT:  Michael Huggins.
10          MS. LIEBER:  Now, for the jury, I'm going play
11   several clips, Call 2737, which is at Page 370 of Volume Two,
12   Call Number 2737.
13          THE COURT:  Volume Two, what page again?
14          MS. LIEBER:  Page 370, Call 2737.
15          MR. ACREE:  Your Honor, we do object as this being
16   beyond the scope of cross.
17          MS. LIEBER:  It goes to the reliability of the
18   tracking device.
19          THE COURT:  All right.  Overruled.
20          MS. LIEBER:  Page 370, Call 2737.  I am going to
21   play it right now.
22          (Call Number 2737 was played.)
23   BY MS. LIEBER:
24   Q    Det. Kirschner, that call was at -- the GPS puts
25   Mr. Jones's jeep at the Barto Avenue address at 8:11 P.M.; is
```

ANTOINE JONES
MOTION TO SUPPRESS GPS
OUTLINE CHART

Ex-Parte Application for Order Authorizing Use of an Electronic Tracking Device:  The honorable Judge Paul L. Friedman United States District Judge for the District of Columbia on September 16, 2005, gave "Order Authorizing the installation and use of an electronic tracking device".  Wherefore, pursuant to 18 U.S.C. § § 3117 permits courts to authorize use of an electronic tracking device both within and outside the court's jurisdiction as long as the device is installed in the issuing jurisdiction.

Honorable Judge Paul L. Friedman further ordered that the installation of the tracking device may be executed at any hour of the day or night and must be executed "no later than 10 days" from the date of the issuance of this order.

Honorable Judge Paul L. Friedman also further ordered that this authorization to operate the electronic tracking device as a "physical surveillance aid" must terminate when objective of the investigation is reached or at any event ninety days from the date of this order, whichever is earlier.

On July 24, 2006, document 151, pages 52-53 footnote 12.  Government stated that the defendant Jones filing was untimely, 13 days after the Court Ordered the defendant to file their pretrial motion.

Defendant Jones is submitting this Motion to Suppress all evidence obtained from the GPS on the following ground:

(1) The FBI agents intentionally went against the Court Order 10-day execution order of Judge Friedman, placing a GPS on the Jeep Cherokee later than 10 days after the date of the Order, knowing the Court Order had already expired.  In footnote 12, the Government admits that Judge Friedman's September 16, 2005 Court Order had not only expired, but further noted it was indeed a violation.

(2) Pursuant to 18 U.S.C. § § 3117 Order did not authorize installation of the device outside the District of Columbia.  Once again, the FBI violated Judge Friedman's Court Order.  Installation of the GPS on the Jeep Cherokee, according to the FBI, was done in Maryland outside the Jurisdiction of the District of Columbia.

(3) Judge Friedman gave the order to use the GPS as a surveillance aid.  Jones challenges that the GPS on the Jeep Cherokee was illegal by the FBI installing the GPS on the Jeep Cherokee after going against the Court Order (18 U.S.C. § § 3117) and (the expired 10-day execution order).  In regard to the fruit of the poisonous tree, Jones is hereby filing a motion to suppress all of the GPS evidence.

In the Court Memorandum Opinion Document 172, dated August 10, 2006, page 30 in the court's conclusion: "In part, the court granted the GPS motion to suppress" by stating

the Government cannot use GPS tracking data obtained when the Jeep Cherokee was parked in the garage adjoining Jones' Moore Street property. I am arguing that the court should suppress all the GPS tracking data. Monitoring electronic tracking devices are used to ascertain the final resting place of contraband, to tie the evidence to specific individuals or to track specific individuals for purpose of tying their activity to criminal conduct. Installation is meaningless, therefore unless the Government also monitor the signals and develops incriminating information from the GPS. Tracking individual contraband or other property to tie the property to a final resting place is usually followed by issuance of a ~~violent~~ search warrant for the location. **The Government in numerous occasions stated they never applied for a search warrant.** In the interest of Justice, I have reasonable expectation of privacy in my home and attached garage at the Moore Street property. Without a search warrant under **Rule 41 and Fourth Amendment** the $69,000 cash, Jeep Cherokee and any other evidence should be suppressed.

CASE LAW

US v Berry – Document 151, 7/24/2006 page 53, footnote 13: The Government stated the court did not decide the issue in US v Berry. However, the argument regarding GPS device in that case is significantly different in respect to the GPS device in this case. That case is irrelevant to this court's present analysis.

Defendant responds, yes indeed that case (US v Berry) is irrelevant to this court's present analysis. This case had: (1) an expired Court Order which the FBI agents went against and (2) the device was installed on the Jeep Cherokee outside the issuing jurisdiction. Both of the acts were clearly in violation to the Court Order issued by Judge Friedman.

US v Berry the Court Order was ~~violent~~ VALID. The court need not decide whether the GPS require a Court Order because the first four trips to New York was gathered by search and seizure, the violent court order rendered the evidence admissible. US v Berry supports the defendant because, unlike defendant Jones' Court Order, Berry was supplied with a ~~violent~~ Court Order, the expired Court Order wasn't decided and need not be decided. VALID

US v McIver – Here the Government stated they obtained a Court Order from Judge Friedman as an extra layer of precaution, the Fourth Amendment does not require it. Thus the agent was free to install the GPS device even without a Court Order. While the case law specific to GPS device is limited, given the technology's relatively recent vintage, those court that have squarely confronted the issue of whether or not a court order is required for installation of a GPS device have uniformly held that such court authorization is not required. See (US v McIver), (US v Moran), (US v Eberle), and (US v Garcia), here the Government misses the mark. US v McIver and US v Eberle (both co-defendants), the GPS in these two cases had malfunctioned after three days. The law enforcement used a bird dog tracking device which was placed by a magnetic tracking device on the vehicle. Neither case mentioned if it was a ~~violent~~ or non-~~violent~~ court order. McIver and Eberle challenge other issues that don't apply to this case.

Even in <u>US v Moran</u>, the Government misses the mark. Moran is challenging a Fourth Amendment issue of not having a warrant. Jones' issue here is not rather the agent's had a search warrant, but rather the matter of "<u>Did the agents obey the law or did they operate outside the law by going against the Court Order issued by Judge Friedman?</u>".

<u>US v Berry</u> – States "now on the market are GPS devices even more sophisticated. Such devices can be tracked with aid of a computer that displays a map showing where the device is in real time. The computer's memory can store the device's movements, moment-by-moment for days, weeks, or even years. The improved technology may be viewed as a more sophisticated beeper. In the trial, the GPS expert testified a GPS merely records electronically what the police could learn if they were willing to devote the personnel necessary to tail a car around the clock. <u>US v Berry</u> – The Supreme Court might conclude, however, that the <u>new technology is so intrusive that the police must obtain a court order before using it.</u> The <u>Government</u> also cited <u>US v Karo</u>, <u>US v Knotts</u>, and <u>US v Gbemisola</u>. Which none of these electronic beeper cases pertain to the issue Jones is herewith challenging. Jones' grounds is that the FBI agents went against Judge Friedman's Court Order (<u>18 U.S.C. § § 3117</u>) and the 10-day execution order. The agents operated outside the law and illegally installed the electronic GPS device on the Jeep Cherokee and illegally obtained evidence from the GPS device.

Government case – <u>US v Karo</u> – In Karo, the Government did obtain a Court Order authorizing the installation and monitoring of a beeper in one of the _____ _____, not like defendant Jones where the Court Order had expired.

Defendant's rebuttal, <u>US v Karo</u>, A search began at the moment Karo brought the car into his house at hence concealed it from public view. As a general matter, the private citizen is entitled to assume, and in fact does assume that his possessions are not infected with concealed electronic devices. The concealment of such items on personal property significantly compromises the owner's interest in privacy, by making it impossible to conceal that item's possession and location from the Government, despite the fact that the Fourth Amendment protects the privacy interest in the location of personal property not exposed to public view.

I find little comfort in the court's notion that no invasion of privacy occurred until a listener obtains some significant information by use of the device. The expectation of privacy should be measured from the standpoint of the citizen whose privacy is at stake, not of the Government. It is compromised the moment the invasion occurs.

The agent did not know who was in possession of the property or where it was once it entered Karo's house. From that moment on, it was concealed from view. Because the beeper enabled the agent to learn the location of the property otherwise concealed from public view, it infringed a privacy interest protected by Fourth Amendment.

In the Government's cited case, <u>US v Knotts</u> it was reversed finding for the defendant that the monitoring of the beeper was prohibited by the Fourth Amendment because its

use had violated respondent's reasonable expectation of privacy, <u>and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring.</u> When a police agent tracked, bugged personal property without first obtaining a warrant, they must do so at the risk, that this enhanced surveillance, intrusive at its best, might push fortuitously and unreasonably into private sphere protected by the Fourth Amendment. The Fourth Amendment protects against government invasions of a person's reasonable expectation of privacy, even when those invasions are not accompanied by physical intrusions.

Government also cited <u>US v Gbemisola</u> – which speaks on a Curt Ordered beeper in a package with contraband delivered through the mail. The Government and defendant in this case argue over the <u>18 U.S.C. § § 3117</u> issue. The court was inclined to agree that <u>18 U.S.C. § § 3117</u> statue does not empower a Court to authorize the installation of a tracking device outside its jurisdiction. Even in oral argument in <u>US v Gbemisola</u> – the Government indicated agreement of the <u>18 U.S.C. § § 3117</u> statue issue. The Government in this case (<u>US v Gbemisola</u>) relied on a warrantless installation and monitoring of a precursor device, a "mobile tracking device (on a package) in the defendant's possession." Because no warrant was required for either the installation or use of the mobile tracking device, the fruit of that use was admissible at trial, regardless of validity of the warrant obtained by the Government... Here the Government was off the mark once again, Jones is not challenging the warrantless electronic device. Because the Government didn't have a warrant and yes, a person does not have expectation to privacy on public thoroughfare and it's not subject to Fourth Amendment. The suspect here is Gbemisola where the agents had a legal court order, however, in Mr. Jones' case, FBI agents operated outside the expiration of the court order thereby illegally installing a GPS device on a personal property (Jeep Cherokee) of Mr. Jones', not a package with contraband coming through the mail. (In <u>US v Gbemisola</u>) the <u>18 U.S.C. § § 3117</u> statue issue was agreed upon by the courts, and the Government at the argument. Here we stand to the issue of <u>18 U.S.C. § § 3117</u> and "10-day expire" execution order from Judge Friedman. (A court order comes from "the court", it's a judge who gives a written command, direction or instruction.)

## CONCLUSION

<u>US v Karo</u> This "search began at the moment Karo brought the car into his house hence concealed it from public view. It is certainly true that a home owner has reasonable expectation of privacy in the contents of his home. <u>Alderman v US</u>, <u>US v Knotts</u> – The monitoring of the beeper was prohibited by the Fourth Amendment because its use had violate respondent's reasonable expectation of privacy, and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring. Knotts further add, when a police agent <u>track, bugged</u> personal property without first obtaining a warrant, they must do so at the risk, that this enhanced surveillance, intrusive at its best. The Fourth Amendment protect against invasion of a person reasonable expectation of privacy, even when those invasions are not accompanied by physical intrusions...

Jones argues the agents are to uphold the law, not disobey or operate above or outside the law; the agents are not above the law. When an agent steps out, above the law or goes against a Judge's court order. The agent is doing so at their own risk of immunity, equally, their self as a civilian, without protection, or guidance from the courts. To illegally seize a citizen's vehicle, illegally possess and have complete dominion and control of a vehicle, no matter how many seconds, minutes or hours. Installing and hiding an illegal electronic device, would be against the law, terrifying in this day of "car jacking, bomb threats, and terrorism". I move to suppress all GPS data and evidence.

**17**

1  Detective Horne.
2         Your Honor, I actually have copies of an exhibit to
3  hand out for this witness, if I may do that while she's coming
4  in?
5         THE COURT:  Sure.  Miscellaneous 4?
6         MS. LIEBER:  That's correct.
7         THE COURT:  I think we've taken it, and all objections
8  have been resolved, Mr. Balarezo and defense counsel?  4 is
9  going in now?
10        MR. BALAREZO:  There was just one thing that was
11 actually --
12        THE COURT:  Wait.  Either be on the record or don't.
13 Talk out loud.
14        MR. BALAREZO:  Your Honor, we had agreed on it as of
15 yesterday, and there was one change that was being made right
16 before lunch.
17        THE COURT:  Is there any problem with it now?  Because
18 it's going out -- hold up.
19        Good afternoon, Detective.
20        THE WITNESS:  Good afternoon.
21        THE COURT:  Sorry.  Any other problems?
22        MR. BALAREZO:  No objection.
23        THE COURT:  All right.  Miscellaneous 4 will be
24 admitted into evidence, and we're going to provide it to the
25 jury.

**18**

1         (Government's Exhibit Misc-4 was received into
2  evidence.)
3         THE COURT:  Now, this is what is called a summary
4  chart the government has put together.  It's information just
5  in summary form, and everybody has had a chance to look at the
6  underlying information.  So we're not going to overwhelm you
7  with all the stuff that serves as the underlying data for this
8  chart.  It's a summary chart only of certain items shown by the
9  government.
10        Go ahead.  This is -- Miscellaneous 4, and it has been
11 admitted.
12        MS. LIEBER:  Thank you, Your Honor.
13 (Detective Norma Horne, 2:26 p.m.)
14             DIRECT EXAMINATION
15 BY MS. LIEBER:
16 Q.  Good afternoon, Detective Horne.
17 A.  Good afternoon.
18 Q.  Now I'll give you a copy of Miscellaneous 4, if I may.
19    Detective Horne, what is Miscellaneous 4?
20 A.  It's a generated time line of the Antoine Jones wiretap
21 calls on certain days.  It's dated September through October.
22 Q.  Okay.  And does it also contain at times, GPS data
23 information as well?
24 A.  Yes, it does.
25 Q.  And in the course of recent weeks, did you have the

**19**

1  distinct pleasure of reviewing this time line for accuracy?
2  A.  Yes.
3  Q.  Okay.  And did you make some changes to it here and there
4  timing and --
5         MR. BALAREZO:  Objection, leading.
6         THE COURT:  Well, it is, but it's preliminarily.
7         Go ahead.  Overruled.
8  BY MS. LIEBER:
9  Q.  You know, if the call times are off a little bit, minor
10 changes like that?
11 A.  Yes, I went through, double checked what I could, and also,
12 if something had to be changed, I would mark it on my little
13 thing, yes.
14 Q.  Your little thing, your copy of it?
15 A.  My general copy, yes.
16 Q.  And sitting here now before this jury, is it as accurate as
17 you think can be expected?
18 A.  Yes.
19 Q.  Okay.  Now, does this time line contain every -- does it
20 contain information from every call that came across the wire
21 between September 2nd and October 24th of 2005?
22 A.  No.
23 Q.  Okay.  In reviewing -- and sort of as you went through this
24 time line, did you interject interpretation of the calls, or
25 did you -- did these lines just include direct language from

**20**

1  the calls?
2  A.  These lines are direct language from the calls, as well as,
3  still, the GPS tracker information too, which I had nothing to
4  do with.
5  Q.  All right.  Is that Detective Kirschner's domain?
6  A.  Yes, all the techie stuff.
7  Q.  Okay.  And I just wanted to show you, if everyone can turn
8  to page 9, just sort of a sample day, so we get a sense of how
9  the time line works.
10    I'm not going to ask you your opinion of any of these
11 calls, but I just want you to describe to the jury, just walk
12 them through this day and how this is set forth or set out.
13    I guess that's such a broad question.  Let me ask you this,
14 did this include many of the calls that took place on the wire
15 interception on September 28th of 2005?
16 A.  It's a -- it's just a small glimpse.  It's a glimpse of
17 some of the calls on that day.
18 Q.  Okay and --
19        THE COURT:  Who picked the calls, you or Miss Lieber
20 just for our information?
21        THE WITNESS:  I did not pick them.
22        THE COURT:  Okay.  So were you instructed which ones
23 to highlight, in other words, which ones to summarize like
24 this, which calls?
25        I said, "Who picked the calls you put in the chart?"

# ILLIGOL SEARCH - 10870 mose

A) Illigol electronic Device, survellance of mosrest Garage.

B) use of unauthorize key    poor

C) No search warrant on Attachment A, present, or left to MR Jones, son or MR Jones.

D) Forge consent form to search Jeep

E) Perjurios statement - MR Jones pointes out Bags of money.

F) GPS - Disconnectes 5:21 AM Oct24 2005

G) Illigol seize of MR and MRS Jones Personal, Private and business Property.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   10/24/2005

*[handwritten: This is a lie, it was more 5AM Plus the T.V. alarm went off while they was in the house. It goes off at 6 A.M.]*

On 10/24/05, at approximately 6:15 A.M., a federal
search warrant was executed at 10870 Moore Street, Waldorf, MD.
The search warrant was executed pursuant to a United States
District Court search warrant issued on 10/22/05.
*[handwritten: It was MD District court.]*

Special Agent (SA) Stephen R. Naugle <u>knocked and</u>
<u>announced.</u>  Upon the second knock of the front door, the door
opened.  Entry was made and ANTIONE JONES and his wife DENIECE
JONES were located in the upstairs bedroom.  Located in the top
left bedroom was JONES's son, ANTIONE JONES.  ANTIONE JONES gave
consent to search his vehicle, a Jeep Grand Cherokee Laredo,  JONES
signed a FD-26 (Consent To Search).  All subjects were secured and
the search revealed the following:  *[handwritten: This is a lie - They check the cadillac And Toyota sequoia.]*

*[handwritten left margin: They use A key or target to open the door I heard the click.]*

*[handwritten left margin: is is a lie cause I knew the door and I went up stairs to my uncle and to show Move the arm if door is open.]*

   1. $69,191.00/Located inside of the Jeep Grand Cherokee.
The money was found inside of three separate bags.  The bags were
located in the rear of the Jeep Grand Cherokee.

   2. $452.00/Located from the front pants pockets of a male
pair of jeans from JONES's bedroom.

   3. Numerous personal and financial documents in the name
of ANTIONE JONES and DENIECE JONES.

   4. Numerous keys which ANTIONE JONES said were his keys.

   5. Two (2) cellular telephones

The following two (2) vehicles were seized:

   1. 2001, Cream colored Jeep Grand Cherokee, VIN:
1J4GW48S71C683464, MD license plate, M 667480.

   2. 2002, Silver Colored Toyota Sequoia, SRS, VIN:
5TDBT44A43S144078, MD, license plate, M 895532.  *[handwritten: search warrant or Attachment A.]*

*[handwritten: This A lie; they only left A Property Receipt - No warrant or]*

A copy of the warrant was left with DENIECE JONES along *[handwritten: lie]*
with five (5) FD-597's (Receipt for Property Seized).  As SA
Naugle was explaining the FD-597's to DENIECE JONES in the presence
of SA Kaluzny, SA Wolf, SA Wise and Craig Wallace, (Forfeiture
Analyst), SA Naugle asked her if she could hear the agents knocking

Investigation on   10/24/05   at  Washington, D.C.

File # 281D-WF-213679                    Date dictated  N/A

   SA Stephen R. Naugle:srn
by  SA Serghy Kaluzny

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

*[handwritten: Enced missing page]*    *[handwritten: Has missing Page - note by Mr. Balarezo]*

on scene as to whether or not to arrest any subjects present inside the residence. Any arrested subject(s) will be transported to WFO for processing and interview purposes.

All prisoners will be processed at WFO to include fingerprinting and photographing by CTOC Specialist Mark Barrows. All PD-163's will be completed by MPD Detectives Rick Watkins and/or Barbara Lyles and "booked" by same. It is noted that SAs Yanta, O'Brien and Detectives Horne and Kirschner will attempt to interview all prisoners once they have been processed due to their institutional knowledge of the case.

**\*\*\* All operations are pending a drug transaction between Antoine Jones and "909" [FNU, LNU], Hispanic male.**

**TEAM #1 (Search)**    *[handwritten: Important]*

Subject: Antoine Jones, a./k/a "Toine", 02/25/1960, 6'0", 185, Denise Jones, 03/17/1963, 5'5", 1989

Location: 10870 Moore Street, Waldorf, Maryland

Vehicle(s): Gold Jeep Gand Cherokee (MD) M667480, Gold Sequoia (MD) M895532, Black Cadillac (MD) MCW-738    *[handwritten: Important - why just have warrant for vehicles]*

Assignment:    SA Steve Naugle (CR-6) (Team Leader) — 202-437-5071
                SA Jon Snow      202-497-6869
                CR-1 Craig Wallace     (Forfeiture)
                SA Gregg Horner     202-359-7659
                SA Joseph Lowery    202-409-1884
                SA Angela McCravy   202-497-6918
                SA Brian Mumford    202-438-3508
                SA Timothy Pak      202-409-1449
                ~~SA Thomas Ryan~~    ~~202-345-7643~~ *(SWAT)*
                SA Jared Wise       202-359-7932
                SA Serghy Kaluzny    202-369-7542
                SA Kevin Wolf       202-369-7514
                SA Kate Beaton      410-977-5398

*[handwritten: Ofc. Joseph Sparks]*    *[handwritten: Charles county]*

**Deadly Force Policy:** (see attached)  *[handwritten: ?? why not MPD Police]*

Coordination Issues:  FBI Baltimore Division, ATF, MPD and SWAT teams notified. *[handwritten: check / Check]*

Handling of Injured:  Seriously injured will be transported by EMS (911 or MPD dispatch).

  X    Southern Maryland Hospital Center
         7503 Surratts Road, Clinton, MD  301-868-8000

**FBI DEADLY FORCE POLICY APPLIES**
**\*\*PARTICIPANTS ARE TO WEAR BODY ARMOR\*\***
**ARMED & DANGEROUS**

FD-302a (Rev. 10-6-95)

281D-WF-213679

Continuation of FD-302 of _____ , On 10/24/05 , Page 2

on the front door.  She said that she could and that she was *getting ready to call the police.* (After the first Lock) By time I jump out of the bed, got to the door, I could see them opening the door. They didn't Announce FBI until the Reach the steps.

The following law enforcement personnel participated in the execution and search of the premise:

*They never Announce they had a search warrant shown or presented a search warrant I ask atleast five time to see a search and a arrest warrant.*

　　　　SA Steve Naugle-Team Leader/Knock and Announce
　　　　SA Jon Snow-Searched
　　　　SA Gregg Horner-Rear/Search
　　　　SA Joseph Lowery-Search
　　　　SA Angela McCravy-Rear/Search/Sketch
　　　　SA Brian Mumford-Search
　　　　SA Timothy Pak-Search
　　　　Det.Joseph Sopata (MPDC)-Search
　　　　SA Jared Wise-Search
　　　　SA Serghy Kaluzny-Seized
　　　　SA Kevin Wolf-Search
　　　　SA Kate Beaton (BA)-Search

The FD-26 (Consent To Search), sketch, FD-597 (Receipt for Property Seized), copy of the search warrant and the photograph logs were placed into a 1-A envelope. *I want to see the copy of the search warrant (they should had took a picture of the search warrant with the money or with the property seize.) I want to see all logs and listen to all Radio calls before entering the House with local Police and FBI Agents. I also want to listen to all Radio calls with local Police and FBI Agents during the search and after the search, I also want to know why they took me from MD Jurisdiction to DC, crossing charles county line PG line into the District of columbia.*

*My Grounds to Suppression*

*coming in and Envading our Privacy without our Permission-Giving us a chance to open the door.*

*(1) Knock and Announce Violation.*

*(2) Daytime search violation.- It was still complete dark outside Plus they came in before 6AM, We need to see if they tamper with the alarm company to change the time. If so, it's misconduct and obstruction of Justices.*

*(3) They never show, presented or leave a search warrant with you or show you the attachment A, so you could know what they could take. They shouldn't took nothing that belong to you.*

*(4) The Iced, cadillac and truck was an illegal search because we didn't give them permission to search the cars. I seen them searching the cadillac when I was Leaving.*

*Misconduct -(Gaset to open front door)(Knowing How to cut off alarm) in our presents then record (for using my name)*

**29**

BY MR. BALAREZO:

Q.  Miss Jones, October 24th of last year, do you remember that day?

A.  Yes, I do.

Q.  And why do you remember that day?

A.  Because that's the day my husband was arrested.

Q.  Were you home when your husband was arrested?

A.  Yes, I was.

Q.  Can you tell us what happened that day when your husband was arrested?

THE COURT:  Let's approach. One second, please.

(Bench conference)

THE COURT:  Miss Jones, could you stand over in the corner, please.

She obviously has some discomfort. I mean, if it's important to go after what she is doing right now and how she is living. But she is uncomfortable with it. I'm just telling you.

MR. BALAREZO:  I understand. I'm in a situation, my client has demanded that I put her on. Apparently she has no more privilege. So I'm trying to get answers to questions that I think --

THE COURT:  I just don't know what the relevance is.

MR. BALAREZO:  If it's not relevant, then, Your Honor, with all respect, tell me it's irrelevant and I'll move on. I

**30**

just don't want to get into these discussions in front of the jury because it's happening every time I'm asking a question. If there is an objection, sustain it, and I'll move on. I'm not going to argue.

THE COURT:  I was waiting for you to tell me what the relevance was. You could ask to approach.

MR. BALAREZO:  The relevance to this last question was --

THE COURT:  Not the last one. Now we are on to a new topic. If there is some relevance --

MR. BALAREZO:  Is there an objection? I didn't hear an objection.

THE COURT:  There is, yes. She was standing.

MR. BALAREZO:  They seized 60-something thousand dollars that day. So I think that's --

MISS LIEBER:  Your Honor, I was concerned that we were going to elicit the same kind of testimony that we were seeking to elicit from Miss Holland, which is they kicked in the door, they roughed me up. I was naked. I thought they were going to kill me. Things of that nature.

MR. BALAREZO:  I don't see how that is irrelevant. It happened. It's part of the case, Your Honor. She was in her house with her husband. They come in, they take him and, you know --

THE COURT:  And?

**31**

MR. BALAREZO:  I think it has a little something to do with it.

THE COURT:  The 60,000 certainly does. What the source of it is. Does she know the source of the 60?

MR. BALAREZO:  Not that I know of.

THE COURT:  Well, what can she add here on this particular question, that in some fashion the police were not sweet? I just, you know -- I know your client wants to bring this out. Everybody's client wants to bring out the fact that the police, when they used a battering ram don't come in like --

MR. BALAREZO:  I put that out because I know this is one specific issue that Mr. Jones wishes me get into, and that is both of their assertions, and their, I mean Mr. Jones and Mrs. Jones, that the --

THE COURT:  No consent?

MR. BALAREZO:  No, not consent. But that they actually came in prior to 6:00 a.m., which is the time stated on the search warrant order.

THE COURT:  You can ask the question when did they come. I don't know -- what do you mean prior to the search warrant, you mean the search warrant authorized --

MR. BALAREZO:  It says after 6:00, in the daylight after 6:00 or something.

THE COURT:  That's got nothing to do with the jury. Prejudice

**32**

MR. BALAREZO:  Your Honor, I didn't want to put this witness on. I'm trying to do my best here.

THE COURT:  You are doing an excellent job. But there is a limit. Okay. That's it. What else?

MR. BALAREZO:  And the money, what does she know about that money.

THE COURT:  Well, I think that's fine, but you just told me she doesn't know anything about the money.

MR. BALAREZO:  Right. But I would like the jury to know. I mean, it's not what we talk about here. They are the ones that's going to have to decide, so they need to hear.

THE COURT:  Fine. That's fine. The government likes that. Bring that right up that she doesn't know where the money came from. Excellent. The government has no objection to that. What else?

MR. BALAREZO:  I think that might be it. I will have to consult with Mr. Jones.

THE COURT:  The hour is sustained. But what else is there? The hour, I have sustained. Sixty thousand she can explain, she doesn't know about. What else happened?

MISS LIEBER:  Gestapo tactics.

THE COURT:  We are not getting into how they executed the whole thing. I don't see any relevance other than the 60,000. Sustained. Thank you.

(Open court)

Very Important Note! The Judge don't want my wife to testifies about the illegal search of Moore St House.

**25**

1  A.  That's correct.
2  THE COURT:  And is that your handwriting?
3  THE WITNESS:  Yes, it is.
4  BY MR. BALAREZO:
5  Q.  Do you see again a credit application?
6  A.  Yes.
7  Q.  Once again lists FTN as a business consultant at Brandywine
8  Road?
9  A.  Uh-huh.
10  Q.  And here it lists principal or owner of that business as
11  Deniece Johnson?
12  A.  Okay.
13  Q.  And I think your signature is that?
14  A.  Yes.
15  Q.  And you signed this Deniece Johnson?
16  A.  Yes.
17  Q.  Can you explain to the jury why you signed the first page
18  as "Deniece Jones" and you signed the second page as "Deniece
19  Johnson"?
20  A.  Because -- can you put it back?
21  Q.  I'm sorry.
22  A.  Because there it says business information.  And for the
23  business information I'm Deniece Johnson, president of FTN
24  Consultants.
25  Q.  Okay.

**26**

1  A.  After I got married, I didn't switch over and conduct
2  business in my married name.  I continued to conduct business
3  under FTN Consultants under my maiden name.
4  Q.  Is that why you have Deniece Johnson as the president --
5  A.  That's correct.
6  Q.  Ma'am, by signing "Deniece Johnson" and "Deniece Jones,"
7  did you have any intent to defraud anybody or pull one over on
8  anybody?
9  A.  No, sir.
10  Q.  When you went to complete this application, did you provide
11  them any sort of identification, any picture ID?
12  A.  I think he asked me to fax over a copy of my driver's
13  license.
14  Q.  Did you do so?
15  A.  Yes.
16  Q.  Did that driver's license have your picture?
17  A.  Yes.
18  Q.  Did it have your name?
19  A.  Yes.
20  Q.  Besides completing this credit application and signing it,
21  did you have any further involvement in any, anything having to
22  do with the Hampton Park warehouse?
23  A.  No, sir.
24  Q.  Last question on the warehouse.  Did you maintain any
25  records or were involved in any way besides ownership in the

**27**

1  trucking subsidiary of FTN?
2  A.  No, sir.
3  Q.  Who maintained those records?  Who took care of that
4  business?
5  A.  My husband.
6  Q.  Miss Jones, are you currently living at Moore Street today,
7  is that where you slept last night?
8  A.  No.
9  Q.  Well, do you still own that home, Moore Street?
10  A.  Yes.
11  Q.  You just didn't sleep there yesterday, that's fine.  But
12  that's where you regularly stay, I'm assuming?
13  A.  Sometimes.
14  Q.  I'll move on then.
15  THE COURT:  She doesn't think it's relevant and
16  neither do I.  Okay.  Move on.
17  MR. BALAREZO:  I'm not casting dispersions, Your
18  Honor, just trying to get an answer.
19  BY MR. BALAREZO:
20  Q.  Do you still own Moore Street?
21  A.  Yes, I do.
22  Q.  Do you still have a mortgage?
23  A.  Yes.
24  Q.  Are you current on that mortgage right now?
25  A.  Not right now.

**28**

1  THE COURT:  Current?
2  MR. BALAREZO:  Current, C-U-R-R-E-N-T.
3  THE COURT:  Not right now.  Okay.
4  MR. BALAREZO:  I didn't hear the answer.  I'm sorry,
5  Your Honor.
6  THE COURT:  She said not right now.
7  BY MR. BALAREZO:
8  Q.  And how late are you?  How behind are you?
9  MISS LIEBER:  Objection.
10  THE COURT:  Yes.  Is this actually important?
11  MR. BALAREZO:  Your Honor, I thought so, that's why I
12  asked.
13  THE COURT:  Well, I don't know that Miss Jones wants
14  to answer.  If you want to press it, if it's really important,
15  you can tell me.  I can tell she doesn't want to --
16  MR. BALAREZO:  I didn't realize she got to pick and
17  choose, Your Honor.
18  THE COURT:  No, she doesn't.  But if it's not
19  relevant, I'm not going to make her answer something that --
20  MR. BALAREZO:  So is the objection sustained?
21  THE COURT:  Do you want to explain the relevance?
22  Otherwise it would be.
23  MR. BALAREZO:  Obviously, it's a problem.  I'll move
24  on, Your Honor.
25  THE COURT:  Okay.

**33**

1         THE COURT: Ma'am, come on back.
2         MR. BALAREZO: If I could just have one second, Your
3 Honor?
4         THE COURT: Yes.
5         MR. BALAREZO: Thank you, Your Honor.
6 BY MR. BALAREZO:
7 Q. Mrs. Jones, on October 24th, when law enforcement came to
8 arrest your husband, were you asleep?
9 A. Yes, I was.
10 Q. Do you recall what time it was that they showed up to
11 arrest your husband?    *This is the truth*
12 A. 4:45 in the morning.
13         MR. BALAREZO: I have nothing further at this time,
14 Your Honor.
15         THE COURT: Okay.
16         MR. NORRIS: I have a few questions.
17         THE COURT: Fine. Go right ahead, Mr. Norris.
18         CROSS-EXAMINATION
19 BY MR. NORRIS:
20 Q. Good afternoon, Miss Jones.
21 A. Good afternoon.
22 Q. Now, Miss Jones, you testified on direct that one of your
23 businesses was as a real estate agent; is that correct?
24 A. Yes.
25 Q. And were you actively working as a real estate agent in

*MRs Jones testifies 4:45
The Judge didnt Let my Attorney
get into detail about the search*

**34**

1 2005?
2 A. Yes, I was.
3 Q. And do you know my client, Mr. Adrian Jackson?
4 A. Yes, I do.
5 Q. And how do you know Mr. Jackson?
6 A. He was one of my real estate clients.
7 Q. He was one of your residential clients?
8 A. Real estate clients.
9         THE COURT: Real estate.
10 BY MR. NORRIS:
11 Q. Real estate clients, okay.
12         And could you tell the ladies and gentlemen about
13 that? How was he a client of yours, what were you doing for
14 him as a real estate agent?
15 A. Mr. Jackson was looking for a house. I was taking him out
16 and showing him houses.
17 Q. And what time frame was this that you were showing him
18 houses?
19 A. I guess about four months.
20 Q. Okay. And I take it is this four months prior to
21 October 24, 2005?
22 A. That's correct.
23 Q. So would that have taken it back to the summer?
24 A. That's correct.
25 Q. And into October of 2005; is that correct?

**35**

1 A. Yes.
2 Q. Okay. And at any point, did you ever, was a contract ever
3 put on a house by Mr. Jackson?
4 A. Yes.
5 Q. Okay. And when did that occur?
6 A. I don't remember the exact date, but probably around the
7 first of October.
8 Q. And where was that house located that the contract was put
9 in on, if you remember?
10 A. Well, actually we wrote offers on a few houses. So I
11 assume you're talking about the last one.
12 Q. Okay. Well, let me backup then. How many houses did you
13 write offers on for Mr. Jackson?
14 A. I believe three.
15 Q. Okay. And where were those houses located?
16 A. Waldorf, Maryland.
17 Q. Okay. All three of them were in Waldorf.
18 A. I believe all three that we wrote on were in Waldorf,
19 Maryland.
20 Q. Were they single family homes or townhomes or condominiums,
21 what type of real estate, if you remember?
22 A. We looked at townhomes and single family homes. I believe
23 we wrote on one of each.
24 Q. Okay. And did any of those three go beyond the offer stage
25 to where there were closing dates or anything that set?

**36**

1 A. The last one we had an acceptance, the contract was
2 accepted, it was ratified. We did the home inspection and we
3 had a closing date.
4 Q. Okay. And do you remember when the closing date was?
5 A. I don't remember.
6 Q. Or when it was approximately, what month it might have
7 been?
8 A. Usually when you write an offer, the closing date is at
9 about 30 days later. So it would have been -- if we wrote that
10 offer the beginning of October, he would have closed the
11 beginning of November.
12 Q. Okay. And so that would have been after the October 24th,
13 2005 date; is that correct?
14 A. That's correct.
15 Q. Okay. Did you know where the source of the funds for
16 Mr. Jackson were coming from to purchase this house?
17 A. No, sir.
18 Q. Okay. In addition to your work with him as a real estate
19 client, did you know Mr. Jackson in any other context?
20 A. I met Mr. Jackson when my family had the banquet at the
21 club. And I know that Mr. Jackson also was involved with the
22 club.
23         MR. NORRIS: Okay. Thank you. Nothing further.
24         THE COURT: Mr. McDaniel, Mr. Acree?
25         MR. McDANIEL: No.

37

1    MR. ACREE:  No, thank you, Your Honor.
2    THE COURT:  Okay, cross.
3              CROSS-EXAMINATION
4    BY MISS LIEBER:
5    Q.  Good afternoon, Mrs. Jones.
6    A.  Good afternoon.
7    Q.  I want to talk to you, just follow up on a few questions by
8    Mr. Balarezo.  What is your estimate about how much you
9    actually made a year, say, in 2002, 2003, 2004?
10       MR. BALAREZO:  Objection.
11       THE COURT:  Do you mean gross -- no.  Overruled.  Do
12   you mean gross, net?
13   BY MISS LIEBER:
14   Q.  I mean gross.  If you had to indicate your salary?
15       THE COURT:  2002; '3 and '4?
16   BY MISS LIEBER:
17   Q.  Right.  And '5, I'm sorry.  Just generally over of the
18   course of that time?
19       MR. BALAREZO:  I don't mean to object.  Just
20   clarification.  Is it just her, both of them?
21       THE COURT:  Her.  That's my understanding from the
22   question.
23       How much were you grossing from your various
24   businesses per year?  You don't have to be on the nose.  She is
25   saying what's your best.

38

1    THE WITNESS:  About $100,000 a year.
2    THE COURT:  Each year?
3    THE WITNESS:  There was one year that I did not have a
4    contract, and I can't remember which year it was.  So that
5    year, I would have made considerably less.
6    BY MISS LIEBER:
7    Q.  Okay.  And I'm asking about you personally, not FTN
8    Consultants, the business.  I guess maybe the best thing to do,
9    first of all, is explain to the jury, just to make it clear,
10   how is it that you personally got paid by FTN Consultants the
11   business.  You said it was a draw; is that right?
12   A.  That's correct.
13   Q.  What does that mean?
14   A.  That means that if I needed to withdraw money from the
15   account, I withdrew money from the business account.
16   Q.  Okay.  So is that how you considered -- I guess it's not
17   technically a salary.  But is that sort of like a salary?
18   That's how you got paid by the business; is that right?
19   A.  Right.  But it's not a salary.
20   Q.  Okay.  I guess I want it to be clear, FTN Consultants as a
21   business made $100,000 a year; is that right?
22   A.  That's correct.
23   Q.  And out of that $100,000 that FTN Consultants got -- and
24   this is for an NIH contract, for instance?
25   A.  Uh-huh.

39

1    Q.  Is that yes?
2    A.  Yes.
3    Q.  If, for instance, your contract was for $100,000 by NIH,
4    that went to FTN Consultants; is that correct?
5    A.  That's correct.
6    Q.  And out of that $100,000, you would subtract out overhead
7    expenses; is that right?
8    A.  Well, I worked from home.  It's a home-based business.
9    Q.  Okay.  But you would subtract out business expenses, I
10   would think; right?
11   A.  Correct.
12   Q.  And, in fact, if the contract is to do conferences, is that
13   what you did?
14   A.  Yes.
15   Q.  Okay.  Were those local conferences or conferences in other
16   jurisdictions?
17   A.  Both.
18   Q.  Okay.  And to sort of, out of that $100,000 you would
19   subtract travel cost; is that right?
20   A.  That's correct.
21   Q.  Facilities fees, so if you had to rent space?
22   A.  That's correct.
23   Q.  Incidental expenses, food and --
24   A.  That's correct.
25   Q.  -- travel?  Okay.

40

1    If you had to pay somebody, if you had a speaker or
2    some sort of, whatever was happening at the conference --
3    A.  That's correct.
4    Q.  -- you had to pay those people?
5    And materials fees for the conference, if you printed
6    up, you know, binders or what have you for the conference, you
7    would subtract that out of the $100,000 as well?
8    A.  That's correct.
9    Q.  And I think you said at times folks also worked for you
10   sort of on a contracts basis, if you needed assistance for one
11   of the events?
12   A.  That's correct.
13   Q.  And then would you have to pay that person out of that
14   $100,000?
15   A.  That's correct.
16   Q.  Overall, what could be considered sort of money in the
17   pocket of you would be considerably less than $100,000; is that
18   correct?
19   A.  That's correct.
20   Q.  And we are just talking now in general terms about that
21   sort of time frame 2002 through 2005?
22   A.  Yes.
23   Q.  So, for instance, when you said on Government Exhibit ICE
24   16, here, here where it says annual salary, 60K, that's
25   $60,000?



GPS LAst entry, it show and
Prove the Agents was in moorust
House before 6AM, This is an
illigal entry,

1    the multi-kilogram quantity to which you contend Mr. Jones

2    referred on October 21st, 22nd, and 23rd?

3         MR. GEISE:  Your Honor, I don't think that the

4    deliveries had occurred yet.  So I don't believe that we

5    have evidence of a meeting that night between Jackson and -

6    - between the Defendant Jackson and the Defendant Jones.

7         THE MAGISTRATE JUDGE:  Did you not suggest a

8    moment ago that your argument, that the Government's

9    argument was that Mr. Jones's reference to making the

10   rounds was delivering quantities of cocaine to the four or

11   five people identified in the proffer?

12        MR. GEISE:  Your Honor, yes, he was trying to set

13   up the meetings.  Our hopes would be by doing the raids at

14   6:00 in the morning on Monday, we prevented most of it from

15   being redistributed.  So our hopes would be that we took it

16   off before he was able to make all of those contacts.

17   I'd have to check the surveillance log, but I don't know

18   whether he managed to execute any of those meetings Sunday

19   night.

20        These conversations are Sunday night; the raids

21   were 6:00 in the morning, 6:00 and 5:00 in the morning,

22   on Monday morning.  Part of the reason we did it then

23   obviously was to try and get as much as possible before it

24   was distributed.  So our theory would not be that the

25   Sunday night phone calls were followed instantly by him

**33**

1  point, but you are welcome to bring her back on it.
2        Okay.
3        (Open court.)
4        THE COURT:  Do we have another question from anybody?
5  Are you finished?
6        MR. BALAREZO:  That's it for me.
7        THE COURT:  Okay. Anybody else?
8        MR. NORRIS:  No, thank you, Your Honor.
9        THE COURT:  Anything else, Mr. Geise?
10       MR. GEISE:  A couple of quick questions.
11              REDIRECT EXAMINATION
12  BY MR. GEISE:
13  Q.   When did you recognize that that Hispanic male you saw on
14  the 4th was Roel Bermea?
15  A.   On the date that we arrested him.
16  Q.   And that would be what date?
17  A.   October 24th, 2005.
18       MR. GEISE:  Thank you, Your Honor. No further
19  questions.
20       THE COURT:  You may step down.
21       MISS LIEBER:  Your Honor, we call Detective Joe
22  Sopata. And while we're waiting for him to come in, I'm going
23  to just show the photos to counsel just to sort of move things
24  along.
25       THE COURT:  All right. Can we have the spelling when

**34**

1  he takes the stand, please?
2       (Witness sworn by Deputy Clerk.)
3              DIRECT EXAMINATION
4  BY MISS LIEBER:
5  Q.   Good afternoon, sir.
6  A.   Good afternoon.
7  Q.   In a nice clear voice, can you please introduce yourself to
8  our jury and spell your last name for the court reporter?
9  A.   Joseph F. Sopata, S-O-P-A-T-A. I'm a detective with the
10  Metropolitan Police Department in Washington, D.C.
11  Q.   Sir, how long have you worked for the Metropolitan Police
12  Department?
13  A.   Going on 17 years.
14  Q.   And you said that you are a detective; is that right?
15  A.   Yes, ma'am.
16  Q.   How long have you been a detective with the Metropolitan
17  Police Department?
18  A.   The last five years.
19  Q.   Okay. Now, give the jury a sense, prior to the time that
20  you were a detective, where did you work at MPD?
21  A.   I was assigned to the Fifth Police District, which is in
22  Northeast Washington, D.C.
23  Q.   And how long did you work in 5-D?
24  A.   I would say from 1990 to -- well, 1990 to 2000.
25  Q.   And in 2000 did you become a member of the Safe Streets

*Moore St search - start*

**35**

1  Task Force?
2  A.   Actually in 1994 I did.
3  Q.   Oh, okay. In the course of working on the Safe Streets
4  Task Force, did you investigate activity in 5-D?
5  A.   Yes.
6  Q.   Okay. I want to direct your attention specifically to
7  October the 24th of 2005. Were you part of a search team
8  executing a search warrant that morning?
9  A.   Yes.
10  Q.   Okay. And were you a part of a much larger team?
11  A.   Yes.
12  Q.   And in the course of executing that search warrant, was
13  that at a 10950 Moore Street in Waldorf Maryland?
14  A.   Yes.
15  Q.   Did you have a particular focus that was generally your
16  search area?
17  A.   Yes, I was assigned an area.
18  Q.   And what area was that?
19  A.   It would have been the garage of the house.
20  Q.   Right.
21       MISS LIEBER:  Court's indulgence.
22  BY MISS LIEBER:
23  Q.   And in the course of executing the search warrant, focusing
24  on the garage area of the house -- first, let me ask you this:
25  Did you help secure the house before you began any formal

**36**

1  search?
2  A.   Yes, once the house was secured, then we go about searching
3  after the -- the walls and everything are labeled.
4  Q.   Okay. And what does it mean to secure a scene before you
5  search it?
6  A.   Once you get into the location, you make sure that
7  everybody is -- there's no one running around the house and
8  everything is secured.
9  Q.   Okay. And you said the rooms are labeled. What does that
10  mean?
11  A.   What they do is they label each -- the search team leader
12  has a person label each room individually and photo --
13  photograph it.
14  Q.   And they actual -- actually usually label with big letters?
15  A.   Big letters.
16  Q.   Taped to the walls?
17  A.   Yes, ma'am.
18  Q.   Okay. I want to focus now your attention to the search
19  conducted in the garage area of that house in Waldorf,
20  Maryland. And actually, first, let me show you a photo of the
21  house itself.
22       MISS LIEBER:  Your Honor, for the record, this is
23  AJ-SW-1.
24       THE COURT:  Any objection?
25       MISS LIEBER:  I'm showing this to defense counsel.

*Moore St*                    *Moore St*

37

```
 1   That's why it's --
 2         THE COURT:  Well, they should know what this are.  You
 3   have seen it, Mr. Balarezo?
 4         MR. BALAREZO:  No.
 5         THE COURT:  I assume no one else -- it's admitted.
 6   That's SW -- AJ-SW-1.
 7         MISS LIEBER:  That's right.
 8         (Exhibit No. AJ-SW-1 was received into evidence.)
 9   BY MISS LIEBER:
10   Q.  Detective Sopata, do you see AJ-SW-1?
11   A.  Yes, I do.
12   Q.  Is that a photograph of the house that you searched on
13   October 24th, 2005?
14   A.  Yes, ma'am.
15   Q.  Okay.  Do you see the exterior portion of the garage?
16   A.  Yes.
17   Q.  Do you see the vehicle that I'm pointing to here with my
18   pen?
19   A.  Yes.
20   Q.  Okay.  At the time that you actually conducted the -- the
21   search, where was that vehicle?
22   A.  Inside the garage.
23   Q.  Do you know when this particular photograph was taken?
24   A.  No.
25   Q.  Okay.  It wasn't taken the day of the search, though; is
```

38

```
 1   that right?
 2   A.  No.
 3   Q.  Okay.  Now, Detective --
 4         MISS LIEBER:  Your Honor, at this time I have shown to
 5   defense counsel what we have labeled AJ-SW-49 through AJ-SW-59.
 6   And before I show these to the witness, I seek admission of
 7   these photographs as well?
 8         THE COURT:  Okay.  Give me the numbers again.
 9   Forty-nine -- they're all photos.
10         MISS LIEBER:  They're all photos, beginning at
11   AJ-SW-49 --
12         THE COURT:  Through?
13         MISS LIEBER:  -- through AJ-SW-59.
14         THE COURT:  Okay.  I take it everybody has seen them.
15   Then do we have no objection?  They will be admitted.  That's
16   49.
17         (Exhibits No. AJ-SW-49 through AJ-SW-59 were received
18         into evidence.)
19   BY MISS LIEBER:
20   Q.  Detective Sopata, first, I'm going to show you AJ-SW-49.
21   Is that the interior of the garage?
22   A.  Yes, ma'am.
23   Q.  Okay.  And did you personally conduct a search of the --
24   the champagne-colored Jeep Cherokee?
25   A.  Yes, ma'am.
```

39

```
 1   Q.  And I'm pointing to that here in the photograph?
 2   A.  Right.
 3   Q.  Okay.  And, Detective Sopata, what I want to do is just
 4   walk through the photographs at the same time as you tell us
 5   what you found; okay?
 6   A.  Okay.
 7   Q.  I'm going to show you AJ-SW-50.  Do you see that?
 8   A.  Yes.
 9   Q.  Okay.  And I'm going to zoom in a little bit.  What is this
10   here that I am pointing to with my pen?
11   A.  That's a computer bag.
12   Q.  Okay.  Black in color?
13   A.  Black in color.
14   Q.  Okay.  And just generally give the -- the jury a sense of
15   what was the interior of that Jeep Cherokee like?
16   A.  Basically it was a mess.  I mean, there was -- as you can
17   see, there was stuff all in the back.  This is the back
18   compartment behind the rear seats.
19   Q.  And, Detective Sopata, was this photograph taken before you
20   really began to conduct any search of -- of that interior
21   compartment of the Jeep?
22   A.  Yes.
23   Q.  Okay.  And is -- we'll talk -- we'll get to what you found
24   in the black computer bag in a minute, but is the black
25   computer bag, as it's depicted here in this photograph, is that
```

40

```
 1   how it was when you began to search the car?
 2   A.  It wasn't zipped.  It was zipped, it wasn't unzipped, I
 3   mean.
 4   Q.  Okay.  And so at this point in the photograph, just so
 5   we're clear, have you or someone like you unzipped it just a
 6   little bit --
 7   A.  Yes.
 8   Q.  -- to expose the contents?
 9   A.  Yes.
10   Q.  Okay.  Now let's talk about the contents.  I'm going to
11   show you AJ-SW-51.  Is that a close-up photo of the interior of
12   that black computer bag?
13   A.  Yes, ma'am.
14   Q.  Okay.  At the point that this photograph was taken, had you
15   searched the entirety of that computer bag?
16   A.  I believe so.
17   Q.  Okay.  I want to focus -- well, this brown paper bag here
18   that I'm pointing to with my pen, do you see that?
19   A.  Yes.
20   Q.  Okay.  Is that how it was located in the computer bag?
21   A.  Yes, ma'am.
22   Q.  Showing you AJ-SW-52, what is that a picture of?
23   A.  The contents which was in the bag on the previous picture.
24   Q.  Okay.  And so have you basically just stacked the contents
25   on top of the paper bag?
```

41

1    MR. BALAREZO:   Objection. Could the witness describe
2  what he did rather than the question.
3  BY MISS LIEBER:
4    Q.  Detective Sopata, how did that money get on top of the bag?
5    A.  I removed it and placed it on top the paper bag so it could
6  be photoed, photographed.
7    Q.  Okay.  Was the money in the -- the very condition we see it
8  in here, with rubber bands around it like that?
9    A.  Yes, ma'am.
10   Q.  Show you AJ-SW-53.  What is that that you see there in the
11  middle of the computer bag?
12   A.  I searched another compartment of the bag, unzippered it,
13  held the -- the bag open so they could photograph, and that's
14  the photograph you see now.
15   Q.  And that stack of money, was it also rubber-banded, just as
16  it's depicted here in the photograph?
17   A.  Yes, ma'am.
18   Q.  So did you put any extra rubber bands on it?
19   A.  No.
20   Q.  Okay.  Was that large amount of money contained in any
21  separate bag, or was it just as you see here in the photo?
22   A.  In that compartment.
23      THE COURT:   What denomination?
24      THE WITNESS:   I'm sorry, Your Honor?
25      THE COURT:   What denominations are these, do you know?

42

1      THE WITNESS:   I believe it looked like a 100-dollar
2  bill there.  I don't know exactly how it was in the
3  denominations.
4  BY MISS LIEBER:
5    Q.  Okay.  Detective, let me ask you this:  Did you recover a
6  substantial quantity of money from that black computer bag
7  during the execution of the search warrant on October 24th,
8  2005?
9    A.  Yes, ma'am.
10   Q.  And did there come a point in time that you all counted
11  that money?
12   A.  Yes, ma'am.
13   Q.  Tell the jury before we get to the rest of the pictures,
14  how did that happen?  What was sort of the sequence?
15   A.  Once the money was located and photographed, we then took
16  the money into the -- I believe it was the dining room area of
17  that house, because it was a large enough area that we could
18  count it, and there was a number of us that counted it.
19   Q.  Okay.  And, sir, I'm going to show you what's been admitted
20  as AJ-SW-59.  Do you see that photograph?
21   A.  Yes, ma'am.
22   Q.  What is that a picture of?
23   A.  The money that was placed on the table that we -- we
24  counted in the living room.
25      THE COURT:   From the computer bag only, is that what

'cut PASES

Note! Never mention me signing a consent form
on me pointing out any BASS of money.

43

1  you're saying, or was this other places?
2      THE WITNESS:   Well, there was -- yes, ma'am.
3      THE COURT:   It came from other places too?
4      THE WITNESS:   Yes, Your Honor.
5  BY MISS LIEBER:
6    Q.  Is this all the money that was seized from that residence
7  that day?
8    A.  No.
9    Q.  Okay.  What is depicted in -- in the photograph you're
10  looking at, AJ-SW-59?
11   A.  I believe that's the money that was recovered from the Jeep
12  Cherokee.
13   Q.  Okay.  Was a separate quantity of money seized from
14  someplace else in the residence that day?
15   A.  I'm not sure.
16   Q.  Okay.  Is this the money that -- that was recovered from --
17  just from the Jeep?
18   A.  I believe so.
19      MR. BALAREZO:   Objection, Your Honor.
20  BY MISS LIEBER:
21   Q.  Okay.
22      THE COURT:   Overruled.
23  BY MISS LIEBER:
24   Q.  What is this sort of floral print thing underneath the
25  money?

44

1    A.  I believe that's a tablecloth of the -- of the dining room
2  table.
3    Q.  And how much money total was there?
4    A.  I believe -- I don't know exactly how much was there, but I
5  believe total that we found that day was like -- I think
6  somewhere like $69,000.
7    Q.  Now, sir, I'm actually --
8      MISS LIEBER:   Since we're talking about the money,
9  Your Honor, I'll show defense counsel what's been marked
10  AJ-SW-65.
11      THE COURT:   Any objection to 65?
12      Okay.  It's admitted.
13    (Exhibit No. 65 was received into evidence.)
14      MR. BALAREZO:   It's what it is, Your Honor.
15      MISS LIEBER:   Your Honor, if I may approach the
16  witness?
17      THE COURT:   Yes.  Sixty-five is admitted.
18  BY MISS LIEBER:
19   Q.  Detective Sopata, I'm showing you AJ-SW-65.  What is that?
20   A.  U.S. currency.
21   Q.  Is it a bag of U.S. currency?
22   A.  A bag of U.S. currency.
23   Q.  Okay.  And if you will, are there individual bundles inside
24  that bag?
25   A.  Yes.

45

1  Q. Can you pull out just a representative bundle? And you're
2  showing the jury, just for the record, what denomination are
3  those -- is that bundle in?
4  A. I'm sorry, the question?
5  Q. What denomination is that? Is that a bundle of all the
6  same denominations?
7  A. Yes, 20-dollar bills.
8  Q. Is there a yellow sticky on that?
9  A. Yes.
10  Q. How did the yellow sticky get there?
11  A. Once we counted it in the -- on the dining room table, each
12  stack was with a sticky how much money in each stack and what
13  denomination.
14  Q. Okay. So just so -- just so the jury is clear about
15  that -- that bag of $69,000, the yellow stickies were not there
16  when you --
17  A. No.
18  Q. -- seized that money?
19  A. No.
20  Q. Okay. And that was a measure that you employed just to
21  make sure you kept the count correct; is that right?
22  A. Yes.
23       MR. BALAREZO: I'm going to object to the form.
24       THE COURT: Okay. All right. We're going to take a
25  short recess now, ladies and gentlemen, for about ten minutes.

46

1       (Jury out at 2:53 p.m.)
2       (Jury present.)
3       THE COURT: Okay. Please be seated. You are still
4  under oath.
5       THE WITNESS: Thank you.
6  BY MISS LIEBER:
7  Q. Good afternoon again, sir.
8  A. Good afternoon.
9  Q. Detective Sopata, at the break did we have a chance to
10  actually get that money out of the bag and put it out there on
11  the table?
12  A. Yes.
13  Q. And are there several of those yellow stickies?
14  A. Yes, ma'am.
15  Q. Were all those yellow stickies placed on there by law
16  enforcement?
17  A. By law enforcement, yes.
18  Q. Thank you. Now, Detective, I think my questions were a
19  little confusing. Going back to Government's Exhibit AJ-SW-50
20  that's already in evidence, all the money that you saw on
21  the -- on the dining room table, did money come from the black
22  computer bag and elsewhere in the Jeep?
23  A. Yes.
24  Q. Okay. Now I want to talk about some of the "elsewhere in
25  the Jeep."

47

1  A. Okay.
2  Q. Okay. Do you see here towards the bottom of the photo with
3  my pen showing this shiny red area here?
4  A. Yes.
5  Q. Okay.
6       THE COURT: Well, I'm now confused. Sixty-five, which
7  is what's sitting in front of you -- is that AJ-SW-65?
8       THE WITNESS: Yes, Your Honor.
9       THE COURT: How many different places did that come
10  from?
11       THE WITNESS: It all came from within the Jeep.
12       THE COURT: I see, but it came from more places than
13  the computer bag?
14       THE WITNESS: Yes, Your Honor.
15       THE COURT: Okay.
16  BY MISS LIEBER:
17  Q. Now, Detective Sopata, I want to show you AJ-SW-57. What
18  is that a picture of?
19  A. That's a picture of a locker room -- plastic locker room
20  bag.
21  Q. Okay. Is that the red that you can see in that picture?
22  A. That is the red part of that bag that was in the photo
23  before this one.
24  Q. That spot right there in No. 50?
25  A. Yes.

48

1  Q. Okay. Let's talk about what was inside that bag. I'm
2  going to show you AJ-SW-56. Do you see that picture?
3  A. Yes, ma'am.
4  Q. Okay. Why are those three bags I'm pointing to, a brown
5  paper bag, a black plastic bag, and a beige plastic bag, why
6  are they sitting on top of the red shiny bag?
7  A. Those three bags there were inside of the red -- the
8  brownish locker room bag that you see underneath that was in --
9       THE COURT: Fifty --
10       THE WITNESS: -- the prior two pictures.
11       THE COURT: Fifty-seven was the red bag, and you're
12  saying 56 shows the contents of 57?
13       MISS LIEBER: That's correct.
14       THE WITNESS: Yes, Your Honor.
15  BY MISS LIEBER:
16  Q. Now, sir, I want to show you AJ-SW-58. Do you see that
17  photograph?
18  A. Yes.
19  Q. Okay. Tell the jury what this is.
20  A. That is the contents of AJ-56, I believe. That is the
21  contents that was inside those three bags, the brown paper bag,
22  the tan paper -- the tan plastic bag, and the black plastic
23  bag. All three of those bags were inside of the locker room
24  bag.
25  Q. Now, we see here three different piles of money. Did you

DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF INVESTIGATION

## CONSENT TO SEARCH

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:

(Describe the person(s), place(s), or thing(s) to be searched.)

Jeep Grand Cherokee Laredo

VIN Tag: MU674080

This is A lie, I never gave consent. This guy told me they forge his signature to look exactly like his signature, the expose them in his trial. It was all A lie and A forge signature.

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation.

10/24/05
**Date**

Antonio Jones
**Signature**

Witness    Alex R. Gilf

Note They never mention this in trial or Pre-trial.

*Grand Jury Transcript*
*Jan 26 2006*

*Witness — Pointed out the money*

20

1 | purchasing in Baltimore. At that location -- in his, in his

2 | home address, as (it was told to me,) he directed agents when

3 | they let him know that it was a search warrant, that he had

4 | money in his vehicle, and he took them out to the vehicle.

5 | Now, these photos here are actually of his -- inside of his

6 | vehicle which is a gold Jeep Cherokee. And (he pointed out)

7 | some are in the briefcase and some are in bags, plastic bags,

8 | I believe in the brown paper bag.

*BIAS statement #7*

*(lie*

*BIAS*

*BIAS Grand Jury — first they said I sign the consent form*

9 |       MR. GEISE.  And we'll mark that as Grand Jury

10 | Exhibit 7.  And how many --

11 |       WITNESS.  No, that would be No. 8.

12 |       COURT REPORTER.  No. 8.

13 |       MR. GEISE.  No. 8, No. 8.

14 |       WITNESS.  And there would be nine photos in that

15 | batch.

16 |       GRAND JUROR.  Are those the other ones, come back?

17 |       MR. GEISE.  Yes.

18 |       GRAND JUROR.  Can we see those?

19 |       MR. GEISE.  Which -- oh, you want to see --

20 |       GRAND JUROR.  No, we need to see 2 through 6.  We

21 | need to see 2 through 6.

22 |       GRAND JUROR.  Yeah.  We haven't seen -- they've

23 | been going around.

24 |       WITNESS.  Any questions?

25 |       MR. GEISE.  All right, give me a minute or two to -

*Note! The government never mention this in trial on pretrial*

49

```
1    do anything to affect those piles of money, or were they all in
2    that condition, rubber-banded and folded and the like?
3    A.   Exactly the same condition as they are now.
4    Q.   Okay. And finally, sir, did you seize from inside the Jeep
5    area -- actually I'll show you AJ-SW-54. Is that another --
6    I'm pointing to the center there. Is that another bag that you
7    found inside the Jeep?
8    A.   Yes.
9    Q.   Is it actually still positioned inside the Jeep?
10   A.   Yes.
11   Q.   Okay. And I'll show you a close-up of that photo,
12   AJ-SW-55. What is that?
13   A.   Money that was inside of the blue cooler. I think it's
14   like a lunch cooler thing.
15           THE COURT:   Cooler, is that what you said?
16           THE WITNESS:   Cooler.
17   BY MISS LIEBER:
18   Q.   And I'm pointing here, sir, to sort of the bottom portion
19   of the photograph inside the cooler bag. Do you see all these
20   loose rubber bands and papers and things?
21   A.   Yes, ma'am.
22   Q.   Are those -- does that picture fairly and accurately depict
23   how the contents looked on that day?
24   A.   Yes, ma'am.
25   Q.   Now, back to the table full of money. Does that picture
```

50

```
1    represent all the -- all the money --
2            THE COURT:   Fifty-nine, please.
3            MISS LIEBER:   I'm sorry. Thank you.
4            THE COURT:   AJ-SW-59.
5    BY MISS LIEBER:
6    Q.   AJ-SW-59, is the picture here -- where was all this money
7    taken from?
8    A.   From inside of the Jeep Grand Cherokee, which is located
9    inside the garage of the Moore Street address.
10   Q.   Okay. Thank you.
11   Q.   Is 59 the same as is in front of you now,
12   the same money, more or less the same?
13           THE WITNESS:   The same, Your Honor.
14           THE COURT:   So what we see in 59 is what everybody is
15   looking at on the witness stand?
16           MISS LIEBER:   That's correct.
17   BY MISS LIEBER:
18   Q.   And that, just for the record --
19           MISS LIEBER:   Thank you, Your Honor.
20   BY MISS LIEBER:
21   Q.   AJ-SW-55 is the bag full of money that we're all looking at
22   on the witness stand?
23   A.   Correct.
24   Q.   Okay. Sir, I'm also now going to show you AJ-SW-57.
25           MISS LIEBER:   With the Court's permission, I'll show
```

51

```
1    it to defense.
2            Your Honor, I'll move admission of this subject to --
3    there may be something that needs to come out, but --
4            THE COURT:   All right. Well, you can double-check the
5    bag later, but it will be admitted subject to further
6    investigation I guess.
7            MISS LIEBER:   If I may approach the witness, Your
8    Honor?
9            THE COURT:   Yeah. You going to take away all that
10   money?
11           MISS LIEBER:   Yes.
12           THE WITNESS:   Do you want that -- not yet?
13           MISS LIEBER:   Yes.
14           THE WITNESS:   Yes?
15           THE COURT:   Did we establish the quantity yet of what
16   is in that 65, meaning amount of money? I didn't -- did you
17   testify --
18   BY MISS LIEBER:
19   Q.   Detective, to the best of your recollection, how much money
20   is there?
21   A.   $69,191.
22           THE COURT:   Okay.
23   BY MISS LIEBER:
24   Q.   And, Detective Sopata, if you will, please just take a look
25   at what's inside that bag. Do you recognize the contents of
```

52

```
1    that bag?
2    A.   Yes.
3    Q.   And what's inside that bag?
4    A.   The blue lunch cooler, the locker room bag, and the black
5    plastic bag.
6    Q.   Are there other rubber bands and things inside that bag?
7    A.   Yes.
8            MISS LIEBER:   Okay. Your Honor, I'm now showing to
9    defense counsel AJ-SW-69.
10           THE COURT:   Sixty-nine?
11           MISS LIEBER:   That's correct, Your Honor, yes.
12   BY MISS LIEBER:
13   Q.   Detective Sopata, I'm showing you AJ-SW-69.
14   A.   Yes, ma'am.
15   Q.   Do you see that?
16   A.   Yes, ma'am.
17   Q.   Okay. What is contained inside that plastic bag?
18   A.   Two brown paper bags.
19   Q.   Were those the brown paper bags that we've seen in the
20   photographs?
21   A.   Yes, ma'am.
22           MISS LIEBER:   Your Honor, I'm not sure I've done this,
23   but at this time, I would move these bag exhibits into
24   evidence.
25           MR. BALAREZO:   No objection, subject to that
```

53

1  limitation on the contents of the other bag.
2       THE COURT:  Well, I don't know what that means, but if
3  you've got a problem, we'll find out about it later.  Okay.
4       But, okay.  Then 69 is admitted.  But my record shows
5  no 66, -7 or -8.
6       Is that right, Gwen?
7       THE DEPUTY CLERK:  I have a 67 in.
8       THE COURT:  You have SW-67 as admitted?
9       THE DEPUTY CLERK:  Yes.  I don't have a 66 and a 68.
10      THE COURT:  Okay.  All right.  So the bag and its
11 contents were 67 and 65?
12      MR. BALAREZO:  That's right, Your Honor.
13      THE COURT:  All right.  Thank you.
14      Sorry.  69 is in.
15      (Government's Exhibit AJ-SW-69 was received
16      into evidence.)
17 BY MISS LIEBER:
18 Q.  Now, Detective Sopata, I'm going to show you one of the
19 bags taken from inside AJ-SW-69.
20      Can you see that very well?
21 A.  Yeah, okay.  Good.
22 Q.  What do you see written on that bag?
23 A.  Looks like an "MT, 11.5."
24 Q.  Thank you.
25      MISS LIEBER:  Court's indulgence.

54

1  BY MISS LIEBER:
2  Q.  Thank you very much, sir.
3  A.  You're welcome.
4       MR. BALAREZO:  May I proceed, Your Honor?
5       THE COURT:  Uh-huh.
6                 CROSS-EXAMINATION
7  BY MR. BALAREZO:
8  Q.  Good afternoon, Detective.  How are you?
9  A.  Good, Mr. Balarezo.
10 Q.  You said that you were in charge of the -- specifically,
11 the search of the garage at Moore Street; correct?
12 A.  Myself and others.
13 Q.  Were you in charge, or was somebody else in charge?
14 A.  I don't know, probably someone else.  I just assisted.
15 Q.  You assisted.  Okay.
16      Now, your testimony is that you found the -- found all this
17 money that's in these various bags; right?
18 A.  Correct.
19 Q.  Now at some point during the direct examination, Judge
20 Huvelle asked you if you broke it up into specific
21 denominations.  And I think you said you didn't know or you
22 didn't -- hadn't done it.
23      Is that correct?
24 A.  When we counted it, we did.
25 Q.  When you counted it.

*Dective SOPATA testified We Found all the money*

55

1       How about prior to?
2  A.  No.
3  Q.  Okay.  So let me show you AJ-SW-53.
4       Do you see that?
5  A.  Yes, sir.
6  Q.  And I think -- I'm pointing to this little -- my finger
7  looks horrible -- this little piece right here.
8  A.  Yes, sir.
9  Q.  That is currency of some type; right?
10 A.  Yes, sir.
11 Q.  Okay.  Did you count specifically how much was in that one
12 bundle?
13 A.  I don't know that I did, but someone did.
14 Q.  Okay.
15 A.  Once we took it out of the Jeep, the bag, each compartment,
16 that was counted separate, and the brown bag was counted
17 separate.
18 Q.  Well, can you tell us today how much was in this particular
19 bundle?
20 A.  No.
21 Q.  And SW-58, can you tell us today how much was in each of
22 these bags, as you've described?
23 A.  No.
24 Q.  And just -- well, this is SW-59.  I'm sorry.
25      That is the entire seizure of cash; correct?

56

1  A.  Within the Jeep.
2  Q.  Within the Jeep?
3  A.  Yes, sir.
4  Q.  And this is after you took it out of each bag and
5  counted -- and did you stack it in, you or other agents stack
6  it into individual denominations?
7  A.  Myself and others.
8  Q.  Okay.  And is this what adds up to the 69 and change or --
9  A.  Yes.
10 Q.  Okay.  Now, just to be clear, there were quite a few
11 one-dollar bills?
12 A.  Yes, there were.
13 Q.  Do you recall how many one-dollar bills there were?
14 A.  No, I don't.
15 Q.  Do you recall how many five-dollar bills there were?
16 A.  No.  It's -- it's on the --
17 Q.  The little yellow stickers?
18 A.  -- the yellow stickers.
19 Q.  Okay.  As far as how many ones or fives there are?
20 A.  Offhand, no, I don't know --
21 Q.  No --
22 A.  I just -- I'm sorry.
23 Q.  I'm sorry.  I didn't mean to interrupt you.
24      Go ahead.
25 A.  I said offhand, I don't know.  But if I were to look at the

57

1  stickers, maybe --
2  Q.  Right.  But the stickers only indicate how many ones, or
3  fives, or 20s there were?
4  A.  Correct.
5  Q.  The stickers don't indicate how much was in each bag?
6  A.  I don't know -- no, they don't.
7  Q.  Okay.  Now, so as you sit here today, you can't tell us
8  whether any one of these bags or any of the ones you have
9  before you contained $20,000; right?
10  A.  I can't, someone else could.
11  Q.  But you can't --
12  A.  I can't.
13  Q.  -- you're testifying here?
14  A.  I can't, no.
15  Q.  Now, do you know whether any of the -- any -- do you know
16  whether there are any prints, fingerprints, I mean, on any of
17  these dollar bills or any of this currency that ties it to
18  someone by the name of John Adams?
19  A.  No, I don't.
20  Q.  Do you know if any of the currency was dusted for prints or
21  checked for fingerprints or anything of that nature?
22  A.  I don't know.
23  Q.  And I think the prosecutor showed you this particular bag,
24  and you read the notation "Empty" or "M" something, in 11.5?
25  A.  Yes.

58

1  Q.  All right.  You have no idea how that got there; correct?
2  A.  No.
3  Q.  And you have no idea what it means; right?
4  A.  No.
5       MR. BALAREZO:   If I could just have one second, Your
6  Honor.
7  BY MR. BALAREZO:
8  Q.  During the -- do you know what a receipt for property
9  received, returned, released, or seized is?
10  A.  Yes.
11  Q.  Okay.  Do you know if one was completed in this particular
12  case?
13  A.  I'm certain there was.
14  Q.  Okay.  Did you complete it?
15  A.  No.
16  Q.  Okay.  But you know some other agent did?
17  A.  Yes.
18  Q.  Do you have one in front of you, by any chance?
19  A.  No.
20  Q.  Okay.  Do you know whether or not that receipt -- or that
21  inventory sheet, let's call it that -- that just lists
22  everything that was seized at Moore Street; correct, at least
23  in this particular case?
24  A.  Yes, everything that was seized and taken out of the house,
25  yes.

59

1  Q.  And when those -- have you completed these before,
2  yourself?
3  A.  Yes.
4  Q.  And when you complete these, you try to be accurate and
5  complete so that they can be used later at a trial, for
6  example; right?
7  A.  Yes.
8  Q.  You don't want to put down incorrect information; right?
9  A.  No.
10  Q.  Do you know whether or not the inventory sheet in this
11  particular case indicated whether or not multiple bags of
12  currency were seized or whether just one bag of currency was
13  seized?
14  A.  I don't know.
15  Q.  I'll show you what I marked as, I think, Jones Number 13.
16       MR. BALAREZO:   Is that right?
17       THE DEPUTY CLERK:   Yes, Jones 13.
18  BY MR. BALAREZO:
19  Q.  Let me show you what I've marked as Jones Number 13.
20       MISS LIEBER:   Objection.  He didn't actually prepare
21  this document.
22       THE COURT:   I'm not sure for what purpose you're using
23  it, nor do I know what it is.
24  BY MR. BALAREZO:
25  Q.  What is that --

60

1       THE COURT:   Do you know?
2  BY MR. BALAREZO:
3  Q.  -- Detective Sopata?
4       THE COURT:   Oh, this is the inventory list?
5       MR. BALAREZO:   Yes, Your Honor.
6       THE COURT:   Okay.  I'm not sure which one -- do you
7  want to put it into evidence or what?
8       MR. BALAREZO:   Not just yet, Your Honor.
9  BY MR. BALAREZO:
10  Q.  This is the inventory sheet for 10870 Moore Street; is that
11  correct?
12  A.  Yes.
13  Q.  Okay.  And does that in -- have you seen that before?
14  A.  No.
15  Q.  And you didn't prepare it?
16  A.  No.
17  Q.  All right.  When you -- when you seized the cash, did you
18  speed 21 and let them know what you had found with respect to
19  the --
20       THE COURT:   When you seized the cash, what?
21  BY MR. BALAREZO:
22  Q.  When you seized the cash -- after you seized the cash, did
23  you have the opportunity to speak with another agent or the
24  agent that prepared that inventory to let them know what you
25  had found?

**61**

1  A. Either myself or someone that was assisting in the counting

2  did.

3  Q. Okay. And you don't recall if you, yourself, did?

4  A. No, I don't.

5  Q. And if you -- if you had, would you have told them that you

6  found the currency in individual bags, or would you have told

7  them that you found it in one bag?

8      MISS LIEBER:  Objection.

9      THE COURT:  Sustained. Totally hypothetical.

10     Do you remember what you told the person?

11     THE WITNESS:  No.

12     THE COURT:  Okay.

13     THE WITNESS:  No, Your Honor.

14     MR. BALAREZO:  I believe that's all I have for the

15 Detective, Your Honor.

16     THE COURT:  Anyone else?

17     MR. NORRIS:  No questions.

18     THE COURT:  Anything else?

19     MISS LIEBER:  Nothing. Thank you very much,

20 Detective.

21     THE WITNESS:  Thank you, Your Honor. Thank you.

22     THE COURT:  Is he taking the bag with him?

23     MISS LIEBER:  The money, yes. And, Your Honor, I'll

24 collect the rest of the exhibits.

25     The Government calls Special Agent Steve Naugle.

*Agent Steve Naugle*

**62**

1      (Special Agent Steve Naugle sworn by clerk.)

2                  DIRECT EXAMINATION

3  BY MISS LIEBER:

4  Q. Good afternoon, sir.

5  A. Good afternoon.

6  Q. In a nice, clear voice, can you please introduce yourself

7  to our jury?

8  A. Yes, Steve Naugle.

9  Q. And how are you employed?

10 A. Employed by the Federal Bureau of Investigation.

11 Q. How long have you worked for the FBI?

12 A. Eight years.

13 Q. And Det -- Special Agent Naugle, where are you currently

14 assigned?

15 A. Currently assigned to the FBI Washington field office here

16 in Washington, D.C.

17 Q. And do you have a particular squad that you're assigned to?

18 A. Yes. I'm currently assigned to a drug squad.

19 Q. Back in the fall of 2004, October, specifically -- I'm

20 sorry, 2005 -- where were you working within the FBI?

21 A. I was assigned to a Washington field office, and I was

22 assigned to a save streets gang task force.

23 Q. Now, Special Agent Naugle, I want to direct your attention

24 specifically to a search that you conducted on October 24th,

25 2005.

**63**

1      Were you a team leader of a search warrant that was

2  executed that morning?

3  A. Yes, I was.

4  Q. And was that at 10870 Moore Street in Waldorf, Maryland?

5  A. Yes, it was.

6  Q. Do you know whose house it was that you were searching?

7  A. Yes.

8  Q. Who was that?

9  A. Antoine Jones.

10 Q. Do you see Mr. Jones here in court today?

11 A. Yes, I do.

12 Q. Can you identify him by where he is seated and something

13 that he's wearing?

14 A. Yes. He's to the far right of the defense table. He is

15 wearing a --

16     THE COURT:  I think he just stood up.

17     THE WITNESS:  That's correct.

18     THE COURT:  All right. Let the record reflect that he

19 has identified Mr. Jones.

20     MISS LIEBER:  Thank you.

21 BY MISS LIEBER:

22 Q. And I guess I should ask this, during the course of the

23 execution of the search warrant at Moore Street in Waldorf that

24 morning, did you actually arrest Mr. Jones?

25 A. Yes.

**64**

1  Q. You said that you were a team -- you were a team leader.

2      Tell the jury what it means to be a team leader in a search

3  warrant.

4  A. Yes. Basically, it just means that I coordinated the

5  search warrant. I gave out assignments to all the law

6  enforcement personnel that was on our team. And one of the

7  assignments I gave myself, I did the knock and announce, in

8  other words, I knocked on the door, identified ourselves as law

9  enforcement. And as I said, I gave out other assignments for

10 other law enforcement personnel.

11 Q. And were you actually what's called a "seizing agent" for

12 anything that was recovered that morning?

13 A. Yes, there was a seizing agent there, yes.

14 Q. Now, tell the jury about how you all made entry into that

15 location on October 24th.

16 A. Yes. As I said, I was the knock and announce agent. I

17 knocked on the door on this -- after I knocked on the door, the

18 door was opened; we went inside the dwelling. On the second

19 floor of the house, there's a -- it's the upstairs. The

20 bedrooms are located on the second floor.

21     We observed a man come out of -- we observed a man come out

22 of a room. He was in the hallway, appeared to be Mr. Jones.

23 We gave him -- I give him commands to get down on the ground,

24 gave him some other commands. He then went back into the

25 bedroom, the room that he came out of. He didn't follow any of

*Steve Naugle was responsible for the search, the illegal seizure of the property and knock and announce*

65

1  our commands.
2      He went back into the bedroom area, and I followed him up
3  the stairs, along with some other agents. And finally, he
4  followed our commands once he was inside the bedroom. And at
5  that point, we placed him under arrest.
6  Q.  Now, Special Agent Naugle, what was Mr. Jones wearing at
7  the time you made entry into the house?
8  A.  He didn't have any clothes on.
9  Q.  Okay.  Did there come a time once he got back into his
10 bedroom that you all allowed him to put some clothes on?
11 A.  Yes.
12 Q.  All right.
13      MISS LIEBER:  And, Your Honor, actually, I'm going to
14 show it to defense counsel right now, AJ-SW-60 through 64.
15 These are photographs, all at the same time.
16      THE DEPUTY CLERK:  60 through 64?
17      THE COURT:  All right.
18      MR. BALAREZO:  No objection.
19      THE COURT:  They will be admitted, 60 through 64.
20      (Government's Exhibit Numbers AJ-SW-60 through
21      AJ-SW-64 were received into evidence.)
22 BY MISS LIEBER:
23 Q.  Special Agent Naugle, I'm going to show you AJ-SW-60.
24      What is that a picture of?
25 A.  A – a – stairwell of the house.

66

1  Q.  So when you first observed Mr. Jones, where was he on this
2  photograph?
3  A.  The way I'm looking at the photo, he would be – he would
4  be to the right –
5  Q.  So –
6  A.  – over in this area, yes.
7  Q.  Where I'm placing my pen, is there sort of a long hallway
8  that cuts back up this way?
9  A.  Right.  And then there's a bedroom back there, yes.
10      MISS LIEBER:  Okay.  And, Your Honor, just for the
11 record, I'm pointing to the upper right-most corner of the
12 photograph.
13 BY MISS LIEBER:
14 Q.  Now, Special Agent Naugle, you talked about the bedroom.
15 And I'm going to show you a few pictures.
16      AJ-SW-61, is that the bedroom you're talking about?
17 A.  Yes, it is.
18 Q.  And then AJ-SW-62?
19 A.  Yes.
20 Q.  Now, I can't help but notice a rather large "H" hanging on
21 the wall.
22      Was that "H" there when you executed the search warrant?
23 A.  No, it was not.
24 Q.  How did that get there?
25 A.  We – law enforcement placed that there.

67

1  Q.  Okay.  And why do you place that there?
2  A.  One of the things we do is, we go in, and we label all the
3  rooms, so then if we find anything in the room, we identify
4  which room we found it in.
5  Q.  Okay.  So we'll just refer to this as the bedroom, okay?
6  A.  Okay.
7  Q.  Were there several bedrooms in the house?
8  A.  Yes, there was.
9  Q.  In terms of the evidence -- let me ask this, have you
10 reviewed some items of evidence that we're going to seek to
11 admit here this afternoon?
12 A.  Yes, I have.
13 Q.  Okay.  Were several of those items retrieved from this
14 room, Room H, the bedroom?
15 A.  Yes.
16 Q.  Okay.  Were others -- other items retrieved from an office
17 on the ground level of the house?
18 A.  Yes.
19 Q.  Okay.  And I'm going to show you AJ-SW-64.
20      What is that a picture of?
21 A.  An office on the ground level, first floor as you walk in.
22 Q.  Okay.  And do you see the letter sort of cut off of it up
23 here?
24 A.  Yes, I do.
25 Q.  What is that?

68

1  A.  Letter A.
2  Q.  Okay.  And finally, I'm showing you AJ-SW-63, what is --
3  what is that?
4  A.  U.S. currency.
5  Q.  Where did that U.S. currency come from?
6  A.  From a pair of jeans from the bedroom.
7  Q.  Okay.  Was Mr. Jones wearing those jeans that day?
8  A.  Yes, he was.
9  Q.  How did that happen?
10 A.  Once he was arrested, we wanted to get him dressed.  We
11 asked him, you know, where his pants were.  He pointed to a
12 pair of jeans.  Then we went and picked up the jeans, allowed
13 him to put the jeans on.
14      Prior to him putting them on, we searched the jeans, and
15 the U.S. currency was inside the jeans.
16 Q.  Do you recall how much currency that was?
17 A.  $452.
18 Q.  Special Agent Naugle, was anyone else home when you
19 executed the search warrant?
20 A.  Yes, there was.
21 Q.  Who was that?
22 A.  There was another female in the house, I believe it was
23 Mr. Jones' wife, and also the son of Mr. Jones.
24 Q.  About how old is Mr. Jones' son?
25 A.  I believe he was attending college, so I would have to say

**69**

1  you know, anywhere from 18 to 20 years old.
2  Q.  So an adult?
3  A.  Yeah.
4  Q.  Now, Special Agent Naugle, I want to just run through with
5  you, some items of evidence.
6       First, are you familiar with some non-cash items that were
7  recovered from the Jeep Cherokee in the garage?
8  A.  Yes.
9       MISS LIEBER:  Your Honor, if I may, I'm going to show
10  it to defense counsel what they've already seen in preparation
11  for today's testimony, several Government's Exhibits, AJ-SW-8,
12  AJ-SW-10, and AJ-SW-4, -5, and -6.
13       THE COURT:  Okay.  You've shown them to Mr. Balarezo.
14       Any objections to 4, 5, 6, 8, 10?  Have you seen them,
15  sir?
16       MR. BALAREZO:  I have.  I just want to peruse.
17       THE COURT:  All right.  Go ahead.
18  BY MISS LIEBER:
19  Q.  Agent Naugle, do you -- did these -- all these items --
20  take a minute to review them -- come from the Jeep?
21  A.  Yes, they did.
22  Q.  Okay.  I'm going to show you, first, what is AJ-SW-8?
23  A.  It's a photo of three -- appears to be three males in the
24  photo.
25  Q.  Okay.  AJ-SW-4?

**70**

1  A.  This is an advertisement, a flyer for a club called
2  "Levels."
3  Q.  Was this the actual paper that was seized from the Jeep?
4  A.  Yes.
5  Q.  Okay.  Taking a look at that, Special Agent Naugle, do you
6  see any indication that tickets -- well, first of all, let me
7  ask, does this advertise an event that happened at Club Levels?
8  A.  Can you repeat that again, please?
9  Q.  Does this advertise a particular event that was to happen
10  at Club Levels?
11  A.  Yes.
12  Q.  Taking a look at that, do you see any indication that
13  tickets were for sale?
14  A.  No, I do not.
15  Q.  And looking down here, does it indicate who the promoter
16  is?
17  A.  Yes.
18  Q.  Who is that?
19  A.  Indicates "Big Vic," V-I-C.
20  Q.  Thank you.
21       Now, I'm going to show you AJ-SW-5.
22       And what is that?
23  A.  This is a partnership agreement.
24  Q.  And what's the date on the partnership agreement?
25  A.  First day of January, 2004.

**71**

1  Q.  And who is it between?
2  A.  Between Darnell Jackson and Antoine Jones.
3  Q.  Okay.  And here under "purpose," can you tell what's the
4  purpose of the partnership agreement?
5  A.  It says:  "The purpose is to -- of the partnership shall be
6  to own, manage, and operate a nightclub located at 1950 Montana
7  Avenue, Northeast, Washington, D.C., known as Club Levels."
8  Q.  Sir, I'm also now going to show you AJ-SW-6.
9       What is the title of that document, on the top?
10  A.  "Owners, Capital Investment."
11  Q.  And does it indicate for Phase One of the capital
12  investment, how much money Antoine Jones invested in the club?
13       MR. BALAREZO:  Objection, Your Honor.
14       THE COURT:  Well, the document speaks for itself.
15  It's in evidence.  So what's the objection?  Can you say it in
16  a word?
17       MR. BALAREZO:  Well, it speaks for itself.  There is
18  no evidence that this happened or --
19       THE COURT:  No, but that's what the document shows.
20  It shows what it shows.  He can answer.  He can read the
21  document.
22       Go ahead.
23       THE WITNESS:  On the top there, it's $197,500.
24  BY MISS LIEBER:
25  Q.  Okay.  Does it also indicate that Adrian Jackson made a

**72**

1  capital investment, as well?
2  A.  Yes.
3  Q.  And how much was that capital investment?
4  A.  45,000.
5  Q.  Thank you.  Going to show you AJ-SW-10.
6       Do you see that document?
7  A.  Yes.
8  Q.  Okay.  What is that document?
9  A.  It's a Maryland insurance certification from State Farm
10  Mutual Automobile Insurance Company.
11  Q.  Does it indicate, here at the bottom, the year and the name
12  of the vehicle that it insured?
13  A.  Yes, 1997 Honda.
14  Q.  What were the effective dates of the policy on this
15  particular certification?
16  A.  February 25th, 2005.
17  Q.  And when was the end of the policy?
18  A.  The expiration is August 25th, 2005.
19  Q.  Special Agent Naugle, I'm now going to show you a number of
20  items that were seized from Room H, from the bedroom.
21       MISS LIEBER:  Your Honor, for the record, for counsel,
22  these are AJ-SW-68, AJ-SW-7, AJ-SW-19 and -20, AJ-SW-9, and
23  then AJ-SW-66, followed by items AJ-SW-24, -25, -26, -27, -28,
24  -29, -30, -31, -32, -33, -34, -35, -36, -37, -38, -39, -40,
25  -41, -42, -43, -44 and -45.

89

1  THE COURT:  Are you looking for something specific?
2  MR. BALAREZO:  My understanding is all the documents,
3  he wishes to have copies of all the documents.
4  THE COURT:  Maybe there will be a break in the action.
5  What portion did you give him?  Did you take a lot of things
6  you haven't made available to defense counsel?
7  MISS LIEBER:  Your Honor, every single solitary type
8  of paper, rubber band, and miscellaneous seized from his house
9  was made available to counsel.  On at least -- but probably
10 four or five occasions, Mr. Balarezo and I had the distinct
11 pleasure of hanging out at the interview room of Washington --
12 THE COURT:  Well, you can tell your client that he
13 doesn't get copies -- that's not the way it works.  It was made
14 available.  Everything that was taken from his house was made
15 available, and what has been introduced.  Nothing is coming in
16 as a surprise.  So to the extent that he is requesting copies
17 of what was made available to you, the Court denies that
18 request.
19 MR. BALAREZO:  Just so the record is complete, I did
20 send Miss Lieber and Mr. Geise an e-mail sometime yesterday
21 with specific requests from Moore Street and from Levels.  It's
22 not every document, it's mainly the financial documents and
23 records.  His wife ran a business, all those documents were
24 seized and we need them in preparation for the defense.  And
25 Mr. Jones -- and obviously, I think -- we are entitled to those

90

1  documents, so we could at least go through --
2  THE COURT:  That's a Levels question.
3  MR. BALAREZO:  Levels and Moore Street.
4  THE COURT:  No, what I just understood was everything
5  that was seized from Moore street was available.  If you want
6  to go there and designate something that needs to be
7  duplicated, that's fine.
8  MR. BALAREZO:  I spoke with Miss Lieber about this, I
9  think when I went over there, I designated much more than what
10 I got.
11 THE COURT:  You didn't keep records?
12 MR. BALAREZO:  I did for about the first batch, but
13 then it's very tedious, when you are going through thousands of
14 pages of documents to keep a list, but I was told if I put a
15 sticky on it --
16 THE COURT:  What do you want the Court to do?
17 MR. BALAREZO:  I want the Court to --
18 THE COURT:  -- no, no, no, at this point in time, I
19 think you're going to have to go tell them again what you want
20 out of this.
21 MR. BALAREZO:  I did in my e-mail yesterday.
22 THE COURT:  Wait, you're saying all financial records.
23 MR. BALAREZO:  They are not the entire universe of
24 records, it's part of what was seized.  I think over 40 boxes
25 were --

*never copy or gave
copy of moores + discovery.*

91

1  THE COURT:  We are not going to take this up with the
2  jury.  Let's finish some testimony here.
3  MISS LIEBER:  Your Honor, I can add more to the
4  record.
5  THE COURT:  Fine, let's finish the witness.  We don't
6  have to resolve this now.
7  Okay.
8  (Open court.)
9  THE COURT:  All right.  11 is admitted over objection.
10 MISS LIEBER:  Thank you, Your Honor.
11 (Government's Exhibit Number AJ-SW-11 was received
12 into evidence.)
13 BY MISS LIEBER:
14 Q.  Special Agent Naugle, I'm showing you on the projector
15 here, an envelope marked "SW-11."
16 What is this?
17 A.  A Social Security statement.
18 Q.  And who is it in the name of?
19 A.  Antoine Jones.
20 Q.  At what address?
21 A.  12221 Brandywine Road, Brandywine, Maryland.
22 Q.  Now, Special Agent Naugle, I'm going to open to, I guess,
23 what would be the third page, marked Number 3.  And I want to
24 direct your attention to --
25 MISS LIEBER:  Actually, Court's indulgence, if I may

92

1  speak with Mr. Balarezo.
2  BY MISS LIEBER:
3  Q.  Special Agent Naugle, do you see, first of all, this is --
4  is this your earnings records -- "Your earnings record at a
5  glance."
6  Is that what that says?
7  A.  Yes.
8  Q.  Okay.  And I want to focus specifically on the years 2002
9  and 2003.
10 How much Social Security income, reported income, did
11 Mr. Jones have in the year 2002?
12 A.  You're looking at the second -- okay.
13 Q.  Sorry.  Right there, yeah.
14 A.  2002, $13,778.
15 Q.  Okay.  How about 2003?
16 A.  $334.
17 Q.  Okay.  Now, I want to direct your attention to AJ-SW-39,
18 which is already in evidence, the W-2 form.
19 A.  Yes.
20 Q.  For the year 2002, how much does this indicate that he
21 made, Social Security wages?
22 A.  $35,997.67.
23 THE COURT:  What year is that one?
24 MISS LIEBER:  2002.
25 BY MISS LIEBER:

93

1  Q. How about for 2003, the year that the Social Security
2  administration had him making $334, AJ-SW-31, that W-2 from
3  2003, what was his Social Security -- how much reported income
4  is -- is in that year?
5  A. Under Social Security wages, would be $51,751.08.
6  Q. All from the Thomas Brown Agency?
7  A. Yes.
8  Q. Thank you.
9      MISS LIEBER:   Court's indulgence.
10 BY MISS LIEBER:
11 Q. Nothing else, sir. Thank you very much.
12 A. You're welcome.
13     THE COURT:   Cross.
14     MR. BALAREZO:   Thank you, Your Honor.
15          CROSS-EXAMINATION
16 BY MR. BALAREZO:
17 Q. Good afternoon, sir.
18 A. Good afternoon.
19 Q. The prosecutor just asked you questions about the -- well,
20 before I go there, let me ask you this, are you familiar with
21 tax law?
22 A. No.
23 Q. Do you know that you don't necessarily have to file taxes
24 or report your taxes in the year in which they were earned?
25 A. I'm not familiar with that.

94

1  Q. Did you know that you can file an extension to file your
2  taxes for years and years until you're ready to file them?
3  A. Yes, I know you can file an extension.
4  Q. Well, with respect to the -- I think Miss Lieber asked you
5  about 2003, where you indicate that this document says that
6  Mr. Jones earned $334 that year?
7  A. Yes.
8  Q. Do you know whether or not Mr. Jones filed an extension to
9  file his taxes?
10 A. No, I do not.
11 Q. Do you know whether or not Thomas Brown ever reported the
12 amount of his income to the federal government?
13 A. No.
14 Q. If Thomas Brown never reported it, then, obviously, it
15 won't appear in the statement; right?
16     MISS LIEBER:   Objection.
17     THE COURT:   If he knows.
18     THE WITNESS:   I don't know that answer. I don't know
19 the answer to that.
20 BY MR. BALAREZO:
21 Q. I think it stands to follow if it was never reported to the
22 government, the government wouldn't know.
23    Is that fair to say?
24     MISS LIEBER:   Objection.
25     MR. BALAREZO:   It's common sense, Your Honor.

95

1     THE COURT:   Well, it may be, but if he doesn't know
2 the answer, he can't answer it.
3 BY MR. BALAREZO:
4 Q. Can you answer that question?
5 A. Well, if something isn't reported, I guess you can't --
6 Q. Now, you also indicated that you were the --
7     THE COURT:   I don't -- did you finish the answer?
8     If something isn't reported, I guess you can't what?
9     THE WITNESS:   I guess you can't document it. If it's
10 not reported, it's not reported, so you don't know whether he
11 filed it.
12 BY MR. BALAREZO:
13 Q. Can you speak up so the jury can hear you?
14 A. If it's not reported, I guess you can't determine if it was
15 filed or not.
16 Q. Now, you said you were the -- and the questions I just
17 asked you also apply to the other year, I think, 2002, which
18 Miss Lieber asked you about and then showed you a W-2 for that
19 year?
20 A. Right.
21 Q. Okay. Again, if Thomas Brown never filed with the IRS or
22 never submitted the information to the IRS, would it
23 be accurate to say that -- excuse me, with Social Security --
24 would it be accurate to say that Social Security won't reflect
25 it on that particular report?

96

1  A. I guess so, yes.
2  Q. And you have no information as to whether or not Mr.
3 Brown -- excuse me, Mr. Jones sought an extension to file taxes
4 in 2002?
5 A. I don't have any indication of that, no.
6 Q. Now, you did indicate that you were the lead -- lead agent
7 in the -- with respect to the search warrant of Moore Street?
8 A. Yes, team leader.
9 Q. Team leader.
10   Well, you were in charge of the whole search warrant,
11 basically; right?
12 A. Yes.
13 Q. You coordinated who got what assignments, that kind of
14 thing; right?
15 A. Yes, sir.
16 Q. And you're familiar with the overall result of the seizure;
17 correct?
18 A. Yes, sir.
19 Q. Okay. Now, it is correct to say that when you went into
20 the house at Moore Street, that was at sometime -- well, what
21 time did you go into the house?
22 A. Well, it was after 6:00 a.m.   *PERJURY*
23 Q. Do you remember what time, specifically?
24 A. No, not off the top of my head.
25 Q. You indicated that the door was open. How was the door



**97**

```
 1  open?
 2  A.  I knocked on the door twice, and the second knock, the door
 3  came open.  PERJURY
 4  Q.  So the door just happened to open?
 5  A.  It was ajar, I'm assuming.  It wasn't locked.  PERJURY
 6  Q.  All right.  So you didn't pick the lock?
 7  A.  No.
 8  Q.  You didn't knock the door down?
 9  A.  No.
10  Q.  You knocked, and the door just opened?
11  A.  That's correct.  PERJURY
12  Q.  Now, would it be accurate to say then, that Mr. Jones was
13  not expecting you that morning?
14          MISS LIEBER:  Objection.
15          THE COURT:  Sustained.  How would he know?
16  BY MR. BALAREZO:
17  Q.  Well, did you or any agents tell Mr. Jones:  Hey, we have a
18  search warrant for your house at 6:00 something in the morning
19  on October 24th?
20  A.  No.
21  Q.  All right.  And typically, you do these searches early in
22  the morning to catch people by surprise; correct?
23  A.  There's a host of reasons why we do them at the time, yes.
24  Q.  Well, that's one of them; right?
25  A.  That's one of them, yes.
```

**98**

```
 1  Q.  I mean, you don't want people to destroy evidence, or hide
 2  things, or run away, or anything like that; right?
 3  A.  Yes.
 4  Q.  You want to be able to go into the house and find evidence
 5  to make your case; correct?
 6  A.  Yes.
 7  Q.  Now, do you think Mr. Jones knew you were coming that
 8  morning?
 9  A.  No.
10  Q.  Okay.  When you came into the house after the door just
11  opened, did you -- did Mr. Jones resist in any way?
12  A.  He didn't -- he did not follow any of our commands.
13  Q.  Well, he didn't follow your initial command.  And you said
14  he then went back into his bedroom, and then you went up, and
15  he got on the floor, and you arrested him; right?
16  A.  After he placed his hands in a pile of clothes that was on
17  a chair and I could no longer see his hands, then after we
18  physically went over and put handcuffs on him, yes.
19  Q.  All right.  You didn't say that on direct examination,
20  though; right?
21      You said that he didn't respond.  He went back into the
22  bedroom, and then when you went up, that you gave him some
23  commands, and he got down on the floor, and you arrested him.
24      That's what you said on direct?
25  A.  Well, he -- I'm telling you now, he placed his hands in a
```

How can I do all of this
and they deactivate the alarm in 30 seconds

**99**

```
 1  pile of clothes which were on top of a chair, and I could not
 2  see his hands at that point.
 3  Q.  Did you just happen to remember that little detail about
 4  putting his hands in a pile of clothes?
 5  A.  Yes.  Because that is -- when you're in law enforcement, I
 6  like to see people's hands at all times, for my safety and the
 7  other officers, and their safety, also.
 8  Q.  Well, let me ask you this, did Mr. Jones have a weapon in
 9  that pile of clothes?
10  A.  No, he did not.
11  Q.  Now, given that you were the team leader and you're aware
12  of all the results of the seizures, no weapon was ever found at
13  Moore Street, was it?
14  A.  No, there wasn't.
15  Q.  No weapon was found in the garage, in the -- in the Jeep;
16  correct?
17  A.  That's correct.  There was no weapon.
18  Q.  No weapon was found, whatsoever, with respect to this
19  particular seizure or search?
20  A.  That's right.
21  Q.  Also there were no drugs found; correct?
22  A.  At that address, yes, there was no drugs found.
23  Q.  Yes, there were drugs found or no, there --
24  A.  No, there was not.
25  Q.  Anywhere with respect to the seizure -- or the search and
```

**100**

```
 1  seizure of Moore Street?
 2  A.  No drugs found there, right.
 3  Q.  There was no, what you would consider paraphernalia, no
 4  scales; right?
 5  A.  That's correct.
 6  Q.  There were no Ziploc bags, nothing of that nature; correct?
 7  A.  Yes, there was not.
 8  Q.  There were no cutting agents, nothing that would indicate
 9  the presence of drugs in that house; right, at least
10  drug-related?
11  A.  Drug-related, yes.
12  Q.  Yes, there were or no, there --
13  A.  There was not.  There were no drugs or anything related to
14  drugs at that house.
15  Q.  There were none?
16  A.  That's correct.
17  Q.  All right.
18      You have, you have testified about some bank records from
19  Sun Trust Bank.  You didn't find any, any tally sheets?  Do you
20  know what those are?
21  A.  You're referring like drug tally sheets?
22  Q.  Correct.
23  A.  Yes.
24  Q.  And you didn't find any at this location, did you?
25  A.  We did not.
```

No tally sheets

**101**

1  Q.  You didn't see any records that Mr. Jones might have kept
2  saying such and such person owes me such and such amount of
3  money; right?
4  A.  That's correct.
5  Q.  You didn't find anything saying I gave such and such person
6  such and such amount of drugs; right?
7  A.  Right.  I didn't see any of that.
8  Q.  You also didn't find any records directly related to
9  narcotics trafficking, pay and owe sheets, tally sheets,
10  anything of that nature; right?
11  A.  That's correct.
12  Q.  The records that you found were bank records which come in
13  the mail to anybody who has a bank account; right?
14  A.  Yes.
15  Q.  Now, did you find — well, you also didn't find any
16  evidence of any sort of large amounts of wire transfers or
17  anything of that nature, did you?
18  A.  No.
19  Q.  Anywhere in that house?
20  A.  That's correct.
21  Q.  And when I say anywhere, I'm also talking about the Jeep or
22  the garage, the premises.
23  A.  Right, I understand.  No, we did not.
24  Q.  You didn't find money orders, evidence of money orders,
25  like large amounts of money orders; correct?

*No tally sheets*

**102**

1  A.  Correct.
2  Q.  And you didn't find any evidence of any transfers from
3  Mr. Jones to any other people in large amounts; correct?
4  A.  Yes.
5  Q.  Yes, yes, or yes, no?
6  A.  Correct, we did not find any.
7  Q.  Okay.  And I asked you about weapons.  You didn't find any
8  other dangerous weapons or anything of that nature in
9  Mr. Jones' home; correct?
10  A.  We did not find any weapons.
11  Q.  And my initial question I think was Mr. Jones did not
12  resist in any way?  I mean you said he put his hands in, under
13  a pile of clothes, but he didn't fight with you, he didn't try
14  to run away or anything of that nature; correct?
15  A.  That's correct.  Right.
16  Q.  And he complied fully once you had him in custody
17  basically?
18  A.  Yes.
19  Q.  And did you — you didn't find also any — you are familiar
20  with cell phones, they have SIM cards, chips?
21  A.  Fairly familiar with that, yes.
22  Q.  You know what they are; right?
23  A.  Right.
24  Q.  It's the little card that makes the phone work basically?
25  A.  Yes.

**103**

1  Q.  You didn't find any discarded phone calls or any chips or
2  anything of that nature, did you?
3  A.  No.
4  Q.  You only found those two cell phones that the government
5  introduced in AJ SW-20 and AJ SW-19; right?
6  A.  Yes.
7  Q.  Do you know what numbers go to these phones?
8  A.  The cell phone numbers?
9  Q.  Yes.
10  A.  No, I do not.
11       MR. BALAREZO:   If I could just have one second.
12  BY MR. BALAREZO:
13  Q.  Let me show you what has been marked as or is in evidence
14  as AJ SW-13.  Do you see that?
15  A.  Yes.
16  Q.  Okay.  And this is a, a Sun Trust Banking statement from
17  the period right here, August 1st through August 31st of 2005;
18  is that right?
19  A.  Yes.
20  Q.  And this particular section, talks about deposits — excuse
21  me — the account summary.  I can't see where I am on this
22  thing.  There you go.  Do you see that?
23  A.  Yes, I can.
24  Q.  This section here?
25  A.  Yes.

**104**

1  Q.  All right.  That indicates that the beginning balance in
2  the, as of August 1st was $5,942.22; is that correct?
3  A.  Yes.
4  Q.  And deposits were 9,555; right?
5  A.  Yes.
6  Q.  And the checks were written in the amount of $10,770;
7  right?
8  A.  Yes.
9  Q.  And the ending balance was lower than what it started at,
10  and that was 4695; correct?
11  A.  Yes.
12  Q.  And if you look at the next slide, it says that the average
13  balance was $4,667; correct?  Right here.
14  A.  Yes, that was collected balance.  Yes.
15  Q.  And that would be approximately, what, two months prior to
16  the takedown, to the arrest and the search and seizure?
17  A.  Yeah.  I'm sorry.  What was the date on that again?  Oh,
18  yes, okay.
19  Q.  All right?
20  A.  Yeah.
21  Q.  Did you ever get a chance to review these documents?
22  A.  Briefly, yes.
23  Q.  Okay.  Now, the statements in particular also have copies
24  of checks; right, that were written on the accounts?
25  A.  Yes.

105

1  Q. And these are checks that correspond to the $10,770.33 that
2  was withdrawal as checks; right?
3  A. Right.
4  Q. And all these checks, did you get a chance to see who these
5  people were that had had checks written?
6  A. No. I looked at it briefly, but I don't -- I don't know
7  who they are, if you're asking me that.
8  Q. How long have you been a law enforcement officer?
9  A. Eighteen years total.
10 Q. Eighteen years?
11 A. Yes.
12 Q. It is fair to say, though, in your experience that a drug
13 dealer doesn't write checks for drugs; right?
14 A. Lot of times they deal in cash.
15 Q. Well, my question was checks, not cash.
16 A. I mean --
17 Q. Did you see any check here that you could say was for a
18 drug transaction? And I can give them to you so you can see
19 them clearer. There are several pages of them.
20 A. No, I'll take -- I'm assuming there are no checks written
21 for drug transactions.
22 Q. These are normal, everyday bills, that kind of thing;
23 right?
24 A. That's what it appeared to me, yes.
25 Q. And that was basically the remainder of all the statements

106

1  for just a normal checking account, bills going out, some money
2  coming in, that kind of thing; right?
3  A. Yes.
4      MR. BALAREZO:   If I could just have one second here.
5  BY MR. BALAREZO:
6  Q. Show you AJ SW-14. Can you see what time period that's
7  for?
8  A. Yes. September 1st, 2005.
9  Q. And that was for the month before the takedown; correct?
10 A. Yes.
11 Q. And if we look at the account summary again, that indicates
12 the beginning balance --
13     THE COURT:   Is this the Levels account again? Sorry.
14 Can I see that?
15     MR. BALAREZO:   Yes. It is Levels. Well, that's fine.
16 It is Levels.
17 BY MR. BALAREZO:
18 Q. That is for Levels Entertainment; correct?
19 A. Yes.
20 Q. And that indicated that the beginning balance, at least for
21 this account, was $1,773?
22 A. Yes.
23 Q. And there were deposits, checks drawn on it, and the ending
24 balance was 5,969; correct?
25 A. Yes.

107

1  Q. And did you get a chance to go through these particular
2  checks?
3  A. I went over them briefly, yes.
4  Q. Okay. Could you tell if any of these were for drug
5  purchases?
6  A. They didn't appear to be.
7  Q. They appear to be basically business related expenses;
8  correct?
9  A. Yes.
10     MR. BALAREZO:   Sorry, Your Honor. We are just trying
11 get the right one.
12     THE COURT:   Okay.
13 BY MR. BALAREZO:
14 Q. I'll show you AJ SW-17. This is a Sun Trust statement for
15 Denise Jones and Antoine Jones; is that right?
16 A. Yes.
17 Q. And again, if we look at the summary page, beginning
18 balance, $10,288, excuse me, $10,228.35?
19     THE COURT:   What is the date of this statement?
20 Nine-seven to 10-05. And this is a personal statement?
21 BY MR. BALAREZO:
22 Q. This is in the name of Denise Jones and Antoine Jones;
23 right, at the Moore Street address?
24 A. Yes.
25 Q. And that's for the period of September 7th through

108

1  October 5th?
2  A. Yeah. I can't see the -- okay. Yes, October.
3  Q. So that would be for the month immediately preceding the
4  takedown?
5  A. Yes.
6  Q. And the summary indicates starting balance, $10,228, ending
7  balance, $818; right?
8  A. Yes.
9  Q. And when you reviewed this, you didn't see any checks or
10 any expenditures from this account that you could say were
11 drug-related, did you?
12 A. No, I did not.
13 Q. Do you know if you seized a statement for the month of
14 October itself?
15     THE COURT:   You mean for the individuals as opposed to
16 Levels?
17     MR. BALAREZO:   For the individuals, correct.
18 BY MR. BALAREZO:
19 Q. From the month -- after October 5th, do you know if one was
20 seized?
21 A. I do not know that.
22     MR. BALAREZO:   Your Honor, I think that's what I have
23 for Agent Naugle.
24     THE COURT:   Any other cross?
25     MR. NORRIS:   Briefly, Your Honor.

109

1    Court's indulgence.

CROSS-EXAMINATION

3    BY MR. NORRIS:

4    Q.   Good afternoon, Agent Naugle.

5    A.   Good afternoon.

6    Q.   My name is John Norris.  I have some questions on behalf of

7    my client, Mr. Adrian Jackson.

8         You have testified already about AJ SW-6; is that correct?

9    Do you remember this document, Owners Capital Investment?

10   A.   Yeah.

11   Q.   This is a document that talks about the various percentages

12   of ownership of Levels Entertainment, Incorporated, is that

13   fair to say?

14   A.   Yes.

15   Q.   Okay.  And it shows that Antoine Jones, at least in 2004,

16   was an 81 percent owner in Levels Entertainment, Incorporated;

17   is that correct?

18   A.   Yes.

19   Q.   Based upon –

20   A.   Based upon –

21   Q.   – his investment?

22   A.   Well, based upon this document that I'm viewing.

23   Q.   Okay.  And below Mr. Jones are two individuals, is a

24   Mr. Adrian Jackson; is that correct?

25   A.   Yes.

110

1    Q.   And this shows a ten percent ownership based on an

2    investment of $25,000; is that correct?

3    A.   Yes.

4    Q.   Okay.  And now, it goes into different time frames or

5    different phases, phase two, phase three, phase four and total;

6    is that correct?

7    A.   Yes.

8    Q.   Okay.  And –

9         MR. NORRIS:   Court's indulgence.

10   BY MR. NORRIS:

11   Q.   And if you go down to this lower area here, it looks like

12   at some point Mr. Adrian Jackson's ownership will increase to

13   23 percent; is that correct?

14   A.   Yes, sir.

15   Q.   Okay.  And where exactly was this document recovered from,

16   if you remember?

17   A.   I don't – I don't remember off the top of my head right

18   now.

19   Q.   Okay.

20   A.   I would –

21        THE COURT:   Is this from H?  I'm sorry, in general

22   speaking terms or – I can't remember his testimony – or from

23   the office downstairs?

24   BY MR. NORRIS:

25   Q.   It certainly came from Moore; correct.

111

1    A.   Oh, yes.  It either came from Room H or Room A.

2    Q.   Okay.  And you just don't remember at this time; correct?

3    A.   Yes, sir.

4    Q.   That's fine.

5         And I would also like to ask you about AJ SW-4, which I

6    believe you have also testified about, which was the flyer

7    having to do with an event at the Levels Nightclub; is that

8    correct?

9    A.   Yes.

10   Q.   And I would like to just direct your attention to the upper

11   right corner – actually the whole top portion of this refers

12   to two big bands; is that correct?

13   A.   Yes.

14   Q.   And then to the right of that it says:  "Each and every

15   Saturday starting August 6th of 2005"; correct?

16   A.   Yes, sir.

17   Q.   Can you see that?  And it's fair to say that when it refers

18   to starting in August of 2005, it talks about going into the

19   future, September, some point in the future in 2005; correct?

20   A.   Right.  Starting August 6, 2005, right.

21        MR. NORRIS:   Okay.  Thank you.  Nothing further.

22        MR. BALAREZO:   Your Honor, can I get a do over?  I

23   neglected to ask a question.

24        THE COURT:   Sure.

25        MR. BALAREZO:   I'll be real quick.

112

1         THE COURT:   I don't know.  Does anybody else have

2    anything?

3         MR. ACREE:   I just have a brief question.

4         THE COURT:   All right.  Well, go ahead.

5         MR. BALAREZO:   I'm sorry, Your Honor.  I got caught up

6    in those rotten bank accounts.

RECROSS-EXAMINATION

8    BY MR. BALAREZO:

9    Q.   Agent, this document, that AJ SW-6, which is titled "Owners

10   Capital Investment," you have no evidence that this ownership

11   percentage or these amounts were actually paid or actually

12   contributed, do you?

13   A.   No, I do not.

14   Q.   So this could just be a projection for all you know?

15   A.   Yes, sir.

16   Q.   You don't know whether or not this actually means anything?

17   A.   Yes, sir.

18        THE COURT:   Yes, you don't know.

19        THE WITNESS:   I do not know.

20        MR. BALAREZO:   Not again.

21        THE COURT:   Correct might help.

22   BY MR. BALAREZO:

23   Q.   And AJ SW-4.  This flyer or ticket, whatever you want to

24   call it, let me draw your attention specifically to this

25   section of it.  You see where it does indicate the fellows,

113

1  which presumably means guys, pay $15?
2  A.  Yes, sir.
3  Q.  And ladies get in free; right?
4  A.  Yes.
5  Q.  You don't know whether or not tickets were sold to fellows
6  for $15; right?
7  A.  No, I don't.
8  Q.  Or for any other amount?
9  A.  Might be a cover at the door, I don't know.
10  Q.  But you don't know that?
11  A.  Yeah, right.  I don't know.
12  Q.  And given that it says fellows $15 before 12 a.m., you
13  could assume that after 12:00 a.m., that the prices change;
14  correct.
15  A.  Yes.
16  Q.  And you don't know if any tickets were sold for entrance
17  after 12:00?
18  A.  No, I do not.
19  Q.  And also specifically this right here.  What does that say?
20  A.  Two VIP rooms.
21  Q.  Okay.  And you don't know whether or not tickets were sold
22  to those VIP rooms; right?
23  A.  No, I don't know that.
24  Q.  And you don't know if anything – a VIP ticket was sold for
25  those rooms; correct?

114

1  A.  That's correct.
2    MR. BALAREZO:  And I think that's it, Your Honor.  I
3  promise I won't come back.
4    THE COURT:  Okay.  Mr. McDaniel.
5    MR. McDANIEL:  No.  Thank you, Your Honor.
6    MR. BALAREZO:  Mr. Acree.
7    MR. ACREE:  No.  At this time I think the areas have
8  been covered.
9    THE COURT:  Okay.  Anything further on redirect?
10    MISS LIEBER:  Yes, Your Honor, just briefly.  And I
11  want to show Mr. Balarezo something before –
12    THE COURT:  Fine, show him the bag.
13    You packing up already?  I can hear you doing it.
14    MISS LIEBER:  Your Honor, if I may approach the
15  witness?
16    THE COURT:  Yes.
17    REDIRECT EXAMINATION
18  BY MISS LIEBER:
19  Q.  I'm going to share your microphone, if I may, Agent Naugle.
20  Taking this bag out of AJ SW-67, this blue sort of cooler type
21  item, I'm going to show an item within there, a small scrap of
22  paper.  I want you to take a look at that.
23    MISS LIEBER:  Your Honor, I'll separately label that
24  with my next AJ SW exhibit, whatever that may be, 70 maybe?
25    THE COURT:  Seventy.

115

1    THE DEPUTY CLERK:  Seventy.
2    MISS LIEBER:  Thanks.
3    THE COURT:  I'm sorry, do we have any objection to 70?
4    MR. BALAREZO:  Which is what?
5    THE COURT:  I think it's a grab bag.
6    MR. BALAREZO:  Grab bag free for all.
7    THE COURT:  Is this from the Jeep, sorry, or from the
8  house?
9    MISS LIEBER:  From the Jeep.  This has already been
10  previously been admitted from the previous witness, this bag
11  and its contents.  I'm now going to label an item within the
12  contents AJ SW-70.
13    THE COURT:  The bag was which one?  It was 66, 67, or
14  68?  I just don't know which one.  So the outside bag is
15  already in.  What you're doing this is the contents of what
16  exhibit?
17    MISS LIEBER:  The outer bag, Your Honor, is AJ SW-67.
18  This outer bag is the bag of bags.  And one of the bags within
19  the bag of bags is the blue bag.
20    THE COURT:  And that wasn't marked separately?
21    MISS LIEBER:  It was not marked separately.
22    THE COURT:  It's about to be marked separately.
23    MISS LIEBER:  The blue bag will be AJ SW-70.
24    THE COURT:  That's the blue cooler that was in 67,
25  right?

116

1    MISS LIEBER:  Yes.
2    THE COURT:  I'm sorry.  Go ahead.  Seventy going in,
3  any objection?  Admitted.
4    (Government's Exhibit No. AJ SW-70 admitted in
5    evidence.)
6    MR. BALAREZO:  If I can get an opportunity to recross.
7  I promised I wouldn't come back, but I am.
8    MISS LIEBER:  Your Honor, this item is in evidence and
9  I'm merely marking some sub items, parsing an item, one in
10  particular.
11    THE COURT:  All right.  So it's in evidence.  There is
12  nothing to say about it now.  Okay.  Seventy is going in.  It's
13  already been put in evidence as part and parcel of 67, I think.
14    MISS LIEBER:  That's correct, Your Honor.  Now I'm
15  going to separately label AJ SW-71, a small scrap of paper.
16    THE COURT:  AJ-71.
17  BY MISS LIEBER:
18  Q.  Special Agent Naugle, did you just take AJ SW-71 out of
19  AJ SW-70, the blue bag?
20  A.  Yes.
21  Q.  Mr. Balarezo asked you questions about your experience in
22  drug trafficking and tally sheets and the like.  What does that
23  appear to be to you?
24  A.  There is numbers written on here.
25  Q.  I'll actually put it on the projector now.  What does that

**117**

1  appear to be to you?
2        MR. BALAREZO:   Objection.
3        THE WITNESS:   It's a number sheet.
4        MR. BALAREZO:   Objection. He can say what it is, but
5  he can't speculate, Your Honor.
6        THE COURT:   No. He has not been offered as an expert.
7  It goes in for whatever it is.
8  BY MISS LIEBER:
9  Q.   If I may ask this. Have you seen sheets like this before
10 in your drug investigations?
11 A.   Yes.
12 Q.   Now, just finally a couple of questions about the Sun Trust
13 records, a very few questions. From AJ SW-15, the Levels
14 Entertainment, Inc., Sun Trust account from September 30, 2005,
15 was there an over-the-counter withdrawal on 8-25?
16 A.   Yes, there was.
17        THE COURT:   From which account, please? Is this
18 Levels or the other one?
19        MISS LIEBER:   Levels Entertainment, Inc.
20 BY MISS LIEBER:
21 Q.   How much was that withdrawal.
22 A.   Five thousand dollars.
23        THE COURT:   What was the date again?
24        THE WITNESS:   I think it was 8-21, Your Honor.
25 BY MISS LIEBER:

**118**

1  Q.   8-25. Second, with respect to AJ SW-17, the October 5th,
2  2005, statement of Antoine and Denise Jones. I'm going to
3  direct your attention to 9-29. Was there a substantial cash
4  withdrawal that day?
5  A.   Yes.
6  Q.   In the amount of what?
7  A.   Fifteen thousand dollars.
8  Q.   And finally, AJ SW-18, April 5, 2004, Denise Jones and
9  Antoine Jones' Sun Trust account, were there a series of
10 over-the-counter withdrawals in March in substantial
11 quantities?
12 A.   Yes.
13 Q.   And actually, I wanted to direct your attention to
14 March 29th of 2004. Where was that withdrawal made, can you
15 tell?
16 A.   Oh, okay. It's Houston, Texas.
17        MR. BALAREZO:   Number?
18        MISS LIEBER:   Eighteen.
19 BY MISS LIEBER:
20 Q.   Just finally, with respect to the flyer that we have been
21 talking about on cross-examination, Mr. Norris asked you if it
22 seems to you that that would be a repeat event when it says
23 each and every Saturday. Do you remember that?
24 A.   Yes.
25 Q.   Do you have any idea how many Saturdays thereafter there

**119**

1  was a big party at Levels?
2  A.   No, I don't know.
3        MISS LIEBER:   Okay. Thank you. I have nothing else,
4  sir.
5        THE COURT:   Anything else? One question.
6        MR. BALAREZO:   Oh, no, I have a question. I may have
7  more than that.
8        THE COURT:   Oh.
9              RECROSS EXAMINATION
10 BY MR. BALAREZO:
11 Q.   I'm back. I'm sorry.
12 A.   That's all right.
13 Q.   The prosecutor showed you AJ-SW-71. Right?
14 A.   Yes.
15 Q.   That just is a bunch of numbers; right?
16 A.   Yes.
17 Q.   You have no idea what that means, what it represents;
18 right?
19 A.   Yes.
20 Q.   Do you or you don't?
21 A.   No, I don't know what that means.
22 Q.   And you have no idea who wrote this; correct?
23 A.   That's correct.
24 Q.   Okay. And just to be sure, you indicated -- and I'm
25 showing you AJ SW-54. Do you see that?

**120**

1  A.   Yes, I do.
2  Q.   You indicated that this particular bag which is in front of
3  you is where you located, where this thing was found?
4  A.   That's correct.
5  Q.   All right. And if we zoom in a little bit, in that bag
6  there is basically a bunch of junk -- no offense, Mr. Jones --
7  and a couple of 1 dollar bills; right?
8  A.   Yes.
9  Q.   And just to be sure, you didn't find $29,460 in this bag;
10 correct?
11 A.   There was money found -- I'm pretty sure money was found in
12 there, but I don't know how -- I don't think it was 29,000,
13 though.
14 Q.   All we can see right now is at least a 1 dollar bill; am I
15 correct?
16 A.   Yes.
17 Q.   On my cross-examination, I asked you specifically if in
18 your capacity as the lead agent for the search of this
19 particular residence, you found any tally sheets, in particular
20 I said any records, tally sheets, pay and owe statements. And
21 you indicated that none were found; is that right?
22 A.   Yes.
23 Q.   Of course, you had looked at the evidence before, when it
24 was seized, probably in preparation for your testimony. And
25 when you testified under oath, you told these people that none

125

1  did in order to effectuate Mr. Balarezo's request is that we --
2       THE COURT:   His last request or some other request?
3       MISS LIEBER:   The request for photocopying. We
4  actually employed an intern in our office who spent an entire
5  day at the FBI making photocopies.
6       THE COURT:   What about this, though, what you just
7  got, this e-mail?
8       MISS LIEBER:   Your Honor, I saw it this morning when I
9  came in, and I just didn't focus on it, frankly. I can say
10  this, if I may have 30 seconds to consult with Special Agent
11  Yanta, who is in the courtroom. I'm not trying to stonewall
12  Mr. Balarezo at all. At the same time, we don't have people at
13  the ready to keep making photocopies on demand. If I can
14  ask -- I have one idea. I don't know if it will fly --
15       THE COURT:   I want to hear what she has to say.
16       MR. BALAREZO:   Could I address something else with
17  Mr. Geise? Your Honor, on Friday or whenever Mr. Bermea
18  testified, there were some pieces of paper that were put into
19  evidence. I guess they were the tally sheets, if you want to
20  call them that. And I indicated, I think at the bench, that I
21  had not seen those documents.
22       Mr. Geise subsequently told me that the government had
23  produced them. I went back and I looked at the myriad of CDs
24  they have in this case, and they appear to be there. That
25  appears to be my fault, that either I don't recall that I saw

126

1  them or perhaps I just didn't pay them attention. But he put
2  on the record and I have no problem with that it appears that
3  the government did turn that over to me.
4       THE COURT:   One for you, Mr. Geise. Thank you.
5       MISS LIEBER:   I think I have a solution to the
6  photocopying problem, which is as follows: I can ask one of
7  the agents to bring over the original hard copies of the boxes
8  or whatever it is that Mr. Balarezo designated. We have got a
9  locked office over here. At lunch break Mr. Balarezo -- or at
10  the beginning of the day or whatever pocket of time he can --
11  can physically go through, figure out what he wants and use
12  those very documents.
13       THE COURT:   First let's see how big the universe is.
14  If the universe is teeny, it's a no-brainer. If the universe
15  is humongous, it's hard in the middle of a trial to start
16  duplicating everything without some destination. And Friday is
17  a good day for destination.
18       Let us, would you report back, we have a file cabinet
19  from Room H at Levels and then we have this. If you can say
20  that it's, you know, six inches high, that's one thing. If you
21  tell me that it's box loads, that's quite something. It will
22  be too bad. You will have to go through it and figure out what
23  it is you really want.
24       MR. BALAREZO:   Your Honor, I thought I did that.
25  That's the problem. And now --

127

1       THE COURT:   You just listed a whole bunch of things to
2  me. I have no idea whether they are a lot or a little. They
3  are just numbers. They are not specific page numbers like
4  Bates stamps.
5       MR. BALAREZO:   I don't think they were Bates stamped.
6       THE COURT:   I'm just telling you your listing for
7  purposes of the record is meaningless at the moment. One of
8  your agents can just get an eyeball of whether we are talking
9  about a lot. Sounded to me like he had certain designations
10  for the house, which may be a small amount. In which case,
11  just send it off and do it. It's just that simple.
12       MISS LIEBER:   Your Honor, I want it to be clear that
13  they certainly did try. I would also say that I --
14       THE COURT:   Nobody is second-guessing anybody. I'm
15  just trying to move the ball along. Mr. Jones wants some
16  documents. If it's a small amount of documents, I order the
17  government to duplicate them all and give it to them. Find out
18  if it's a lot of documents or not. We don't need all this
19  discussions. He has asked for them, if you can do it easily,
20  you give it to them. If you can't, he will have to whittle
21  them down.
22       MR. GEISE:   Your Honor, just in witness planning, I
23  know we are going to break a little early tomorrow so we can
24  all vote, what time do you think?
25       THE COURT:   We had a request from a juror, didn't we?

128

1       MR. GEISE:   I'm from Maryland. I want to vote too,
2  Judge.
3       THE COURT:   I don't want to deprive anybody, 4:00.
4       MR. GEISE:   Four. Sounds good. Thanks, Judge.
5       THE COURT:   I forgot about that. Remind me, Gwen.
6  Okay.

   (Thereupon, the proceedings adjourned at 5:01 p.m.)

121

1   were found; right?

2   A.   Right.

3   Q.   And then all of a sudden after I'm done this little, this

4   little snippet appears in that bag; right?

5   A.   Yes.

6   Q.   And you never saw it before?                    Perjury

7   A.   I won't say I never saw it before, but I didn't recall.

8   Q.   You said there weren't any.

9   A.   Okay.

10  Q.   So most likely you never saw it before; is that correct?

11  A.   I may not have. As you said, you described it as a lot of

12  junk in his bag, so I may not have seen that in here.

13  Q.   Well, if that was a, quote, unquote, tally sheet, that is

14  something important and you would have brought that -- you

15  would have remembered that; right?

16  A.   Yes.

17  Q.   And you didn't remember it?

18  A.   That's correct.

19      MR. BALAREZO:   Okay. I have nothing else, Your Honor.

20  Are you back?

21      MISS LIEBER:   Yeah.

22      Your Honor, I think now the door has been opened to

23  what he thinks this is.

24      THE COURT:   I don't care what he thinks this is, not

25  at this hour.

122

1       Thank you, Officer. Nothing else, I don't think.

2   Thank you. You may step down. Take all the bags with you, if

3   you don't mind.

4       (Witness excused)

5       THE COURT:   Thank you, ladies and gentlemen.

6   Breakfast at 9:00. We will start at 9:30 a.m.

7       (The jury exits the courtroom at 4:53 p.m.)

8       THE COURT:   Okay. One second. Let's take up the

9   issue of -- my understanding, let's get it clear for the

10  record, is that you have made available for inspection and will

11  do so again all documents retrieved during the search,

12  execution of the search warrants at Levels and at the home on

13  Moore Street. I don't know if the same issue comes up with any

14  other home.

15      And if you want to go -- Friday we are not sitting.

16  If you want to go there and designate something you think you

17  haven't gotten, I don't know what else to say. They think they

18  have given you what you asked for.

19      Correct?

20      MISS LIEBER:   That's correct, Your Honor. As I said

21  to Mr. Balarezo --

22      THE COURT:   The other people may not want to stay.

23  It's up to you, gentlemen. I don't think this affects anybody

24  besides -- the only documents that we are talking about are

25  those that were seized from Mr. Jones' home or club. It's up

123

1   to you. Okay.

2       Marshals. Counsel, Mr. Acree, Mr. McDaniel, and

3   Mr. Norris, we will start tomorrow morning at 9:30 a.m.

4       Let's just take up this one small matter so we put it

5   to rest.

6       MISS LIEBER:   Your Honor, if I may, I agree with

7   Mr. Balarezo and his assessment that there was a lot of

8   documents and a lot of information. If there is something that

9   stands out in his mind, I'm happy to ask agents to go and make

10  another photocopy for him --

11      THE COURT:   If he can specify without saying all

12  financial documents. You are not going to get all financial

13  documents duplicated at this late date. If you have a specific

14  document or you want to go designate something specifically or

15  a group of documents, but I'm not going to order them to

16  duplicate all financial records. There could be tons.

17      MR. BALAREZO:   Your Honor, as I said, I did send them

18  an e-mail yesterday, to Miss Lieber and Mr. Geise. And what I

19  did was I went down the inventory sheets and I specifically

20  said from the Moore Street sheet inventory list I would like to

21  have a copy of items 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13,

22  16, 17, 19, 21, 22, 23, 24 and 28.

23      Now, that may seem like a lot, but it's not the -- I

24  don't think it's even half of what was seized from there. And

25  those all relate to financial documents and records involving

124

1   the club, Mrs. Jones' business, which, Your Honor, given that

2   there is forfeiture allegations, given that the government is

3   trying to say that my client's only income came from drug

4   dealing, these are things that we need to have.

5       Now, when I went to FBI to look at these document,

6   unless I'm just totally off the wall, I thought I marked all

7   those documents. And what I got was a stack about two inches

8   thick. Those documents which I thought I had marked or I

9   marked weren't in there. I don't know if -- and I'm not

10  blaming Miss Lieber because I don't think she made the copies.

11  I think she turned it over to somebody else and they made

12  copies. And I'm being specific about what I want.

13      And I also wanted from Club Levels specifically the

14  documents from a cabinet in Room H. That's the cabinet where

15  Levels kept its records. And those are things that we also

16  need.

17      THE COURT:   Room H at Levels?

18      MR. BALAREZO:   Room H at Levels. A black cabinet -- a

19  file cabinet in Room H at Levels.

20      THE COURT:   One file cabinet?

21      MR. BALAREZO:   Yes. I think it's one drawer, Your

22  Honor. Given the resources on that side, it's hardly an

23  onerous request, Your Honor.

24      THE COURT:   Maybe or maybe not. I have no idea.

25      MISS LIEBER:   Your Honor, I will tell you that what we



129

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

Detective Kirschner
    by Miss Lieber                    13
    by Mr. Balarezo
    by Mr. Acree           12                    4

Special Agent O'Brien
    by Mr. Geise        16            33
    by Mr. Balarezo            25

Detective Sopata
    by Miss Lieber      34
    by Mr. Balarezo            54
    by Mr. Acree

Special Agent Naugle
    by Miss Lieber     62            114
    by Mr. Balarezo            93            112 & 119

EXHIBITS

                                      RECEIVED

Government's AJ-SW-1 -49-59
Government's AJ-SW-1- 65                38
Government's Jones 12                  44
Government's AJ-SW-69                  5
Government's AJ-SW-60                  53
                                      65

| Government's AJ-SW-61 | |
|---|---|
| Government's AJ-SW-62 | 65 |
| Government's AJ-SW-63 | 65 |
| Government's AJ-SW-64 | 65 |
| Government's AJ-SW-68 | 65 |
| Government's AJ-SW-7 | 78 |
| Government's AJ-SW-19 | 78 |
| Government's AJ-SW-20 | 78 |
| Government's AJ-SW-66 | 78 |
| Government's AJ-SW-24 | 78 |
| Government's AJ-SW-25 | 78 |
| Government's AJ-SW-26 | 78 |
| Government's AJ-SW-27 | 78 |
| Government's AJ-SW-28 | 78 |
| Government's AJ-SW-29 | 78 |
| Government's AJ-SW-30 | 78 |
| Government's AJ-SW-31 | 78 |
| Government's AJ-SW-32 | 78 |
| Government's AJ-SW-33 | 78 |
| Government's AJ-SW-34 | 78 |
| Government's AJ-SW-35 | 78 |
| Government's AJ-SW-36 | 78 |
| Government's AJ-SW-37 | 78 |
| Government's AJ-SW-38 | 78 |
| Government's AJ-SW-39 | 78 |

131

| Government's AJ-SW-40 | 78 |
|---|---|
| Government's AJ-SW-41 | 78 |
| Government's AJ-SW-42 | 78 |
| Government's AJ-SW-43 | 78 |
| Government's AJ-SW-44 | 78 |
| Government's AJ-SW-45 | 78 |
| Government's AJ-SW-12 | 82 |
| Government's AJ-SW-13 | 82 |
| Government's AJ-SW-14 | 82 |
| Government's AJ-SW-15 | 82 |
| Government's AJ-SW-16 | 82 |
| Government's AJ-SW-17 | 82 |
| Government's AJ-SW-18 | 82 |
| Government's AJ-SW-11 | 91 |

132

CERTIFICATE OF COURT REPORTER

I, ANNIE R. SHAW, certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date:  November 7, 2006

_____
Signature of Court Reporter

— [344]

————————X [2]  1/3 1/10

**A**

a — [5]  18/7 25/19 64/19 65/25 65/25
a.m [6]  19/14 96/22 113/12 113/13 122/6 123/3
able [8]  13/1 21/19 21/21 23/10 24/10 26/9 32/17 98/4
about [61]
about the [1]  93/19
above [2]  6/6 132/5
absence [1]  87/17
absolutely [1]  74/16
according [1]  80/10
account [12]  82/4 84/14 101/13 103/21 106/1 106/11 106/13 106/21 108/10 117/14 117/17 118/9
accounts [2]  104/24 112/6
accurate [8]  15/2 28/17 28/24 30/14 59/4 95/23 95/24 97/12
accurately [1]  49/22
ACREE [6]  2/5 31/24 114/6 123/2 129/7 129/14
action [1]  89/4
activity [1]  35/4
actual [5]  5/14 36/14 70/3
actual — [1]  36/14
actually [38]
actually — [1]  44/7
Adams [1]  57/18
add [2]  85/21 91/3
additional [1]  82/8
address [12]  77/12 7/18 77/20 8/11 10/8 50/9 74/18 76/16 76/24 77/17 77/21 77/25 79/13 80/16 80/17 91/20 99/22 107/23 125/16
addressed [5]  83/16 83/20 83/21 83/23 83/24
addresses [6]  6/21 6/22 6/23 10/2 14/23 15/6
adds [1]  56/8
adjourned [1]  128/7
administration [4]  84/20 84/22 85/16 93/2
administrator [1]  16/20
admission [2]  38/6 51/2
admit [1]  67/11
admitted [21]  5/23 9/6 18/5 18/23 20/6 37/5 38/15 42/19 44/12 44/17 51/5 53/4 53/8 65/19 78/11 82/18 82/25 91/9 115/10 116/3 116/4
ADRIAN [5]  1/6 71/25 109/7 109/24 110/12
adult [1]  69/2
advertise [2]  70/7 70/9
advertisement [1]  70/1
affect [1]  49/1
affects [1]  122/23
after [13]  22/13 36/3 56/4 60/22 64/17 96/22 98/10 98/16 98/17 108/19 113/13 113/17 121/3
afternoon [27]  1/10 3/2 4/18 4/19 4/22 4/23 12/5 12/6 13/15 13/16 16/17 16/18 25/12 25/13 34/5 34/6 46/7 46/8 54/8 62/4 62/5 67/11 73/17 93/17 93/18 109/4 109/5
again [23]  8/13 8/16 8/19 8/19 9/2 15/21 17/16 26/5 38/8 46/7 70/8 73/8 79/4 79/17 90/19 95/21 104/17 106/11 106/13 107/17 112/20 117/23 122/11
Agency [10]  75/17 79/12 80/11 80/21 85/1 85/2 85/3 85/22 85/24 93/6
agent [48]
agents [9]  10/23 11/7 56/5 65/3 97/17 100/8

123/9 126/7 127/8
ago [1]  21/6
agree [4]  29/22 30/25 87/10 123/6
agreement [3]  70/23 70/24 71/4
ahead [10]  15/3 18/9 29/2 32/2 56/24 69/17 71/22 74/4 112/4 116/2
AJ [22]  103/5 103/5 103/14 106/6 107/14 109/8 111/5 112/9 112/23 114/20 114/24 115/12 115/17 115/23 116/4 116/15 116/18 116/19 117/13 118/1 118/8 119/25
ajar [1]  97/5
alerting [1]  88/6
all [112]
allegations [1]  124/2
allowed [2]  65/10 68/12
alone [2]  20/8 23/20
along [3]  33/24 65/3 127/15
already [13]  18/23 20/6 46/20 69/10 82/12 84/18 87/13 92/18 109/8 114/13 115/9 115/15 116/13
also [33]  6/6 8/15 14/3 14/10 14/18 22/22 22/25 30/8 30/25 41/15 50/24 68/23 71/8 71/25 80/23 83/24 85/21 95/6 95/17 99/7 99/21 101/8 101/15 101/21 102/19 104/23 111/5 111/6 113/19 124/13 124/15 127/13
always [1]  32/20
always — [1]  32/20
am [7]  3/25 27/7 39/10 73/3 103/21 116/7 120/14
AMERICA [1]  1/4
amount [10]  41/20 51/16 94/12 101/2 101/6 104/6 113/8 118/6 127/10 127/16
amounts [4]  101/16 101/25 102/3 112/11
analysis [1]  77/17
and — [3]  28/17 83/23 110/8
ANNIE [2]  2/13 132/3
announce [2]  64/7 64/16
another [16]  11/4 15/3 20/8 21/14 23/14 25/5 30/2 30/11 33/4 41/12 49/5 49/6 60/23 68/22 79/23 123/10
another — [1]  49/5
answer [8]  32/3 71/20 94/18 94/19 95/2 95/2 95/4 95/7
answering [2]  3/12 3/15
ANTOINE [20]  1/6 20/16 20/17 20/20 24/15 63/9 71/2 71/12 78/22 80/15 83/23 83/24 86/10 86/22 91/19 107/15 107/22 109/15 118/2 118/9
any [70]
any — [3]  57/15 87/18 102/19
anybody [8]  11/21 33/4 33/7 101/13 112/1 122/23 127/14 128/3
anyone [4]  19/7 21/12 61/16 68/18
anything [23]  13/10 15/15 31/6 33/9 49/1 57/21 61/18 64/12 67/3 82/16 98/2 100/13 101/5 101/10 101/17 102/8 102/14 103/2 112/2 112/16 113/24 114/9 119/5
anything — [1]  113/24
anywhere [5]  8/5 69/1 99/25 101/19 101/21
apartment [5]  74/19 75/13 75/14 76/19 85/20
appear [6]  94/15 107/6 107/7 116/23 117/1 125/24
APPEARANCES [2]  1/14 2/1
appeared [2]  64/22 105/24
appears [5]  27/22 69/23 121/4 125/25 126/2
application [1]  75/18
applied [1]  86/16
apply [1]  95/17
appreciate [1]  87/20
approach [6]  31/16 44/15 51/7 73/25 83/6

114/14
approximately [9]  5/3 12/14 18/25 19/9 19/18 21/16 21/17 26/12 104/15
approximately — [1]  19/9
April [2]  82/7 118/8
are [95]
area [18]  6/6 6/23 6/24 11/16 16/2 25/16 35/16 35/17 35/18 35/24 36/19 42/16 42/17 47/3 49/5 65/2 66/6 110/11
area — [1]  49/5
areas [1]  114/7
around [11]  15/12 15/18 16/6 17/6 17/24 25/20 26/8 26/16 28/8 36/7 41/8
arrest [3]  63/24 65/5 104/16
arrested [4]  33/15 68/10 98/15 98/23
arriving [1]  29/13
arrow [4]  6/4 6/6 6/20 7/13
as [59]
ask [23]  6/24 10/16 17/5 17/19 19/11 23/7 23/25 32/3 32/7 35/24 42/5 63/22 62/9 67/9 70/7 81/24 93/20 99/8 111/5 111/23 117/9 123/9 124/6 126/6
ask — [1]  125/14
asked [14]  13/18 54/20 68/11 79/16 93/19 94/4 95/17 95/18 102/7 116/21 118/21 120/17 122/18 127/19
asking [3]  4/24 7/5 105/7
asleep [1]  87/12
assessment [1]  123/7
assigned [8]  34/21 35/17 62/14 62/15 62/17 62/18 62/21 62/22
assignments [4]  64/5 64/7 64/9 96/13
assisted [2]  54/14 54/15
assisting [1]  61/1
assume [5]  27/2 32/18 32/18 37/5 113/13
assume — [1]  32/18
assuming [3]  75/9 97/5 105/20
at — [4]  17/23 19/14 21/17 27/22
attached [1]  75/18
attending [1]  68/25
attention [15]  3/5 3/13 6/3 17/5 35/6 36/18 62/23 78/21 91/24 92/17 111/10 112/24 118/3 118/13 126/1
Attorney [1]  1/16
August [7]  72/18 103/17 103/17 104/2 111/15 111/18 111/20
Automobile [1]  72/10
available [7]  89/6 89/9 89/14 89/15 89/17 90/5 122/10
Avenue [10]  2/2 2/5 2/9 2/14 10/25 12/15 12/24 13/6 71/7 79/14
average [1]  104/12
aware [4]  4/1 7/10 86/5 99/11
away [4]  9/17 51/9 98/2 102/14

**B**

B-A-R-T-O [1]  12/24
back [27]  21/18 23/17 26/9 28/13 31/9 32/15 32/18 33/1 39/17 39/17 46/19 49/25 62/19 64/24 65/2 65/9 66/8 66/9 88/4 98/14 98/21 114/3 116/7 119/11 121/20 125/23 126/18
bad [1]  126/22
bag [82]
bags [17]  48/4 48/7 48/21 48/23 52/18 52/19 53/19 54/17 55/22 57/8 59/11 61/6 100/6 115/18 115/18 115/19 122/2
balance [10]  104/1 104/9 104/13 104/14 106/12 106/20 106/24 107/18 108/6 108/7
balance — [1]  106/12
BALAREZO [26]  1/19 4/10 4/16 13/18 14/21 21/3 21/4 25/13 25/13 31/25 37/3 54/9 69/13 89/10 92/1 114/11 116/21 122/21

**B**

BALAREZO... [8]  123/7 125/12 126/8 126/9 126/6 129/10 129/13 129/17
Balarezo – [3]  125/24 122/21 126/9
Balarezo's [1]  125/1
balarezo.net [1]  1/22
ball [1]  127/15
band [1]  89/8
bands [5]  41/8 41/18 49/20 52/6 111/12
bank [11]  82/3 82/3 82/4 83/10 83/19 84/14 100/18 100/19 101/12 101/13 112/6
Banking [1]  103/16
Bar [17]  8/11 8/13 8/19 8/21 8/24 8/24 9/21 10/2 14/1 14/3 14/3 14/10 14/12 14/17 14/18 18/17 18/25
Barto [3]  12/15 12/24 13/6
baseball [1]  21/21
based [9]  6/25 7/5 14/18 15/7 18/15 109/19 109/20 109/22 110/1
basically [10]  9/6 39/16 40/24 64/4 96/11 102/17 102/24 105/25 107/7 120/6
batch [1]  90/12
Bates [2]  127/4 127/5
be [77]
be – [3]  30/13 66/3 86/3
be accurate [1]  95/23
because [10]  3/24 32/12 32/21 32/23 42/17 74/16 77/11 82/24 99/5 124/10
become [3]  11/14 34/25 85/22
bedroom [20]  64/25 65/2 65/4 65/10 66/9 66/14 66/16 67/5 67/14 68/6 72/20 73/14 74/7 74/11 74/18 75/23 76/19 81/4 98/14 98/22
bedrooms [2]  64/20 67/7
been [28]  6/15 9/6 13/17 13/20 18/23 20/6 22/6 23/24 28/7 28/9 30/23 34/16 35/19 42/19 44/9 86/21 86/22 88/24 89/15 103/13 105/8 114/8 115/9 115/10 116/13 117/6 118/20 121/22
before [27]  1/12 4/24 20/13 20/19 28/10 32/6 35/25 36/4 38/6 39/19 42/13 47/23 57/9 59/1 60/13 73/25 79/16 88/15 93/20 106/9 113/12 114/11 117/9 120/23 121/6 121/7 121/10
before – [1]  114/11
began [3]  35/25 39/20 40/1
begin [1]  4/16
beginning [6]  38/10 104/1 106/12 106/20 107/17 126/10
behalf [1]  109/6
behind [1]  39/18
beige [1]  48/5
being [5]  7/13 74/10 77/20 77/23 124/12
believe [22]  6/16 12/16 12/18 14/2 14/11 30/2 40/16 42/1 42/16 43/11 43/18 44/1 44/4 44/5 48/20 61/14 68/22 68/25 73/7 75/20 86/4 111/6
believe – [1]  44/4
below [4]  6/4 6/20 7/13 109/23
bench [5]  3/3 31/20 74/3 84/8 125/20
Bermea [22]  19/15 21/1 22/10 22/16 22/18 22/19 23/17 24/3 29/18 29/20 29/25 30/2 30/4 30/6 30/7 30/11 30/14 30/17 31/5 32/23 33/14 125/17
Bermea – [1]  21/1
Berry [2]  10/25 10/25
besides [1]  122/24
besides – [1]  122/24
best [7]  9/24 21/17 28/19 29/3 32/13 32/24 51/19
better [1]  30/3

**between** [5]  27/20 28/15 28/15 71/1 71/?
between – [1]  28/15
beyond [1]  13/9
big [7]  36/14 36/15 70/19 86/9 111/12 119/1 126/13
bill [8]  42/2 74/17 74/18 75/6 77/4 77/14 87/25 120/14
billed [1]  76/24
bills [8]  45/7 56/11 56/13 56/15 57/17 105/22 106/1 120/7
bit – [1]  40/6
bit [7]  6/7 7/20 14/24 25/3 39/9 40/6 120/5
black [12]  39/12 39/13 39/24 39/24 40/12 42/6 46/21 48/5 48/22 52/4 81/10 124/10
blaming [1]  124/10
blank [1]  4/3
block [5]  15/7 15/7 15/18 15/18 18/19
block-and-a-half [1]  18/19
blue [8]  15/25 49/13 52/4 114/20 115/19 115/23 115/24 116/19
books [2]  19/12 19/14
Both [1]  14/11
bottom [5]  8/19 47/2 49/18 72/11 80/8
bounce [4]  15/12 15/14 15/15 15/18
bouncing [1]  15/16
box [3]  80/13 80/14 126/21
boxes [2]  90/24 126/7
Brandywine [4]  80/17 80/17 91/21 91/21
break [4]  46/9 89/4 126/9 127/23
Breakfast [1]  122/6
BRIAN [1]  2/9
brief [2]  12/7 112/3
briefly [6]  31/16 104/22 105/6 107/3 108/25 114/10
bring [6]  3/5 3/13 3/24 32/17 33/1 126/7
broke [1]  54/20
brought [3]  3/21 86/11 121/14
brown [24]  40/17 48/4 48/21 52/18 52/19 55/16 74/21 75/8 75/17 79/12 79/13 80/11 80/21 85/1 85/2 85/3 85/21 85/24 86/11 93/6 94/11 94/14 95/21 96/3
Brown – [2]  74/21 96/3
brownish [1]  48/8
bunch [4]  14/23 119/15 120/6 127/1
bundle [5]  45/1 45/3 45/5 55/12 55/19
bundles [1]  44/23
Bureau [1]  62/10
business [5]  76/9 86/13 89/23 107/7 124/1
but – [2]  51/3 77/2
buy [1]  85/10

**C**

cabinet [6]  124/14 124/14 124/18 124/19 124/20 126/18
cabinet – [1]  124/18
call [9]  5/17 12/9 17/23 18/12 18/15 33/21 58/21 112/24 125/20
called [8]  8/15 19/13 64/11 70/1
caller [1]  25/15
calls [3]  5/8 61/25 103/1
came [18]  17/23 21/18 26/15 28/2 29/12 43/3 47/11 47/12 64/25 73/16 73/18 78/3 97/3 98/10 110/25 111/1 124/3 125/9
can [71]
can – [2]  24/20 126/10
can't [24]  5/14 6/18 29/22 31/6 32/1 32/7 57/7 57/10 57/11 57/12 57/14 66/20 75/5 80/4 95/2 95/5 95/8 95/9 95/11 103/21 108/2 110/22 117/5 127/20
can't – [1]  95/5
cannot [2]  30/5 30/7
cap [1]  21/21

capacity [1]  120/18
capital [6]  71/10 71/11 72/1 72/3 109/9 112/10
captured [1]  75/2
car [5]  9/2 23/3 28/23 31/10 40/1
card [1]  102/24
cards [1]  102/20
care [2]  4/5 121/24
cares [1]  85/10
case [13]  15/18 16/20 16/25 58/12 58/23 59/11 75/21 77/6 77/19 87/19 98/5 125/24 127/10
cash [8]  55/25 60/17 60/20 60/22 60/22 105/14 105/15 118/3
cash – [1]  60/22
catch [1]  97/22
caught [1]  112/5
CDs [1]  125/23
cell [5]  81/2 81/7 102/20 103/4 103/8
center [1]  49/6
certain [4]  58/13 84/13 88/25 127/9
certainly [2]  110/25 127/13
CERTIFICATE [1]  132/1
certification [2]  72/9 72/15
certify [1]  132/3
chair [2]  98/17 99/1
champagne-colored [1]  38/24
chance [5]  46/9 58/18 104/21 105/4 107/1
change [2]  56/8 113/13
characterization [1]  15/1
charge [4]  54/10 54/13 54/13 96/10
chart [1]  10/14
check [1]  105/17
checked [1]  57/21
checking [2]  87/13 106/1
checks [12]  104/6 104/24 105/1 105/2 105/4 105/5 105/13 105/15 105/20 106/23 107/2 108/9
Cherokee [7]  19/22 22/8 38/24 39/15 43/12 50/8 69/7
chips [2]  102/20 103/1
Circle [7]  74/17 75/13 75/19 76/9 76/10 76/14 85/4
clarify [1]  32/21
clear [10]  11/6 30/5 34/7 40/5 45/14 56/10 62/6 85/22 122/9 127/12
clearer [2]  23/12 105/19
clerk [2]  34/2 62/1
client [5]  3/6 3/21 88/20 89/12 109/7
client's [1]  124/3
close [3]  9/15 13/12 13/24
close-up [2]  40/11 49/11
clothes [7]  65/8 65/10 98/16 99/1 99/4 99/9 102/13
club [8]  70/1 70/7 70/10 71/7 71/12 122/25 124/1 124/13
code [2]  80/12 80/18
collect [1]  61/24
collected [1]  104/14
college [1]  68/25
color [5]  39/12 39/13 81/7 81/8 81/10
COLUMBIA [2]  1/2 2/14
come [17]  15/3 33/22 42/10 46/21 47/9 51/3 64/21 64/21 65/9 68/5 69/20 73/19 86/15 87/16 101/12 114/3 116/7
comes [6]  14/3 27/21 28/7 28/13 86/5 122/13
coming [11]  23/17 31/9 74/24 74/25 75/1 76/11 76/15 88/2 89/15 98/7 106/2
command [1]  98/13
commands [6]  64/23 64/24 65/1 65/4 98/12 98/23
common [1]  94/25

135

## C

Company [1] 72/10
compartment [5] 39/18 39/21 41/12 41/22 55/15
complete [4] 58/14 59/4 59/5 89/19
completed [2] 58/11 59/1
complied [1] 102/16
computer [11] 39/11 39/24 39/25 40/12 40/15 40/20 41/11 42/6 42/25 46/22 47/13
computer-aided [1] 2/25
concocted [1] 85/19
condition [3] 41/7 49/2 49/3
conduct [2] 38/23 39/20
conducted [3] 36/19 37/20 62/24
conference [3] 3/3 74/3 84/8
confused [2] 47/6 84/9
confusing [1] 46/19
connect [1] 76/10
Connecticut [2] 2/5 2/9
connecting [1] 14/17
connection [1] 85/9
consider [1] 100/3
consistent [1] 15/9
conspiracies [1] 85/15
Constitution [1] 2/14
consult [1] 125/10
consulted [1] 32/14
Cont'd [1] 2/1
contact [1] 13/3
contained [7] 41/20 52/17 57/9 74/8 76/15 78/23 79/18
contents [15] 40/8 40/10 40/23 40/24 48/12 48/20 48/21 49/23 51/25 53/1 53/11 77/13 115/11 115/12 115/15
continues [1] 74/1
contributed [1] 112/12
convenience [1] 73/21
cooler [8] 49/13 49/14 49/15 49/16 49/19 52/4 114/20 115/24
coordinated [2] 64/4 96/13
coordinates [1] 7/11
copies [8] 88/25 89/3 89/13 89/16 104/23 124/10 124/12 126/7
copies — [1] 89/13
copy [4] 5/14 14/22 17/9 123/21
corner [7] 18/24 19/19 26/11 26/16 28/8 66/11 111/11
corner — [1] 111/11
correct [106]
correspond [2] 5/7 105/1
corresponds [1] 5/16
could [29] 11/19 22/2 24/21 31/13 31/16 41/1 41/5 41/13 42/17 57/10 58/5 77/19 79/21 85/20 85/20 86/21 86/21 90/1 98/17 99/1 103/11 105/17 106/4 107/4 108/10 112/14 113/13 123/16 125/16
counsel [14] 33/23 36/25 38/5 44/9 52/9 65/14 69/10 72/21 82/12 88/4 88/18 89/6 89/9 123/2
count [3] 42/18 45/21 55/11
counted [9] 42/10 42/18 42/24 45/11 54/24 54/25 55/16 55/16 56/5
counted — [1] 56/5
counterfeit [1] 74/23
counting [1] 61/1
couple [6] 11/1 12/7 13/24 33/10 117/12 120/7
course [7] 24/23 35/3 35/12 35/23 63/22 77/15 120/23
court [22] 1/1 2/13 2/13 4/1 4/9 20/20 20/20 32/1 32/18 33/3 34/8 63/10 78/9 78/10 86/9

88/22 89/17 90/16 90/17 91/8 132/1 132/9
Court's [13] 3/5 3/13 14/6 18/20 19/10 31/15 35/21 50/25 53/25 91/25 93/9 109/1 110/9
courtroom [2] 122/7 125/11
cover [2] 85/11 113/9
covered [1] 114/8
cross [5] 4/11 10/13 93/13 108/24 129/2
cross-examination [7] 12/3 25/10 54/6 93/15 109/2 118/21 120/17
crossed [3] 23/18 23/18 23/19
curiosity [1] 85/8
currency [13] 44/20 44/21 44/22 55/9 57/17 57/20 59/12 59/12 61/6 68/4 68/5 68/15 68/16
currently [3] 62/13 62/15 62/18
custodian [1] 88/1
custody [1] 102/16
cut [1] 67/22
cuts [1] 66/8
cutting [2] 88/8 100/8

## D

D.C [11] 1/6 1/17 1/21 2/6 2/10 34/10 34/22 62/16 71/7 79/14 80/12
dangerous [1] 102/8
Darnell [1] 71/2
data [8] 5/3 6/20 7/10 7/16 8/3 10/6 15/11 16/5
date [17] 7/11 8/16 9/24 13/3 17/16 33/15 33/16 70/24 80/3 80/8 82/6 82/7 104/17 107/19 117/23 123/13 132/7
dates [4] 24/17 24/19 24/21 72/14
day [16] 1/9 27/8 28/20 28/22 29/5 37/25 43/7 43/14 44/5 49/23 68/7 70/25 118/4 125/5 126/10 126/17
DC [1] 2/15
deal [1] 105/14
dealer [1] 105/13
dealing [1] 124/4
decide [1] 86/24
defendant [7] 1/19 2/2 2/5 2/9 20/24 21/11 24/15
defendant — [1] 20/24
defendants [2] 1/9 88/5
defense [10] 36/25 38/5 44/9 51/1 52/9 63/14 65/14 69/10 89/6 89/24
demand [1] 125/13
demonstrate [2] 85/14 87/22
demonstrated [1] 87/21
denies [1] 89/17
Denise [6] 83/23 83/24 107/15 107/22 118/2 118/8
denomination [4] 41/23 45/2 45/5 45/13
denominations [5] 41/25 42/3 45/6 54/21 56/6
department [5] 34/10 34/12 34/17 78/21 79/9
depending [1] 76/13
depict [1] 49/22
depicted [3] 39/25 41/16 43/9
deposits [3] 103/20 104/4 106/23
deposits — [1] 103/20
deprive [1] 128/3
Deputy [1] 34/2
describe [1] 41/1
described [2] 55/22 121/11
designate [3] 90/6 122/16 123/14
designated [2] 90/9 126/8
designations [1] 127/9
destination [2] 126/16 126/17
destroy [1] 98/1

Det [1] 62/13
detail [1] 99/3
detective [31] 3/8 12/5 13/15 25/1 25/7 33/21 34/9 34/14 34/16 34/20 37/10 38/3 38/20 39/3 39/19 41/4 42/5 44/19 46/9 46/18 47/17 51/19 51/24 52/13 53/18 54/8 60/3 61/15 61/20 129/4 129/11
Detective — [1] 38/3
determine [1] 95/14
device [2] 12/15 13/6
did [120]
didn't [40]
didn't — [4] 21/22 51/16 54/22 98/12
different [13] 8/10 15/6 23/22 47/9 48/25 75/2 75/7 77/5 77/10 77/17 78/7 110/4 110/5
different — [1] 75/2
diligent [1] 87/5
dining [2] 42/16 44/1 45/11 46/21
direct [15] 10/12 16/15 34/3 35/6 54/19 62/2 62/23 91/24 92/17 98/19 98/24 111/10 118/3 118/13 129/2
direction [2] 19/24 21/18
directly [2] 3/11 101/8
discarded [1] 103/1
discounted [1] 3/7
discuss [1] 88/15
discussions [1] 127/19
distance [2] 9/17 9/18
distinct [1] 89/10
DISTRICT [6] 1/1 1/2 1/12 2/13 2/14 34/21
do [130]
Docket [1] 1/4
document [20] 59/21 71/9 71/14 71/19 71/21 72/6 72/8 75/8 80/10 86/6 89/22 94/5 95/9 109/9 109/11 109/22 110/15 112/9 123/14 124/5
documentation [4] 17/15 76/16 85/10 85/23
documents [34]
does [21] 5/7 26/21 36/4 36/9 49/22 49/25 60/13 70/7 70/9 70/15 71/11 71/25 72/11 81/2 87/16 92/20 112/1 112/25 113/19 116/22 116/25
doesn't [4] 14/2 89/13 95/1 105/13
doing [7] 4/10 12/6 84/10 87/5 87/10 114/13 115/15
dollar [3] 57/17 120/7 120/14
dollars [2] 117/22 118/7
don't [83]
don't — [4] 12/11 95/7 105/6 110/17
done [4] 20/19 52/22 54/22 121/3
door [15] 9/18 64/8 64/17 64/18 64/18 96/25 96/25 97/2 97/2 97/4 97/8 97/10 98/10 113/9 121/22
double-check [1] 51/4
down [18] 8/13 11/4 14/3 14/8 16/10 27/19 28/13 31/18 33/20 59/8 64/23 70/15 97/8 98/23 110/11 122/2 123/19 127/21
downstairs [1] 110/23
draw [1] 112/24
drawer [1] 124/21
drawn [1] 106/23
dressed [1] 68/10
drew [1] 6/3
Drive [29] 6/11 6/15 7/3 7/14 7/19 8/11 8/13 8/19 8/22 8/25 9/12 9/14 9/16 9/16 9/19 9/20 10/2 10/2 13/22 13/23 14/1 14/17 15/7 15/22 18/17 18/17 19/23 20/4 23/17
Drive — [1] 9/14
driver [2] 22/2 22/4
driver's [1] 21/24
driving [5] 24/3 24/11 29/10 30/3 31/9
drove [1] 23/19

# D

drug [9]  62/18 100/21 105/12 105/18 105/21
  107/4 116/22 117/10 124/3
drug-related [3]  100/10 100/11 108/11
drugs [9]  99/21 99/22 99/23 100/2 100/9
  100/13 100/14 101/6 105/13
duplicate [2]  123/16 127/17
duplicated [2]  90/7 123/13
duplicating [1]  126/16
during [10]  6/10 10/13 12/8 24/23 42/7
  54/19 58/8 63/22 85/17 122/11
dusted [1]  57/20
dwelling [1]  64/18

# E

e-mail [4]  89/20 90/21 123/18 125/7
each [15]  28/5 36/11 36/12 45/11 45/12
  55/15 55/21 56/4 57/5 73/13 73/21 82/21
  83/9 111/14 118/23
each — [1]  36/11
earlier [4]  6/9 7/6 9/9 82/19
early [3]  3/6 97/21 127/23
earned [3]  85/5 93/24 94/6
earnings [2]  92/4 92/4
easier [1]  83/7
easily [2]  87/21 127/19
EDUARDO [1]  1/19
effective [1]  72/14
effectuate [1]  125/1
eight [3]  28/15 28/15 62/12
eight — [1]  28/15
Eighteen [3]  105/9 105/10 118/18
either [4]  61/1 87/17 111/1 125/25
ELLEN [1]  1/12
else [22]  11/21 21/12 33/7 33/9 37/5 43/14
  54/13 54/14 57/10 61/16 61/18 68/18 74/20
  93/11 112/1 119/3 119/5 121/19 122/1
  122/17 124/11 125/16
else — [1]  37/5
elsewhere [2]  46/22 46/24
employed [4]  45/20 62/9 62/10 125/4
employee [2]  80/10 80/14
employer [1]  80/13
employment [1]  80/20
Empty [1]  57/24
end [13]  13/23 72/17 88/11
ending [2]  104/9 106/23 108/6
enforcement [8]  46/16 46/17 64/6 64/9
  64/10 66/25 99/5 105/8
enough [2]  42/17 86/16
Entertainment [10]  82/5 83/11 83/20 83/21
  83/22 106/18 109/12 109/16 117/14 117/19
entire [3]  55/25 90/23 125/4
entirety [1]  40/15
entitled [2]  85/13 89/25
entrance [1]  113/16
entries [1]  84/13
entry [2]  64/14 65/7
envelope [4]  78/24 79/7 79/9 91/15
equipment [2]  27/5 30/25
ESQUIRE [6]  1/15 1/15 1/19 2/2 2/5 2/9
essentially [1]  13/5
establish [1]  51/15
even [2]  15/15 123/24
evening [1]  5/4
event [4]  70/7 70/9 111/7 118/22
ever [5]  17/7 24/7 94/11 99/12 104/21
every [5]  87/18 89/7 89/22 117/14 118/23
everybody [3]  36/7 38/14 50/14
everyday [1]  105/22
everyone [1]  19/11
everything [7]  36/3 36/8 58/22 58/24
  90/4 126/16
evidence [37]
evidence — [1]  67/9
exact [1]  25/21
exactly [5]  6/16 42/2 44/4 49/3 110/15
examination [9]  13/13 16/15 33/11 34/3
  54/19 62/2 98/19 114/17 119/9
example [6]  10/6 13/2 59/6 74/22 79/1 79/23
exception [1]  86/5
excuse [6]  9/21 31/17 95/23 96/3 103/20
  107/18
excused [1]  122/4
executed [3]  63/2 66/22 68/19
executing [3]  35/8 35/12 35/23
execution [3]  42/7 63/23 122/12
exhibit [29]  42/25 5/8 5/9 5/25 9/5 18/24 20/6
  22/6 23/24 25/23 27/24 27/25 28/1 37/8
  44/13 46/19 53/15 65/20 78/12 80/4 83/4
  83/12 83/17 83/18 84/2 91/11 114/24 115/16
  116/4
exhibits [7]  38/17 52/23 61/24 69/11 78/23
  80/23 129/18
exits [1]  122/7
expecting [1]  97/13
expenditures [1]  108/10
expenses [1]  107/7
experience [4]  15/8 15/13 105/12 116/21
expert [2]  8/2 117/6
experts [1]  6/24
expiration [1]  72/18
explaining [1]  18/4
expose [1]  40/8
extension [4]  94/1 94/3 94/8 96/3
extent [1]  89/16
exterior [1]  37/15
extra [1]  41/18
eyeball [1]  127/8
eyes [1]  14/15

# F

face [1]  4/3
fact [6]  8/2 8/15 9/21 12/8 76/18 85/7
fact — [1]  85/7
fair [8]  27/2 27/4 85/19 86/17 94/23 105/12
  109/13 111/17
fairly [3]  13/24 49/22 102/21
fake [3]  85/2 85/3 85/7
fall [2]  62/19
false [1]  85/10
familiar [9]  8/3 10/5 11/14 69/6 93/20 93/25
  96/16 102/19 102/21
far [5]  11/1 18/18 56/19 63/14 77/20
Farm [1]  72/9
fault [1]  125/25
favorite [1]  87/14
FBI [9]  20/10 26/19 26/25 62/11 62/15 62/20
  88/24 124/5 125/5
February [1]  72/16
federal [2]  62/10 94/12
fellows [3]  112/25 113/5 113/12
female [1]  68/22
few [8]  21/14 23/14 26/10 56/10 66/15 78/18
  87/21 117/13
field [2]  62/15 62/21
Fifteen [1]  118/7
Fifth [2]  1/20 34/21
Fifty [1]  48/9
Fifty-nine [1]  50/2
Fifty-seven [1]  48/11
Fifty-three [1]  27/14
fight [1]  102/13
figure [3]  9/10 126/11 126/22
file [10]  93/23 94/1 94/1 94/2 94/3 94/9 96/3
  124/19 124/20 126/18
filed [4]  94/8 95/11 95/15 95/21
finally [10]  14/21 49/4 65/3 68/2 81/13 82/8
  84/1 117/12 118/8 118/20
financial [8]  89/22 90/22 123/12 123/12
  123/16 123/25
find [19]  5/14 53/3 67/3 98/4 100/19 104/24
  101/5 101/8 101/15 101/15 101/24 102/2
  102/6 102/7 102/10 102/19 103/1 120/9
  127/17
find — [1]  101/15
fine [8]  4/4 32/2 88/10 90/7 91/5 106/15
  111/4 114/12
finger [1]  55/6
fingerprints [2]  57/16 57/21
finish [4]  28/25 91/2 91/5 95/7
finished [2]  33/5 73/1
first [24]  5/7 5/17 7/13 10/13 21/1 1 27/8
  27/14 27/16 27/21 28/1 28/2 29/12 35/24 36/20
  38/20 66/1 67/21 69/6 69/22 70/6 70/25
  80/25 90/12 92/3 126/13
first — [1]  5/7
five [10]  21/17 26/14 26/14 26/17 28/7 28/9
  28/14 34/18 89/10 117/22
five — [1]  26/14
five-dollar [1]  56/15
fives [2]  56/19 57/3
floor [2]  2/3 64/19 64/20 67/21 82/9 98/15
  98/23
floral [1]  43/24
fluctuate [1]  14/24
fluctuated [1]  15/4
fly [1]  125/14
fly — [1]  125/14
flyer [4]  70/1 111/6 112/23 118/20
focus [6]  17/5 35/15 36/18 40/17 92/8 125/9
focus — [1]  40/17
focusing [1]  35/23
folded [1]  49/2
folk [1]  75/13
follow [5]  28/1 64/25 94/21 98/12 98/13
followed [3]  65/2 65/4 72/23
following [1]  19/7
follows [1]  126/6
force [3]  35/1 35/4 62/22
foregoing [1]  132/3
forfeiture [1]  124/2
forget [1]  18/13
forgot [1]  128/5
form [3]  45/23 75/16 92/18
formal [1]  35/25
formally [1]  82/24
Fort [2]  6/11 9/21
Fort— [1]  9/21
Forty-nine [1]  38/9
Forty-nine — [1]  38/9
found [28]  29/20 39/5 39/23 44/5 49/7 54/14
  54/16 60/18 60/25 61/6 61/7 67/4 74/7 99/12
  99/15 99/18 99/21 99/22 99/23 100/2 101/12
  103/4 120/3 120/11 120/11 120/19 120/21
  121/1
found — [1]  120/11
four [5]  7/16 10/23 89/10 110/5 128/4
fours [1]  7/22
frame [2]  18/13 28/15
frames [1]  110/4
frankly [1]  125/9
free [2]  113/3 115/6
Friday [3]  122/15 125/17 126/16
from — [2]  43/16 85/5

137

## F

front [7]  12/11 12/16 47/7 50/11 58/18 78/21 120/2
full [3]  49/25 50/21 73/6
fully [1]  102/16
fun [2]  31/21 31/23
further [6]  10/16 25/8 33/18 51/5 111/21 114/9
future [2]  111/19 111/19

## G

gang [1]  62/22
garage [11]  35/19 35/24 36/19 37/15 37/22 38/21 50/9 54/11 69/7 99/15 101/22
gathered [1]  12/22
gave [8]  64/5 64/7 64/9 64/23 64/23 64/24 98/22 101/5
GEISE [8]  1/15 33/9 89/20 123/18 125/17 125/22 126/4 129/9
general [2]  15/9 110/21
generally [2]  35/15 39/14
gentleman [1]  77/21
gentlemen [8]  4/15 4/18 18/7 31/17 45/25 79/5 122/5 122/23
gesture [1]  3/10
get [25]  26/9 32/3 36/6 39/23 41/4 42/13 45/10 46/10 64/23 66/24 68/10 86/11 87/1 87/25 89/13 104/21 105/4 107/1 107/11 111/22 113/3 116/6 122/9 123/12 127/8
gets [1]  86/13
Gikas [1]  74/19
give [7]  34/19 38/8 39/14 89/5 105/18 127/17 127/20
given [9]  28/12 32/6 32/6 99/11 113/12 122/18 124/1 124/2 124/22
given — [1]  32/6
giving [3]  6/22 10/1 10/8
glance [1]  92/5
glasses [1]  21/22
go [37]
go — [1]  122/15
goes [4]  28/13 28/13 110/4 117/7
goes — [2]  28/13
going [67]
gold [2]  19/22 24/7
good [28]  4/18 4/19 4/23 12/5 12/6 13/15 13/16 16/17 16/18 25/12 25/13 34/5 34/6 46/7 46/8 53/21 54/8 54/9 62/4 62/5 86/15 87/7 93/17 93/18 109/4 109/5 126/17 128/5
got [18]  8/24 25/15 28/19 53/3 58/1 65/9 76/24 77/21 87/8 87/8 90/10 96/13 98/15 98/23 112/5 124/7 125/7 126/8
gotten [1]  122/17
government [18]  1/15 4/5 30/20 61/25 80/23 85/3 85/13 86/6 88/4 88/22 94/12 94/22 94/22 103/4 124/2 125/22 126/3 127/17
government's [61]
GPS [9]  5/2 6/22 8/10 10/1 10/8 12/15 12/22 13/5 15/11
grab [2]  115/5 115/6
Grand [1]  50/8
ground [3]  64/23 67/17 67/21
group [1]  123/15
guess [13]  12/13 12/21 19/23 19/25 51/6 63/22 91/22 95/5 95/8 95/9 95/14 96/1 125/19
guys [2]  88/9 113/1
Gwen [3]  53/6 78/3 128/5

## H

had [32]  4/25 5/8 6/15 12/7 13/2 16/4 17/9

18/12 20/12 21/21 26/9 28/6 28/9 31/1 40/1 60/18 60/25 61/5 76/17 85/19 87/21 89/10 93/2 102/16 105/5 105/5 120/23 124/8 125/21 125/22 127/9 127/25
hadn't [2]  3/25 54/22
half [1]  123/24
hallway [2]  64/22 66/7
handcuffs [1]  98/18
hands [7]  98/16 98/17 98/25 99/2 99/4 99/6 102/12
hanging [2]  66/20 89/11
happen [5]  11/2 42/14 68/9 70/9 99/25
happened [4]  11/3 70/7 71/18 97/4
happy [1]  123/9
hard [2]  126/7 126/15
hardly [1]  124/22
has [18]  21/2 9/6 21/9 27/5 30/20 36/12 38/14 63/19 75/6 85/17 89/15 101/13 103/13 115/9 117/6 121/22 125/15 127/19
hasn't [1]  82/24
have [139]
haven't [4]  30/19 82/18 89/6 122/17
haven't — [1]  82/18
having [7]  3/12 3/15 31/21 31/23 86/16 88/21 111/7
he [122]
he — [2]  28/12 98/25
he's [3]  27/25 63/13 63/14
head [3]  24/22 96/24 110/17
heading [1]  19/24
headsets [1]  88/6
hear [5]  32/1 83/1 95/13 114/13 125/15
hearsay [1]  74/9 77/3 77/12 86/4
held [1]  41/13
help [4]  17/9 35/25 66/20 112/21
her [3]  11/25 28/25 33/1
here [56]
here — [1]  50/6
Hey [1]  97/17
hide [1]  98/1
high [1]  126/20
him [30]  3/11 18/14 20/22 32/7 33/15 33/22 61/22 63/12 64/23 64/23 64/24 65/2 65/5 65/10 68/10 68/11 68/13 68/14 76/10 86/15 86/16 89/5 93/2 98/15 98/18 98/22 98/23 102/16 114/12 123/10
him — [2]  64/23 123/10
himself [4]  6/15 30/3 75/3 85/4
his [40]
Hispanic [4]  18/13 22/12 22/12 33/13
hold [2]  77/18 78/3
HOLLAND [2]  1/7 2/9
home [6]  68/18 88/23 102/9 122/12 122/14 122/25
Honda [1]  72/13
Honor [91]
Honor — [1]  17/12
HONORABLE [1]  1/12
hopping [1]  86/14
horrible [1]  55/7
horrible — [1]  55/7
host [1]  97/23
hour [1]  121/25
house [34]
house — [1]  35/24
housing [1]  13/24
Houston [1]  118/16
how [56]
how — [1]  120/12
HUGGINS [4]  1/7 2/5 12/9 13/2
Hum [1]  31/22
humongous [1]  126/15

HUVELLE [2]  1/12 54/20
hypothetical [1]  61/9

## I

I — [5]  5/14 6/3 11/22 86/3 127/13
I'll [23]  5/14 7/20 8/9 14/22 18/16 22/6 28/6 44/9 49/5 49/11 50/25 51/2 59/15 61/23 73/7 78/4 78/5 79/23 105/20 107/14 111/25 114/23 116/25
I'm [119]
I've [3]  52/22 59/19 84/2
ICE [1]  75/2
idea [9]  58/1 58/3 87/5 118/25 119/17 119/22 124/24 125/14 127/2
identical [2]  75/2 75/5
identification [1]  81/21
identified [4]  21/9 63/19 64/8 86/10
identify [2]  63/12 67/3
if — [2]  11/4 124/9
immediately [1]  108/3
important [2]  87/22 121/14
impression [1]  32/22
in — [4]  17/25 43/9 48/8 60/13
Inc [2]  117/14 117/19
inches [2]  124/7 126/20
included [1]  80/19
includes [2]  4/3 5/17
income [5]  92/10 92/10 93/3 94/12 124/3
Incorporated [5]  82/5 83/11 83/16 109/12 109/16
incorrect [1]  59/8
increase [1]  110/12
Indiana [1]  2/2
indicate [17]  7/24 15/6 19/15 29/17 31/4 57/2 57/5 70/15 71/11 71/25 72/11 81/2 92/20 94/5 96/6 100/8 112/25
indicated [16]  5/2 7/19 9/9 10/12 10/13 14/16 29/10 59/11 74/23 95/6 96/25 106/20 119/24 120/2 120/21 125/20
indicated — [1]  119/24
indicates [8]  7/17 8/10 70/19 85/5 85/23 104/1 106/11 108/6
indication [3]  70/6 70/12 96/5
individual [4]  21/23 44/23 56/6 61/6
individually [1]  36/12
individuals [3]  108/15 108/17 109/23
indulgence [10]  14/6 18/20 19/10 31/15 35/21 53/25 91/25 93/9 109/1 110/9
inference [4]  85/19 86/15 86/17 87/19
inferences [1]  86/8
information [8]  12/22 25/15 59/8 74/8 77/2 95/22 96/2 123/8
initial [3]  86/4 98/13 102/11
initially [2]  6/14 32/13
inside [22]  37/22 44/23 48/1 48/7 48/21 48/23 49/4 49/7 49/9 49/13 49/19 50/8 50/9 51/25 52/3 52/6 52/17 53/19 64/18 65/4 68/15 79/18
insisting [1]  88/21
inspection [1]  122/10
instance [4]  7/18 13/23 75/16 78/20
instances [1]  10/15
instruct [1]  88/5
insurance [2]  72/9 72/10
insured [1]  72/12
interested [1]  85/9
interior [4]  38/21 39/15 39/20 40/11
intern [1]  125/4
interrupt [1]  56/23
intersection [2]  18/17 23/18
interview [1]  89/11
introduce [2]  34/7 62/6

**I**

introduced [3]  77/20 89/15 103/5
inventory [7]  58/21 59/10 60/4 60/10 60/24
 123/19 123/20
invested [1]  71/12
investigate [1]  35/4
investigation [3]  51/6 62/10 75/2
investigations [1]  117/10
investment [8]  71/10 71/12 72/1 72/3 109/9
 109/21 110/2 112/10
involving [1]  123/25
IRS [2]  95/21 95/22
is [327]
is — [9]  32/20 36/7 39/23 68/2 82/23 87/4
 92/3 93/4 99/5
isn't [4]  32/23 84/15 95/5 95/8
issue [4]  75/24 75/25 122/9 122/13
it [258]
it's [85]
it's — [5]  28/14 30/19 37/1 56/16 75/9
item [5]  114/21 114/21 115/11 116/8 116/9
items [16]  67/10 67/13 67/16 69/5 69/6
 69/19 72/20 72/23 73/13 73/22 74/6 74/9
 74/22 74/22 116/9 123/21
items — [1]  69/19
items are [1]  74/22
its [4]  53/10 81/20 115/11 124/15
itself [5]  36/21 71/14 71/17 83/13 108/14

**J**

JACK [1]  1/15
JACKSON [6]  1/6 2/2 71/2 71/25 109/7
 109/24
Jackson's [1]  110/12
January [1]  70/25
jeans [7]  68/6 68/7 68/12 68/12 68/13 68/14
 68/15
Jeep [39]
job [1]  87/5
Joe [1]  33/21
John [2]  57/18 109/6
JON [2]  1/2
JONES [90]
Jones' [9]  13/6 22/8 68/23 68/24 74/7 102/9
 118/9 122/25 124/1
Joseph [1]  34/9
JUDGE [7]  1/12 54/19 77/8 82/15 87/14
 128/2 128/4
junk [2]  120/6 121/12
junk — [1]  120/6
juror [1]  127/25
jurors [1]  4/3
jury [26]  1/12 4/14 9/25 28/18 29/7 30/20
 32/22 34/8 34/19 39/14 42/13 45/2 45/14
 46/1 46/2 48/19 62/7 64/2 64/14 86/24 87/4
 87/4 88/6 91/2 95/13 122/7
jury's [1]  7/10
just [111]
just — [2]  55/24 56/22

**K**

keep [3]  90/11 90/14 125/13
Kenderson's [1]  77/8
kept [3]  45/21 101/1 124/15
KEVIN [1]  1/7
kicks [1]  6/24
kind [5]  74/24 77/2 96/13 105/22 106/2
Kirschner [8]  3/8 3/17 3/19 12/5 25/1 25/5
 25/7 129/4
knew [1]  98/7
knock [1]  64/7 64/16 97/2 97/8

knocked [5]  64/8 64/17 64/17 97/2 97
know [98]
know — [4]  29/13 56/20 57/6 76/21
known [1]  71/7
knows [1]  94/17

**L**

label [8]  36/11 36/12 36/14 67/2 80/25
 114/23 115/11 116/15
labeled [4]  14/12 36/3 36/9 38/5
ladies [8]  4/15 4/18 18/7 31/17 45/25 79/4
 113/3 122/5
large [6]  41/20 42/17 66/20 101/16 101/25
 102/3
larger [1]  35/10
last [7]  16/19 17/6 17/20 34/8 34/18 88/13
 125/2
late [1]  123/13
later [8]  21/14 21/16 22/12 23/14 29/20 51/5
 53/3 59/5
latitude [1]  7/11
law [11]  46/15 46/17 64/5 64/8 64/10 66/25
 77/6 77/19 93/21 99/5 105/8
lawoffice [1]  1/22
Lawrence [1]  85/23
lay [1]  87/3
lead [3]  96/6 96/6 120/18
lead — [1]  96/6
leader [7]  36/11 63/1 64/1 64/2 96/8 96/9
 99/11
leader and [1]  99/11
leading [1]  25/3
learned [1]  23/8
lease [1]  85/24
least [15]  9/24 9/25 24/10 24/25 30/23 31/6
 58/22 74/7 77/21 89/9 90/1 100/9 106/20
 109/15 120/14
least — [1]  89/9
leaving [2]  29/14 29/15
left [4]  4/24 21/18 28/1 32/22
lengths [1]  85/14
less [3]  26/6 26/7 50/12
let [26]  17/19 19/9 21/6 22/11 23/7 25/23
 27/7 27/20 28/25 30/8 34/18 35/24 36/20
 42/5 55/3 59/19 60/18 60/24 63/18 67/9 70/6
 93/20 99/8 103/13 112/24 126/18
let's [13]  7/11 30/13 40/10 48/1 58/21 73/22
 84/7 91/2 91/5 122/8 122/9 123/4 126/13
letter [2]  67/22 68/1
letters [2]  36/14 36/15
level [2]  67/17 67/21
Levels [36]
Levels — [1]  86/25
LIEBER [17]  1/15 10/15 11/24 12/8 32/13
 74/1 74/22 86/9 89/20 90/8 94/4 95/18
 123/18 124/10 129/5 129/12 129/16
like [26]  5/21 39/15 40/5 41/8 42/1 44/5 44/6
 49/2 49/14 53/23 81/10 82/3 88/15 98/2 99/6
 100/21 101/25 110/11 111/5 111/10 116/22
 117/9 123/20 123/23 127/3 127/9
like — [1]  44/5
likely [1]  121/10
limitation [1]  53/1
line [3]  7/13 7/18 14/16 14/18
lines [1]  6/4
list [4]  60/4 73/2 90/14 123/20
listed [1]  12/11
listen [1]  12/11
listing [1]  127/6
lists [1]  58/21
little [27]  6/7 7/20 9/9 9/10 13/22 14/24 16/2
 25/3 39/9 40/6 46/19 55/6 55/7 56/17 73/9

77/4 77/10 84/9 88/7 88/21 99/3 102/24
 120/5 121/3 121/4 127/2 127/23
little — [2]  9/9 55/6
lived [2]  74/12 75/23
living [1]  42/24
loads [1]  126/21
located [6]  40/20 42/15 50/8 64/20 71/6
 120/3
location [11]  7/7 8/5 9/7 10/9 11/12 11/14
 12/23 36/6 64/15 76/17 100/24
locations [2]  8/10 73/19
lock [1]  97/6
locked [2]  97/5 126/9
locker [5]  47/19 47/19 48/8 48/23 52/4
long [7]  26/12 34/11 34/16 34/23 62/11 66/7
 105/8
longer [3]  23/10 88/12 98/17
look [20]  6/20 8/9 8/13 8/21 9/5 27/22 51/24
 56/25 70/5 70/12 73/8 77/9 77/19 77/25
 88/24 104/12 106/11 107/17 114/22 124/5
 125/23
looked [6]  42/1 49/23 73/6 105/6 120/23
 125/23
looking [12]  13/17 15/13 26/10 43/10 50/15
 50/21 66/3 70/15 74/12 84/19 89/1 92/12
looks [5]  53/23 55/7 81/10 82/3 110/11
loose [1]  49/20
lot [12]  76/1 77/19 85/18 89/5 105/14 121/11
 123/7 123/8 123/23 127/2 127/9 127/18
lots [2]  13/24 13/24
lower [2]  104/9 110/11
lunch [3]  49/14 52/4 126/9

**M**

ma'am [22]  18/11 19/1 34/15 36/17 37/14
 38/22 38/25 40/13 40/21 41/9 41/17 42/9
 42/12 42/21 43/2 46/14 48/3 49/21 49/24
 52/14 52/16 52/21
machine [1]  2/24
made [16]  64/14 65/7 71/25 85/18 88/23
 88/25 89/6 89/9 89/13 89/14 89/17 92/21
 118/14 122/10 124/10 124/11
mail [5]  77/11 77/17 77/21 83/10 101/13
main [2]  73/14 82/9
mainly [1]  89/22
make [20]  19/18 21/14 23/14 25/25 29/22
 30/1 30/5 30/7 31/6 36/6 45/21 74/5 81/19
 81/20 84/25 85/16 86/9 87/19 98/5 123/9
makes [2]  76/6 102/24
making [12]  3/10 3/25 19/22 21/18 25/14
 27/18 27/19 28/1 28/10 93/2 125/5 125/13
making — [1]  27/18
male [7]  18/13 21/21 21/24 22/12 22/12
 22/15 33/13
males [1]  69/23
man [2]  64/21 64/21
manage [1]  71/6
many [6]  47/9 56/13 56/15 56/19 57/2
 118/25
map [1]  9/6
mapping [1]  7/2
March [2]  118/10 118/14
mark [1]  8/10
marked [17]  4/25 22/6 23/24 44/9 59/15
 59/19 81/14 84/2 91/15 91/23 103/13 115/20
 115/21 115/22 124/6 124/8 124/9
marking [1]  116/9
marks [1]  15/18
Marshals [1]  123/2
Maryland [8]  35/13 36/20 63/4 72/9 80/17
 81/18 91/21 128/1
material [1]  83/19
matter [6]  77/13 83/10 83/16 83/19 123/4

**M**

matter... [1] 132/5
matter — [1] 83/19
may [26] 16/10 32/25 33/20 44/15 51/3 51/7
54/4 69/9 73/25 77/14 83/6 91/25 95/1
114/14 114/19 114/24 117/7 116/12 121/11
121/12 122/2 122/22 123/6 123/23 125/10
127/10
maybe [13] 3/7 13/24 17/2 18/19 26/14
26/14 26/17 57/1 88/11 89/4 114/24 124/24
124/24
Maynard [2] 85/23 86/21
McDANIEL [3] 2/9 114/4 123/2
me [46]
me — [1] 103/21
mean [19] 21/2 29/3 36/4 36/10 39/16 40/3
56/23 57/16 74/9 75/1 75/21 76/21 77/19
83/19 84/10 98/1 102/12 105/16 108/15
mean — [1] 105/16
meaning [3] 26/8 26/9 51/16
meaning — [1] 26/8
meaningless [1] 127/7
means [9] 53/2 58/3 64/2 64/4 88/8 112/16
113/1 119/17 119/21
measure [1] 45/20
meet [1] 18/14
meeting [1] 18/2
meeting — [1] 18/2
member [1] 34/25
memory [1] 18/16
mentioned [4] 3/6 20/12 22/11 82/8
merely [1] 116/9
mess [1] 39/16
Metropolitan [3] 34/10 34/11 34/16
Mexicans [1] 85/12
MICHAEL [1] 1/7
microphone [1] 114/19
middle [3] 41/11 88/8 126/15
might [6] 9/15 77/3 83/7 101/1 112/21 113/9
miles [1] 11/1
mind [2] 122/3 123/9
minute [4] 39/24 69/20 79/3 79/3
minutes [12] 19/16 21/14 21/17 23/14 26/14
26/17 28/7 28/9 28/14 28/16 45/25 87/21
miscellaneous [1] 89/8
Miss [15] 10/15 11/24 32/12 73/25 74/22
86/9 89/20 90/8 94/4 95/18 123/18 124/10
129/5 129/12 129/16
missing [1] 86/10
moment [4] 18/20 19/10 21/5 127/7
Monday [1] 1/6
money [45]
money — [1] 50/1
monitoring [1] 18/1
Montana [1] 71/6
Montezuma [5] 18/17 18/25 19/23 23/18
27/19
month [4] 106/9 108/3 108/13 108/19
month — [1] 108/19
months [1] 104/15
Moore [20] 10/24 11/1 35/13 50/9 54/11
58/22 60/10 63/4 63/23 89/21 90/3 90/5 96/7
96/20 99/13 100/1 107/23 110/25 122/13
123/20
more [15] 3/19 6/7 15/14 17/2 26/6 26/7
28/14 28/15 47/12 50/12 75/10 85/9 90/9
91/3 119/7
morning [16] 5/9 17/6 17/19 25/20 35/8 63/2
63/24 64/12 77/9 78/1 97/13 97/18 97/22
98/8 123/3 125/8
most [2] 74/8 121/10

mostly [1] 19/25
move [7] 5/21 6/7 33/23 51/2 52/23 88/21
127/15
moving [1] 80/19
MPD [1] 34/20
Mr [54]
Mr. [74]
Mr. Acree [3] 31/24 114/6 123/2
Mr. Adrian [3] 109/7 109/24 110/12
Mr. Antoine [1] 78/22
Mr. Balarezo [3] 14/21 123/7 125/12
Mr. Bermea [2] 31/5 32/23
Mr. Geise [1] 125/17
Mr. Jones [51]
Mr. Jones — [2] 89/25 120/6
Mr. Jones' [6] 13/6 22/8 68/23 68/24 102/9
122/25
Mr. McDaniel [1] 114/4
Mr. Norris [1] 123/3
Mrs. [1] 124/1
Mrs. Jones' [1] 124/1
MT [1] 53/23
much [24] 21/16 35/10 44/3 44/4 45/12
51/19 54/2 55/11 55/18 55/21 57/5 61/19
68/16 71/12 72/3 85/8 85/16 88/12 90/9
92/10 92/20 93/3 93/11 117/21
multiple [1] 59/11
Mutual [1] 72/10
my [36]
myriad [1] 125/23
myself [4] 54/12 56/7 61/1 64/7

**N**

N.W [6] 1/16 1/20 2/2 2/5 2/9 2/14
name [11] 34/8 57/18 72/11 76/16 76/20
86/17 86/22 87/6 91/18 107/22 109/6
narcotics [1] 101/9
nature [7] 57/21 100/6 101/10 101/17 102/8
102/14 102/2
Naugle [26] 61/25 62/1 62/8 62/13 62/23
65/6 65/23 66/14 68/18 69/4 69/19 70/5
72/19 73/13 78/18 79/16 82/21 83/9 91/14
91/22 92/3 108/23 109/4 114/19 116/18
129/15
near [2] 10/24 13/6
necessarily [2] 76/13 93/23
need [10] 12/18 31/18 76/1 76/4 87/18 87/25
89/24 124/4 124/16 127/18
needed [1] 31/1
needs [2] 51/3 90/6
neglected [1] 111/23
neighborhood [1] 13/20
never [7] 94/14 94/21 95/21 95/22 121/6
121/7 121/10
next [4] 8/21 9/18 104/12 114/24
nice [2] 34/7 62/6
night [1] 12/25
nightclub [2] 71/6 111/7
nightstand [1] 81/5
Nine-seven [1] 107/20
no [135]
No — [1] 56/21
no-brainer [1] 126/14
Nobody [1] 127/14
nodding [1] 3/10
non-cash [1] 69/6
none [4] 83/1 100/15 120/21 120/25
normal [2] 105/22 106/1
NORRIS [4] 2/2 109/6 118/21 123/3
Northeast {2] 34/22 71/7
Northwest [1] 80/11
not {115]

not — [1] 76/25
notation [2] 17/25 57/24
noted [1] 12/13
notes [2] 17/25 85/16
nothing [11] 25/8 61/19 89/15 93/11 100/6
100/8 111/21 116/12 119/3 121/19 122/1
notice [2] 3/8 66/20
noticed [1] 3/20
Nov [1] 1/6
November [1] 132/7
now [86]
now — [1] 126/25
number [4] 4/25 6/23 27/24 42/18 59/15
59/19 72/19 80/4 81/21 83/12 86/3 87/23
91/11 91/23 117/3 118/17
numbers [10] 38/8 65/20 78/12 83/4 103/7
103/8 116/24 119/15 127/3 127/3
numeral [1] 83/13
numerous [1] 87/2

**O**

O'Brien [6] 16/13 16/17 17/14 24/4 25/12
129/8
o'clock [1] 17/24
oath [3] 16/14 46/4 120/25
object [2] 45/23 88/19
objection [30] 5/22 15/1 18/3 25/2 36/24
38/15 41/1 43/19 44/11 52/25 59/20 61/8
65/18 71/13 71/15 73/5 74/6 78/6 83/1 83/2
84/3 86/4 91/9 94/16 94/24 97/14 115/3
116/3 117/2 117/4
objections [1] 69/14
observation [6] 11/8 21/14 23/14 25/19 26/6
27/11
observations [2] 15/11 19/18
observe [1] 21/19
observed [7] 11/11 19/21 19/22 21/11 64/21
64/21 66/1
obtained [1] 85/24
obvious [1] 88/20
obviously [3] 78/6 89/25 94/14
occasional [1] 17/2
occasionally [1] 16/23
occasions [8] 3/9 3/22 24/4 24/8 24/10 24/25
25/6 89/10
occurred [1] 13/10
October [25] 10/18 10/19 10/21 11/10 17/5
17/17 17/19 19/14 22/13 22/22 22/25 25/14
33/17 35/7 37/13 42/7 62/19 62/24 64/15
97/19 108/1 108/2 108/14 108/19 118/1
October the [1] 17/17
of — [4] 17/15 39/20 64/21 122/9
of those [1] 7/22
off [14] 4/24 5/5 6/22 24/22 67/22 77/18
78/3 88/6 88/9 88/11 96/24 110/17 124/6
127/11
offense [1] 120/6
offered [2] 74/10 117/6
offering [2] 74/14 75/15
offhand [2] 56/20 56/25
office [9] 1/16 62/15 62/21 67/16 67/21 82/9
110/23 125/4 126/9
officer [2] 105/8 122/1
officers [1] 99/7
Official [1] 86/6
Oh [7] 35/3 60/4 104/17 111/1 118/16 119/6
119/8
okay [204]
old [2] 68/24 69/1
once {15] 15/19 16/25 17/2 26/5 31/5 31/5
36/2 36/6 42/15 45/11 55/15 65/4 65/9 68/10
102/16

140

## O

one [74]
one -- [1]  60/6
one-dollar [2]  56/11 56/13
onerous [1]  124/23
ones [3]  56/19 57/2 57/8
only [10]  10/6 12/21 42/25 57/2 84/19 87/5
87/6 103/4 122/24 124/3
onto -- [1]  19/22
open [10]  4/9 33/3 41/13 78/9 91/8 91/22
96/25 97/1 97/3 97/4
opened [4]  64/18 97/10 98/11 121/22
operate [1]  71/6
opinion [2]  86/4 87/3
opportunity [2]  60/23 116/6
opposed [1]  108/15
or -- [3]  27/11 56/8 110/22
order [8]  88/22 123/15 125/1 127/16
orders [3]  101/24 101/24 101/25
organization [1]  79/11
original [6]  14/22 75/11 75/11 75/12 85/22
126/7
other [46]
others [3]  54/12 56/7 67/16
others -- [1]  67/16
our [9]  17/15 34/8 62/7 64/6 65/1 65/4 78/6
98/12 125/4
ourselves [1]  64/8
out [36]
outer [2]  115/17 115/18
outside [1]  115/14
over [16]  6/7 66/6 78/6 81/6 84/11 88/22
90/9 90/24 91/9 98/18 107/3 111/22 124/11
126/3 126/7 126/9
over-the-counter [2]  117/15 118/10
overall [1]  96/16
Overruled [3]  18/4 25/4 43/22
overwhelming [1]  86/20
owe [2]  101/9 120/20
owes [1]  101/2
own [3]  14/15 71/6 76/19
owner [1]  109/16
Owners [3]  71/10 109/9 112/9
ownership [5]  86/18 109/12 110/1 110/12
112/10

## P

P-R-O-C-E-E-D-I-N-G-S [1]  3/1
p.m [6]  1/7 12/14 16/12 46/1 122/7 128/7
packing [1]  114/13
page [13]  6/4 6/6 8/4 8/9 8/21 8/21 8/24
12/16 19/12 19/13 91/23 107/17 127/3
pages [4]  7/16 7/22 90/14 105/19
pages -- [1]  7/22
paid [1]  112/11
pair [2]  68/6 68/12
pants [1]  68/11
paper [16]  40/17 40/25 41/5 48/5 48/21
48/22 52/18 52/19 70/3 84/11 84/17 84/18
89/8 114/22 116/15 125/18
paper -- [1]  48/12
papers [1]  49/20
paperwork [1]  87/6
parallel [2]  75/1 77/1
paraphernalia [1]  100/3
parcel [1]  116/13
parked [1]  26/9
Parkway [4]  8/15 8/24 9/15 13/23
parsing [1]  116/9
part [6]  13/25 35/7 35/10 47/22 90/24
116/13

particular [33]  3/21 6/10 8/9 9/24 10/
12/23 13/25 15/8 30/15 30/17 35/15 37/23
55/18 57/23 58/11 58/23 59/11 62/17 70/9
72/15 74/7 75/16 76/17 77/12 95/25 99/19
103/20 104/23 107/1 116/10 120/2 120/19
120/19
particular -- [2]  74/7 75/16
partnership [4]  70/23 70/24 71/4 71/5
parts [1]  15/6
party [1]  119/1
Passenger [1]  22/1
passenger's [1]  21/24
pattern [1]  15/9
pattern -- [1]  15/9
pay [6]  101/9 113/1 120/20 126/1
payroll [1]  78/21 79/9
pen [6]  14/16 37/18 39/10 40/18 47/3 66/7
Pennsylvania [2]  79/14 80/11
people [8]  23/2 97/22 98/1 102/3 105/5
120/25 122/22 125/12
people's [1]  99/6
percent [3]  109/16 110/1 110/13
percentage [1]  112/11
percentages [1]  109/11
perhaps [1]  126/1
period [7]  6/10 8/4 9/2 25/22 103/17 106/6
107/25
permission [1]  50/25
perpendicular [1]  14/18
person [7]  26/18 29/17 36/12 61/10 86/10
101/2 101/5
personal [2]  14/19 107/20
personally [2]  13/20 38/23
personnel [2]  64/6 64/10
pertaining [1]  80/20
peruse [1]  69/16
phase [4]  71/11 110/5 110/5 110/5
phases [1]  110/5
phone [13]  5/8 12/9 17/23 18/12 74/17 74/18
75/6 76/8 76/17 81/7 102/24 103/1 103/8
phones [6]  73/9 73/10 81/2 102/20 103/4
103/7
photo [18]  20/6 22/7 22/25 23/10 23/25 24/8
30/14 30/16 36/12 36/20 40/11 41/21 47/2
47/22 49/11 66/3 69/23 69/24
photo -- [1]  36/12
photocopies [4]  75/11 75/12 125/5 125/13
photocopy [1]  123/10
photocopying [2]  125/3 126/6
photoed [1]  41/6
photograph [17]  36/13 37/12 37/23 39/1
39/19 39/25 40/4 40/14 41/13 41/14 41/16
42/20 43/9 48/17 49/19 66/2 66/12
photographed [2]  41/6 42/15
photographer [6]  20/10 20/10 26/10 26/19
27/3 31/1
photographs [4]  38/7 39/4 52/20 65/15
photos [4]  23/12 33/23 38/9 38/10
physical [2]  12/23 13/2
physically [2]  98/18 126/11
pick [1]  97/6
picked [1]  68/12
picture [28]  15/21 22/21 28/10 28/16 29/22
29/24 29/25 30/2 30/3 30/6 30/7 30/9 30/15
30/17 31/1 32/22 40/2 40/23 42/22 47/18
47/19 47/21 48/2 49/22 49/25 50/6 65/24
67/20
pictures [14]  26/21 26/25 27/16 28/18 29/4
31/4 31/6 31/7 31/8 32/6 32/14 42/13 48/10
66/15
piece [2]  55/7 88/13
pieces [1]  125/18

pile [5]  98/16 99/1 99/4 99/9 102/13
piles [2]  48/25 49/1
place [4]  67/1 84/11 85/9 86/16
placed [7]  41/5 42/23 46/15 65/5 66/25
98/16 98/25
places [5]  43/1 43/3 47/9 47/12 73/14
placing [1]  66/7
planning [2]  18/2 127/22
plastic [7]  47/19 48/5 48/5 48/22 48/22 52/5
52/17
please [10]  5/24 31/19 34/1 34/7 46/3 50/2
51/24 62/6 70/8 117/17
pleasure [1]  89/11
pocket [1]  126/10
point [17]  18/24 20/9 20/22 21/20 30/21
33/1 40/4 40/14 42/10 54/19 65/5 74/8 76/6
90/18 99/2 110/12 111/19
pointed [1]  68/11
pointing [9]  37/17 39/1 39/10 40/18 48/4
49/6 49/18 55/6 66/11
Police [4]  34/10 34/11 34/17 34/21
policy [2]  72/14 72/17
portion [5]  7/20 37/15 49/18 89/5 111/11
position [1]  13/9
positioned [1]  49/9
possible [1]  87/19
post [4]  17/20 25/19 26/6 27/11
Potomac [22]  6/11 6/15 7/3 7/14 7/19 7/25
9/12 9/16 9/16 9/19 9/20 11/16 13/22 13/23
14/1 14/3 14/17 15/7 15/21 18/18 20/4 23/17
preceding [1]  108/3
precise [1]  75/10
premises [1]  101/22
preparation [4]  69/10 73/17 89/24 120/24
prepare [2]  59/20 60/15
prepared [2]  60/24 87/11
presence [1]  100/9
present [3]  4/14 31/5 46/2
presumably [1]  113/1
pretty [2]  87/7 120/11
previous [2]  40/23 115/10
previously [1]  115/10
prices [1]  113/13
print [1]  43/24
printout [2]  5/16 84/24
prints [1]  57/16 57/20
prior [6]  11/7 34/19 48/10 55/1 68/14
104/15
probably [6]  11/1 28/15 28/19 54/14 89/9
120/24
problem [7]  53/3 78/2 78/4 88/7 126/2 126/6
126/25
proceed [1]  54/4
proceedings [3]  2/24 128/7 132/4
produced [2]  2/24 125/23
professional [1]  27/2
projection [1]  112/14
projector [5]  79/21 80/23 82/22 91/4
116/25
promise [1]  114/3
promised [1]  116/7
promoter [1]  70/15
proof [1]  85/15
proper [1]  27/5
property [1]  58/8
prosecutor [4]  10/16 57/23 93/19 119/13
protect [1]  85/14
public [2]  87/11 87/17
pull [1]  45/1
pulled [1]  25/21
pulling [2]  27/23 27/25
purchases [1]  107/5

## P

purporting [1] 73/2
purpose [8] 11/5 59/22 71/3 71/4 71/5 74/11 84/17 85/18
purposes [1] 127/7
put [21] 28/6 41/18 46/10 59/8 60/7 65/10 68/13 72/2 73/21 80/23 82/21 87/6 87/6 90/14 98/18 102/12 116/13 116/25 123/4 125/18 126/1
puts [1] 7/2
putting [2] 68/14 99/4

## Q

quantities [1] 118/11
quantity [3] 42/6 43/13 51/15
question [17] 4/24 12/21 13/25 15/10 28/23 32/3 33/4 41/2 45/4 90/2 95/4 102/11 105/15 111/23 112/3 119/5 119/6
question — [1] 28/23
questions [16] 3/11 3/12 7/5 10/16 12/7 13/18 33/10 33/19 46/18 61/17 93/19 95/16 109/6 116/21 117/12 117/13
quick [2] 33/10 111/25
quickly [1] 26/8
quite [2] 56/10 126/21
quote [1] 121/13
quotes [1] 75/12

## R

RACHEL [1] 1/15
ran [1] 89/23
rather [3] 18/5 41/2 66/20
read [3] 57/24 71/20 81/24
readily [1] 30/15
ready [3] 4/6 94/2 125/13
real [3] 74/23 86/23 111/25
really [5] 6/17 29/22 39/20 77/12 126/23
rear [1] 39/18
reason [1] 3/4
reasons [2] 78/7 97/23
recall [9] 6/16 14/4 16/21 56/13 56/15 61/3 68/16 121/7 125/25
receipt [2] 58/8 58/20
receipt — [1] 58/20
received [13] 5/25 37/8 38/17 44/13 53/15 58/9 65/21 77/11 77/17 78/15 83/5 91/11 129/20
recess [1] 45/25
recognize [3] 23/25 33/13 51/25
recollection [1] 51/19
record [22] 17/12 20/19 20/23 21/6 32/5 36/22 45/2 50/18 53/4 63/18 66/11 72/21 74/5 87/11 87/17 89/19 91/4 92/4 122/10 126/2 127/7 132/4
recorded [1] 2/24
records [17] 82/8 86/14 89/23 90/11 90/22 90/24 92/4 100/18 101/1 101/8 101/12 101/12 117/13 120/20 123/16 123/25 124/15
records — [1] 92/4
recover [1] 42/5
recovered [5] 43/11 43/16 64/12 69/7 110/15
recross [5] 4/16 88/16 116/6 119/9 129/2
RECROSS-EXAMINATION [2] 4/20 112/7
red [6] 47/3 47/21 47/22 48/6 48/7 48/11
red — [1] 48/7
redirect [7] 11/25 12/8 13/13 33/11 114/9 114/17 129/2
refer [1] 2/13
reference [2] 14/21 17/10
referenced [1] 12/8

referencing [2] 19/13 24/7
referring [1] 100/21
refers [2] 111/11 111/17
reflect [3] 21/6 63/18 95/24
reflect — [1] 21/6
refresh [1] 18/16
regards [1] 12/21
relate [1] 123/25
related [3] 100/13 101/8 107/7
relates [2] 11/23 11/25
released [1] 58/9
relevancy [1] 85/21
remainder [1] 105/25
remember [11] 24/19 61/10 96/23 99/3 109/9 110/16 110/17 110/22 111/2 118/23 121/17
remembered [1] 121/15
Remind [1] 128/5
removed [1] 41/5
rent [3] 85/10 85/11 85/20
rental [3] 77/2 86/18 86/19
rented [3] 75/14 76/19 86/18
repeat [2] 70/8 118/22
report [5] 17/7 17/9 93/24 95/25 126/18
reported [10] 92/10 92/3 94/11 94/14 94/21 95/5 95/8 95/10 95/10 95/14
reporter [5] 2/13 32/1 34/8 132/1 132/9
represent [1] 50/1
representative [2] 29/4 45/1
represents [3] 9/10 9/12 119/17
request [9] 88/23 88/25 89/18 124/23 125/1 125/2 125/2 125/3 127/25
requesting [1] 89/16
requests [1] 89/21
reserve [1] 78/5
reserves [1] 78/10
residence [3] 43/6 43/14 120/19
resist [2] 98/11 102/12
resolve [1] 91/6
resources [1] 124/22
respect [10] 11/10 60/18 75/4 86/8 94/4 96/7 99/18 99/25 118/1 118/20
respond [1] 98/21
response [1] 3/11
rest [6] 42/13 61/24 78/1 78/5 78/11 123/5
result [1] 96/16
results [1] 99/12
retained [2] 75/3 85/4
retaining [1] 76/16
retrieved [3] 67/13 67/16 122/11
returned [1] 58/9
review [3] 15/11 69/20 104/21
reviewed [1] 67/10 73/16 108/9
right [161]
right-most [1] 66/11
river [1] 20/2
road [4] 10/25 14/3 80/17 91/21
Roel [3] 22/16 22/18 33/14
role [1] 2/13
room [32] 2/15 36/12 42/16 42/24 44/1 45/11 46/21 47/19 47/19 48/8 48/23 52/4 64/22 64/25 67/3 67/4 67/14 67/14 72/20 73/14 73/18 73/19 81/4 81/13 89/11 111/1 111/1 124/14 124/17 124/18 124/19 126/19
room — [1] 47/19
rooms [5] 36/9 67/3 113/20 113/22 113/25
rotten [1] 112/6
roughly [1] 19/3
RPR [1] 2/13
rubber [5] 41/8 41/18 49/20 52/6 89/8
rubber-banded [2] 41/15 49/2
RUDOLPH [1] 2/5

rule [1] 87/14
rules [1] 86/7
rules — [1] 86/7
run [4] 11/3 69/4 98/2 102/14
running [2] 36/7 85/12

## S

S-O-P-A-T-A [1] 34/9
Safe [2] 34/25 35/3
safety [2] 99/6 99/7
said [27] 7/7 11/11 18/13 21/1 25/15 25/19 32/13 34/14 36/9 49/15 54/10 54/21 56/25 64/1 64/9 64/16 95/16 98/13 98/21 98/24 102/12 120/20 121/8 121/11 122/20 123/17 123/20
sale [1] 70/13
same [22] 13/25 21/18 25/25 39/4 45/6 49/3 50/11 50/12 50/12 50/13 65/15 74/21 75/6 75/8 77/2 78/1 83/20 85/17 86/1 87/3 122/13 125/12
Sandy [18] 8/11 8/13 8/19 8/21 8/24 8/24 9/21 9/21 10/2 14/1 14/2 14/3 14/10 14/12 14/17 14/18 18/17 18/25
Saturday [2] 111/15 118/23
Saturdays [1] 118/25
save [1] 62/22
saw [16] 3/25 14/15 22/11 22/15 22/21 27/8 27/16 29/4 33/13 46/20 86/15 121/6 121/7 121/10 125/8 125/25
say [46]
saying [11] 10/9 13/5 18/11 43/1 48/12 74/6 75/6 90/22 101/2 101/5 123/11
says [12] 14/17 71/5 77/9 78/21 79/12 81/4 92/6 94/5 104/12 111/14 113/12 118/22
scales [1] 100/4
scene [2] 29/13 36/4
scrap [2] 114/21 116/15
search [33] 35/7 35/8 35/12 35/16 35/23 36/1 36/5 36/11 36/18 37/21 37/25 38/23 39/20 40/1 42/7 54/11 62/24 63/1 63/23 64/2 64/5 66/22 68/19 87/1 96/7 96/10 97/18 99/19 99/25 104/16 120/18 122/11 122/12
searched [4] 37/12 40/15 41/12 68/14
searches [1] 97/21
searching [2] 36/2 63/6
seat [3] 21/25 22/1 26/9
seated [2] 46/3 63/12
seats [1] 39/18
second [14] 11/19 26/2 27/12 27/13 31/13 58/5 64/18 64/20 92/12 97/2 103/11 106/4 118/1 122/8
second — [1] 92/12
second-guessing [1] 127/14
seconds [2] 28/5 125/10
section [3] 103/20 103/24 112/25
secure [2] 35/25 36/4
secured [2] 36/2 36/8
Security [11] 84/19 84/21 85/15 91/17 92/10 92/21 93/1 93/3 93/5 95/23 95/24
Security — [2] 93/3 95/23
see [83]
seek [2] 38/6 67/10
seem [1] 123/23
seemed [1] 3/11
seems [2] 31/25 118/22
seen [17] 3/25 10/15 10/22 20/12 30/19 30/22 32/5 37/3 38/14 52/19 60/13 69/10 69/14 82/13 117/9 121/12 125/21
SEGAL [1] 1/12
seize [1] 49/4
seized [26] 43/6 43/13 45/18 58/9 58/22 58/24 59/12 59/13 60/17 60/20 60/22 60/22

## S

seized... [14]  70/3 72/20 73/4 73/13 88/23
89/8 89/24 90/5 90/24 108/13 108/20 120/24
122/25 123/24
seizing [2]  64/11 64/13
seizure [6]  55/25 96/16 99/19 99/25 100/1
104/16
seizure – [1]  99/25
seizures [1]  99/12
send [3]  89/20 123/17 127/11
sense [3]  34/19 39/14 94/25
separate [4]  41/21 43/13 55/16 55/17
separately [5]  114/23 115/20 115/21 115/22
116/15
September [8]  5/3 8/17 12/9 13/7 106/8
107/25 111/19 117/14
sequence [1]  42/14
sequentially [1]  28/2
serendipity [1]  11/2
series [1]  118/9
serviced [1]  76/18
session [2]  1/10 3/2
set [12]  4/16 17/20 18/15 19/3 24/10 25/19
26/6 26/8 26/15 27/11 28/7 28/9
Seventy [4]  114/25 115/1 116/2 116/12
several [8]  3/9 3/21 46/13 67/7 67/13 69/11
88/24 105/19
shall [1]  71/5
share [1]  114/19
SHAW [2]  2/13 132/3
she [22]  4/2 4/2 18/4 18/6 18/6 26/22 26/23
26/25 27/2 27/5 31/1 32/13 32/20 76/9 76/9
82/24 86/11 86/13 88/2 124/10 124/11
125/15
sheet [6]  58/21 59/10 60/10 117/3 121/13
123/20
sheets [10]  100/19 100/21 101/9 101/9
116/22 117/9 120/19 120/20 123/19 125/19
shiny [2]  47/3 48/6
short [1]  45/25
shorthand [1]  2/24
shortly [1]  85/22
shot [1]  29/3
shots [1]  28/19
should [5]  18/7 27/18 37/2 63/22 75/10
95/18 119/13
showed [7]  12/15 13/6 14/23 16/6 57/23
95/18 119/13
showing [13]  14/16 36/25 40/22 44/19 45/2
47/3 52/8 52/13 68/2 85/9 85/18 91/14
119/25
shown [5]  28/18 30/20 38/4 69/13 77/23
shows [11]  29/25 32/23 48/12 53/4 71/19
71/20 71/20 76/16 84/24 109/15 110/1
side [1]  124/22
sign [7]  14/2 14/11 14/13 14/14 14/15 27/23
28/1
signature [5]  86/23 86/25 87/3 87/7 132/9
significant [1]  84/14
Silver [1]  81/12
SIM [1]  102/20
simple [1]  127/11
since [3]  10/5 44/8 88/3
single [1]  89/7
sir [39]
sit [3]  4/2 4/3 57/7
sitting [4]  3/9 47/7 48/6 122/15
situation [1]  4/1
six [1]  126/20
six inches [1]  126/20
Sixty-five [2]  44/17 47/6

Sixty-nine [1]  52/10
slide [1]  104/12
slightly [1]  23/12
small [5]  114/21 116/15 123/4 127/10
127/16
snippet [1]  121/4
so [75]
so – [5]  14/5 28/2 28/4 45/14 66/5
Social [11]  84/19 84/21 85/15 91/17 92/10
92/21 93/1 93/3 93/5 95/23 95/24
software [2]  7/1 7/2
sold [4]  113/5 113/16 113/21 113/24
solitary [1]  89/7
solution [1]  126/5
some [37]
somebody [3]  14/11 54/13 124/11
somehow [1]  25/15
someone [6]  40/5 54/14 55/13 57/10 57/18
61/1
someplace [1]  43/14
something [20]  3/5 3/7 12/19 51/3 57/24
63/12 74/20 76/3 89/1 90/6 95/5 95/8 97/18
114/11 121/14 122/16 123/8 123/14 125/16
126/21
sometime [2]  89/20 96/20
sometime – [1]  96/20
Sometimes [1]  15/15
somewhere [3]  6/11 15/22 44/6
son [3]  68/23 68/24 86/22
son's [1]  86/22
Sopata [15]  33/22 34/9 37/10 38/20 39/3
39/19 41/4 44/19 46/9 47/17 51/24 52/13
53/18 60/3 129/11
sorry [30]  20/25 21/2 22/21 25/2 27/13 29/2
41/24 45/4 50/3 53/14 55/24 56/22 56/23
62/20 73/24 75/10 79/2 79/4 80/6 84/7 92/13
104/17 106/13 107/10 110/21 112/5 115/3
115/7 116/2 119/11
sorry – [1]  21/2
sort [2]  3/10 13/22 14/17 14/23 33/23 42/14
43/24 49/18 66/7 67/22 101/16 114/20
sought [1]  96/3
Sounded [1]  127/9
Sounds [1]  128/4
speak [3]  60/23 92/1 95/13
speaking [1]  110/22
speaks [2]  71/14 71/17
Special [27]  16/13 16/17 17/14 24/4 61/25
62/1 62/13 62/23 65/6 65/23 66/14 68/18
69/4 70/5 72/19 73/13 78/18 79/16 82/21
83/9 91/14 91/22 92/3 116/18 125/10 129/8
129/15
specific [8]  6/24 24/19 54/20 89/1 89/21
123/13 124/12 127/3
specifically [15]  6/3 11/17 35/6 54/10 55/11
62/19 62/24 92/8 96/23 112/24 113/19
120/17 123/14 123/19 124/13
specifically – [1]  62/19
specify [1]  123/11
speculate [1]  117/5
speed [1]  60/18
spell [1]  34/8
spelling [1]  33/25
spent [1]  125/4
spoke [2]  32/12 90/8
spot [4]  8/15 15/25 25/21 47/24
squad [2]  62/17 62/18
stack [7]  41/15 45/12 45/12 56/5 56/5 80/19
124/7
stacked [1]  40/24
stairs [1]  65/3
stairwell [1]  65/25

stamped [1]  127/5
stamps [1]  127/4
stand [4]  30/23 34/1 50/15 50/22
stands [2]  94/21 123/9
start [4]  73/22 122/6 123/3 126/15
started [1]  104/9
starting [4]  108/6 111/15 111/18 111/20
stash [3]  85/11 85/12 85/20
State [1]  72/9
stated [2]  12/14 18/12
statement [10]  80/2 82/3 91/17 94/15 103/16
107/14 107/19 107/20 108/13 118/2
statements [3]  104/23 105/25 120/20
STATES [4]  1/1 1/4 1/12 2/13
stationery [4]  8/7 9/2 10/1 16/5
stay [2]  88/4 122/22
step [5]  16/10 31/18 33/20 86/9 122/2
Steve [3]  61/25 62/1 62/8
stickers [5]  56/17 56/18 57/1 57/2 57/5
stickies [3]  45/15 46/13 46/15
sticky [4]  45/8 45/10 45/12 90/15
still [6]  4/10 15/14 16/14 19/23 46/3 49/9
stipulate [1]  74/11
stonewall [1]  125/11
stood [2]  21/5 63/16
stop [2]  27/23 27/25
street [29]  1/16 1/20 9/12 9/15 9/22 10/24
11/1 14/2 14/14 14/15 20/3 28/13 35/13 50/9
54/11 58/22 60/10 63/4 63/23 89/21 90/3
90/5 96/7 96/20 99/13 100/1 107/23 122/13
123/20
streets [4]  18/16 34/25 35/3 62/22
strike [1]  15/9
stuff [3]  39/17 73/6 76/2
sub [1]  116/9
subject [3]  51/2 51/5 52/25
submitted [2]  75/13 95/22
subsequently [1]  125/22
substantial [3]  42/6 118/3 118/10
such [8]  101/2 101/2 101/2 101/2 101/5
101/5 101/6 101/6
sudden [1]  121/3
suggesting [1]  3/14
Suite [5]  1/20 2/6 2/10 79/14 80/11
summary [7]  5/7 5/17 10/14 103/21 106/11
107/17 108/6
Summit [7]  74/17 75/13 75/19 76/9 76/10
76/14 85/4
Sun [6]  100/19 103/16 107/14 117/12
117/14 118/9
SunTrust [9]  82/3 83/10 83/16 83/19 83/19
83/21 83/22 83/22 83/24
supplied [1]  85/4
supposed [2]  11/7 74/6
supposedly [3]  7/24 8/5 10/22
sure [16]  20/19 25/14 25/25 28/23 29/3 36/6
43/15 45/21 52/22 59/22 60/6 74/25 111/24
119/24 120/9 120/11
surprise [2]  89/16 97/22
surveillance [11]  12/23 14/19 16/5 16/25
17/3 17/7 17/20 18/15 19/4 19/6 24/5
Sustained [2]  61/9 97/15
SW [2]  37/6 114/24
SW – [1]  37/6
sworn [2]  34/2 62/1

## T

table [8]  3/10 42/23 44/2 45/11 46/11 46/21
49/25 63/14
tablecloth [1]  44/1
tail [1]  13/22
tailing [1]  11/7

**T**

take [20]  4/5 18/8 31/1 38/14 45/24 51/9 51/24 69/20 77/25 87/21 88/5 88/11 89/5 91/1 105/20 114/22 116/18 122/2 122/8 123/4
take -- [1]  105/20
takedown [3]  104/16 106/9 108/4
taken [15]  22/22 22/25 23/10 28/10 37/23 37/25 39/19 40/14 50/7 53/19 58/24 81/3 82/9 87/2 89/14
takes [4]  26/21 26/25 34/1 79/3
taking [4]  61/22 70/5 70/12 114/20
talk [5]  30/13 39/23 40/10 46/24 48/1
talk -- [1]  39/23
talked [3]  16/19 66/14 74/19
talking [8]  25/25 30/9 44/8 66/16 101/21 118/21 122/24 127/8
talks [3]  103/20 109/11 111/18
tally [8]  100/19 100/21 101/9 116/22 120/19 120/20 121/13 125/19
tan [2]  48/22 48/22
Taped [1]  36/16
task [3]  35/1 35/4 62/22
tax [2]  80/2 93/21
taxes [5]  93/23 93/24 94/2 94/9 96/3
team [11]  35/7 35/10 36/11 63/1 64/1 64/1 64/2 64/6 96/8 96/9 99/11
team -- [1]  64/1
tedious [1]  90/13
teeny [1]  126/14
tell [25]  7/16 9/24 19/21 24/20 24/20 24/21 39/4 42/13 48/19 55/18 55/21 57/7 64/2 64/14 71/3 77/6 77/9 87/12 89/12 90/19 97/17 107/4 118/15 124/25 126/21
telling [3]  9/25 98/25 127/6
ten [3]  19/15 45/25 110/1
ten percent [1]  110/1
tension [1]  88/21
terms [2]  67/9 110/22
terrible [1]  15/10
testified [7]  6/9 16/19 100/18 109/8 111/6 120/25 125/18
testify [1]  51/17
testify -- [1]  51/17
testifying [2]  3/8 57/13
testimony [8]  6/14 7/6 54/16 69/11 73/17 91/2 110/22 120/24
testimony -- [1]  110/22
Texas [1]  118/16
text [1]  5/5
than [13]  3/19 15/3 15/14 17/2 23/10 23/12 28/14 41/2 47/12 77/10 90/9 104/9 119/7
thank [36]
Thanks [2]  115/2 128/4
that [676]
that -- [10]  18/13 25/4 25/16 28/24 32/19 43/16 45/15 58/21 86/24 121/14
that's [97]
that's -- [2]  9/15 27/12
the -- [33]  5/16 16/20 17/6 19/11 23/18 25/6 28/16 36/3 37/20 38/23 39/14 41/7 41/13 42/16 44/1 45/11 46/21 50/1 54/10 54/16 56/16 57/15 58/8 60/19 82/4 84/13 94/4 95/6 95/16 96/7 99/15 108/2 123/23
their [3]  19/12 88/6 99/7
them [40]
them -- [1]  69/20
then [24]  7/12 28/1 31/9 36/2 38/15 42/15 53/4 64/24 66/9 66/18 67/3 68/12 72/23 90/13 94/14 95/18 97/12 98/14 98/14 98/17 98/22 111/14 121/3 126/19

there [141]
there -- [3]  14/23 99/23 100/12
there's [6]  25/2 36/7 64/19 66/9 86/9 97/23
thereafter [1]  118/25
Thereupon [1]  128/7
these [49]
these -- [2]  28/10 69/19
they [53]
they're [4]  38/9 38/10 74/12 86/14
they've [2]  69/10 82/12
thick [1]  124/8
thing [12]  19/9 26/1 43/24 49/14 74/21 83/20 96/14 103/22 105/22 106/2 120/3 126/20
things [13]  12/8 12/13 16/23 26/10 33/23 49/20 52/6 67/2 89/5 98/2 124/4 124/15 127/1
think [63]
think -- [2]  55/6 89/25
thinks [3]  85/3 121/23 121/24
third [1]  91/23
this [212]
this -- [7]  7/13 23/7 64/17
Thomas [17]  74/21 74/22 75/8 75/17 79/12 79/13 80/11 80/21 85/2 85/3 85/21 85/24 86/11 93/6 94/11 94/14 95/21
Thornton [6]  8/15 8/24 9/14 9/15 10/2 13/23
those [35]
those -- [3]  45/3 49/22 59/1
though [7]  9/14 12/12 37/25 98/20 105/12 120/13 125/6
thought [4]  75/22 124/6 124/8 126/24
thousand [2]  117/22 118/7
thousands [1]  90/13
three [8]  48/4 48/7 48/21 48/23 48/25 69/23 69/23 110/5
three -- [1]  69/23
through [25]  6/17 25/15 38/5 38/12 38/13 38/17 39/4 65/14 65/16 65/19 65/20 69/4 73/5 82/12 82/14 82/15 83/3 83/4 90/1 90/13 103/17 107/1 107/25 126/11 126/22
through -- [1]  90/1
ticket [2]  112/23 113/24
tickets [5]  70/6 70/13 113/5 113/16 113/21
tickets -- [1]  70/6
ties [1]  57/17
time [60]
times [5]  16/4 17/24 88/24 99/6 105/14
title [3]  71/9 81/18 81/18
titled [1]  112/9
to -- [10]  9/18 25/23 26/7 32/8 34/24 51/2 71/5 84/13 90/17 91/24
today [11]  3/7 3/20 3/25 20/19 30/19 30/22 30/23 55/18 55/21 57/7 63/10
today's [1]  69/11
together [1]  80/20
told [6]  61/5 61/6 61/10 90/14 120/25 125/22
tomorrow [3]  88/2 123/3 127/23
tons [2]  87/1 123/16
too [4]  43/3 88/9 126/22 128/1
took [3]  42/15 55/15 56/4
top [13]  24/22 40/25 41/4 41/5 48/6 71/9 71/23 81/22 82/6 96/24 99/1 110/17 111/11
total [4]  44/3 44/5 105/9 110/5
totally [2]  61/9 124/6
Toward [1]  20/2
towards [3]  20/1 20/3 47/2
Track [3]  6/25 7/1 15/14
tracker [12]  6/11 6/18 6/19 6/22 7/7 7/17 9/10 10/1 10/8 10/10 15/8 15/12
tracking [2]  5/2 15/17

tracking -- [1]  15/17
tracks [1]  85/12
trafficking [2]  101/9 116/22
transaction [1]  105/18
transactions [1]  105/21
transcript [6]  1/11 2/24 19/12 19/13 19/14 132/4
transcription [1]  2/25
transfers [2]  101/16 102/2
trial [5]  1/11 3/6 59/5 88/8 126/15
trouble [2]  3/12 3/15
true [1]  9/14
Trust [6]  100/19 103/16 107/14 117/12 117/14 118/9
truth [12]  18/5 18/8 74/14 74/24 75/1 75/15 75/22 76/12 76/20 76/24 77/1 77/16
try [4]  59/4 79/4 102/13 127/13
trying [5]  77/11 107/10 124/3 125/11 127/15
turn [5]  8/4 19/12 81/6 88/22 126/3
turned [3]  14/11 14/13 124/11
turning [1]  26/11
twice [3]  16/25 17/2 97/2
two [19]  8/10 10/14 14/15 23/2 24/10 25/6 28/18 31/4 48/10 52/18 73/9 73/9 103/4 104/15 109/23 110/5 111/12 113/20 124/7
two inches [1]  124/7
type [3]  55/9 89/7 114/20
typically [1]  97/21

**U**

U.S [7]  1/16 44/20 44/21 44/22 68/4 68/5 68/15
Uh-huh [3]  26/3 31/17 54/5
under [8]  16/14 46/4 65/5 71/3 87/17 93/5 102/12 120/25
underneath [2]  43/24 48/8
understand [4]  77/20 84/16 86/14 101/23
understanding [2]  89/2 122/9
understood [1]  90/4
unimportant [1]  32/25
UNITED [4]  1/1 1/4 1/12 2/13
universe [4]  90/23 126/13 126/14 126/14
unless [3]  14/11 86/4 124/6
unquote [1]  121/13
until [4]  5/3 26/15 78/5 94/2
until -- [1]  78/5
unzipped [2]  40/2 40/5
unzippered [1]  41/12
up [44]
upon [3]  109/19 109/20 109/22
upon -- [2]  109/19 109/20
upper [2]  66/11 111/10
upstairs [1]  64/19
us [9]  19/21 23/19 31/17 39/4 42/18 55/18 55/21 57/7 126/18
use [3]  75/11 83/12 126/11
used [4]  59/5 76/23 77/1 87/15
uses [1]  85/10
using [3]  59/22 77/13 77/16
usually [1]  36/14

**V**

V-I-C [1]  70/19
various [4]  54/17 73/14 73/19 109/11
vehicle [20]  15/14 20/12 20/15 20/17 21/11 21/19 22/9 23/19 23/22 24/3 24/11 30/3 31/6 37/17 37/21 72/12 81/18 81/18 81/19 81/21
Verizon [3]  76/25 77/4 87/25
very [10]  26/7 32/25 41/7 53/20 54/2 61/9 90/13 93/11 117/13 126/12
Vic [1]  70/19
view [1]  23/12

## V

viewing [1] 109/22
VIP [3] 113/20 113/22 113/24
visible [1] 30/13 30/15 30/17
visual [1] 16/4
voice [2] 34/7 62/6
Volume [1] 19/12
vote [2] 127/24 128/1

## W

W-I-N-D [1] 7/1
wage [1] 80/2
wages [2] 92/21 93/5
wait [5] 28/25 28/25 78/4 79/3 90/22
waiting [1] 33/22
Waldorf [5] 10/23 35/13 36/19 63/4 63/23
walk [2] 39/4 67/21
wall [2] 66/21 124/6
walls [2] 36/3 36/16
want [54]
wanted [4] 68/10 77/4 118/13 124/13
wants [8] 4/2 32/8 76/9 76/10 86/9 86/11 126/11 127/15
warrant [14] 35/8 35/12 35/23 42/7 63/1 63/23 64/3 64/5 66/22 68/19 87/1 96/7 96/10 97/18
warrants [1] 122/12
was [285]
was — [7] 9/10 18/1 21/17 26/7 28/14 39/16 43/2
Washington [16] 1/6 1/17 1/21 2/6 2/10 2/15 6/11 34/10 34/22 62/16 62/21 71/7 79/14 80/12 89/11
wasn't [7] 11/13 37/25 40/2 40/2 97/5 99/14 115/20
water [3] 15/15 15/16 15/23
watery [1] 24/23
watery — [1] 24/23
way [7] 17/7 66/3 66/8 86/24 89/13 98/11 102/12
we [114]
we — [4] 29/7 42/23 66/25 125/1
we'll [7] 39/23 39/23 53/3 67/5 77/25 79/4 79/17
we're [11] 4/15 4/16 25/25 33/22 40/5 44/8 45/24 50/21 67/10 80/19 84/9
we've [3] 13/17 52/19 81/13
weapon [5] 99/8 99/12 99/15 99/17 99/18
weapons [3] 102/7 102/8 102/10
wearing [4] 63/13 63/15 65/6 68/7
weather [1] 24/20
welcome [3] 33/1 54/3 93/12
well [55]
went [17] 6/17 64/18 64/24 65/2 68/12 85/14 90/9 96/19 98/14 98/14 98/18 98/21 98/22 107/3 123/19 124/5 125/23
were [109]
were — [2] 10/12 90/25
weren't [6] 11/6 11/7 11/9 19/8 121/8 124/9
weren't — [1] 11/6
west [2] 19/25 19/25
what [186]
what — [1] 83/12
what's [19] 18/23 20/6 22/6 23/24 42/19 44/9 47/7 51/25 52/3 64/11 70/24 71/3 71/15 79/13 80/3 80/4 80/16 82/6 83/18
whatever [11] 11/14 28/16 30/25 31/1 75/6 77/14 112/23 114/24 117/7 126/8 126/10
whatsoever [1] 99/18
when [52]
whenever [1] 125/17

where [41]
where — [1] 30/11
whereas [1] 85/17
whether [19] 11/3 15/2 57/8 57/15 57/16 58/20 59/10 59/11 59/12 85/10 94/8 94/11 95/10 96/2 112/16 113/5 113/21 127/2 127/8
which [44]
while [4] 3/7 15/19 30/23 33/22
whittle [1] 127/20
who [31] 3/9 3/15 21/19 21/22 22/2 22/4 22/9 22/15 22/17 23/8 24/11 24/13 24/21 63/8 68/21 70/15 70/18 71/1 80/10 80/14 85/9 86/10 88/5 91/18 96/13 101/13 105/4 105/7 119/22 125/4 125/11
whole [3] 96/10 111/11 127/1
whose [3] 20/15 63/6 82/4
why [8] 17/22 18/5 32/10 37/1 48/4 48/5 67/1 97/23
wife [2] 68/23 89/23
will [29] 4/5 5/23 25/20 32/18 38/15 44/23 51/5 51/24 65/19 73/21 77/25 78/3 80/23 85/21 85/22 86/15 87/1 88/19 89/4 110/12 115/23 122/6 122/10 123/3 124/25 125/14 126/21 126/22 127/20
Wind [2] 6/25 15/13
wire [1] 101/16
wiretap [1] 16/20
wishes [1] 89/3
with — [1] 24/25
withdrawal [5] 105/2 117/15 117/21 118/4 118/14
withdrawals [2] 84/14 118/10
within [12] 25/22 28/3 47/11 56/1 56/2 62/20 73/14 73/19 78/24 114/21 115/11 115/18
within — [1] 28/3
without [3] 88/6 123/11 126/16
witness [19] 3/16 4/4 21/9 32/17 34/2 38/6 41/1 44/16 50/15 50/22 51/7 83/7 84/15 91/5 114/15 115/10 122/4 127/22 129/2
won't [4] 94/15 95/24 114/3 121/7
word [4] 15/3 31/8 71/16 75/11
words [2] 13/1 64/8
work [4] 34/20 34/23 87/8 102/24
worked [4] 15/8 34/11 62/11 75/22
working [3] 20/9 35/3 62/20
works [2] 85/23 89/13
would [53]
would — [1] 110/20
wouldn't [2] 94/22 116/7
write [1] 105/13
written [6] 53/22 104/6 104/24 105/5 105/20 116/24
wrote [2] 17/25 119/22

## Y

Yanta [2] 3/9 125/11
yeah [13] 15/17 51/9 53/21 69/3 76/22 77/7 92/13 104/17 104/20 108/2 109/10 113/11 121/21
year [15] 17/6 17/20 72/11 81/19 81/20 85/17 92/11 92/20 92/23 93/1 93/4 93/24 94/6 95/17 95/19
years [10] 34/13 34/18 62/12 69/1 86/1 92/8 94/2 94/2 105/9 105/10
yellow [7] 45/8 45/10 45/15 46/13 46/15 56/17 56/18
yes [297]
yesterday [3] 89/20 90/21 123/18
yet [5] 31/21 31/23 51/12 51/15 60/8
you [700]
you — [15] 11/14 14/13 20/8 21/8 24/20

26/13 31/4 45/16 47/7 60/17 61/5 69/19 87/8 98/11 102/19
you're [33] 4/10 8/2 9/25 10/9 13/5 13/9 30/9 43/1 43/9 45/1 48/11 54/3 57/13 59/22 62/17 66/16 73/2 75/5 77/13 77/16 87/10 87/12 90/19 90/22 92/12 93/12 94/2 96/16 99/5 99/11 100/21 105/7 115/15
you've [6] 7/7 8/24 30/23 53/3 55/22 69/13
your [138]
your — [1] 31/8
yourself [4] 34/7 59/2 61/3 62/6

## Z

zip [2] 80/12 80/17
Ziploc [1] 100/6
zipped [2] 40/2 40/2
zoom [3] 7/20 39/9 120/5

I/C no audio.

09/20/2005 20:59:22   Summarized by aghattas

09/21/2005 07:31:24   Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1617 | Answered: | No |
| Date: | 09/20/2005 | MonitorID: | |
| Start Time: | 20:49:36 | Minimized By User: | No |
| Stop Time: | 20:49:41 | Subscriber: | |
| Duration: | 00:00:05 | Subscriber: | Jones, Denise |
| Classification: | | Address: | 12221 Brandywine Road |
| Malfunction: | | | |
| Synopsis: | | | |

09/20/2005 20:59:33   Duplicate I.C. W/O Audio (see previous call) by aghattas

09/21/2005 07:31:31   Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1618 | Answered: | Yes |
| Date: | 09/20/2005 | MonitorID: | aghattas |
| Start Time: | 20:49:39 | Minimized By User: | No |
| Stop Time: | 20:49:43 | Subscriber: | Jones, Denise |
| Duration: | 00:00:04 | Address: | 12221 Brandywine Road |
| Classification: | | | |
| Malfunction: | | | |
| Synopsis: | | | |

09/20/2005 20:59:41   Duplicate I.C. W/O Audio (see previous call) by aghattas

09/21/2005 07:31:35   Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1619 | Answered: | No |
| Date: | 09/20/2005 | MonitorID: | aghattas |
| Start Time: | 20:49:53 | Minimized By User: | No |
| Stop Time: | 20:50:28 | Subscriber: | |
| Duration: | 00:00:35 | Address: | |
| Classification: | | | |
| Malfunction: | | | |
| Synopsis: | I/C  AJ Son to AJ telling him "the back garage door is unlocked" repeats this again, and then says if you don't have cash...AJ cuts him off stating you don't need to say no more son | | |

*[handwritten annotation:]* Lil Brandywine
This is when the FB, went into my house

09/20/2005 21:01:11   Summarized by aghattas

09/21/2005 07:31:46   Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1620 | Answered: | Yes |
| Date: | 09/20/2005 | MonitorID: | |
| Start Time: | 20:49:56 | Minimized By User: | No |
| Stop Time: | 20:50:04 | Subscriber: | Jones, Denise |
| Duration: | 00:00:08 | Address: | 12221 Brandywine Road |
| Classification: | | | |
| Malfunction: | | | |
| Synopsis: | | | |

DC no audio

09/20/2005 21:01:37  Summarized by aghattas

09/21/2005 07:32:11  Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1621 | | |
| Date: | 09/20/2005 | Answered: | No |
| Start Time: | 20:52:23 | MonitorID: | aghattas |
| Stop Time: | 20:53:21 | Minimized By User: | No |
| Duration: | 00:00:58 | Subscriber: | |
| Classification: | | Address: | |
| Malfunction: | | | |

Synopsis:  I/C  202-421-8063 Ecode, MM] Rico [phonetic]  to AJ.  AJ says put it in the Nickel room.  Rico asks if it is the camera and the bab b/c he left the bag in the VIP room.  AJ says he just left it and will call Rico in the morning.

09/20/2005 21:03:23  Summarized by aghattas

09/21/2005 07:32:22  Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1622 | | |
| Date: | 09/20/2005 | Answered: | Yes |
| Start Time: | 20:52:28 | MonitorID: | |
| Stop Time: | 20:53:21 | Minimized By User: | No |
| Duration: | 00:00:53 | Subscriber: | Ecode, MM |
| Classification: | | Address: | 6307 57th Ave |
| Malfunction: | | | |

Synopsis:

09/20/2005 21:05:18  Duplicate I.C. W/O Audio (see previous call) by aghattas

09/21/2005 07:32:26  Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1623 | | |
| Date: | 09/20/2005 | Answered: | Yes |
| Start Time: | 20:54:02 | MonitorID: | aghattas |
| Stop Time: | 20:54:32 | Minimized By User: | No |
| Duration: | 00:00:30 | Subscriber: | |
| Classification: | | Address: | |
| Malfunction: | | | |

Synopsis:  O/G 240-416-2249 [Denise Jones] stating she is at airport on way home.

09/20/2005 21:05:37  Summarized by aghattas

09/21/2005 07:32:35  Reviewed by kobrien

| | | | |
|---|---|---|---|
| Session Number: | 1624 | | |
| Date: | 09/20/2005 | Answered: | Yes |
| Start Time: | 21:19:25 | MonitorID: | aghattas |
| Stop Time: | 21:19:56 | Minimized By User: | No |
| Duration: | 00:00:31 | Subscriber: | ginsberg, edward |
| Classification: | | Address: | 1134 N Rolling Road |

## Motion to Suppress Tangible Evidence Obtained from Jeep Cherokee

On October 22, 2005 Magistrate Judge Charles B. Day of the District of Maryland issued a search warrant for Jones' home located at 10870 Moore Street, Waldorf, MD. The application for a search warrant was supported by an affidavit sworn to by FBI agent Stephanie Yanta (see Exh.2 – Yanta affidavit for search warrant).

     a. **The search warrant for Jones' home was invalid:**    Agent Yanta's affidavit was substantially similar to the affidavits discussed in Jones' motion to suppress evidence obtained from interception of wire communications and electronic surveillance and also relied on evidence obtained through the electronic surveillance. Jones incorporates by reference the arguments made in his wire tap suppression motion and submits that the warrant issued was invalid because it resulted from an affidavit that presented intentional misstatements and a reckless disregard for the truth. See Franks v. Delaware, 438 US154 (1978). Additionally, the instant search warrant was invalid because it was tainted by illegally obtained evidence (the wire taps, etc., is the fruit from the poisonous tree (see Wong Sun v. United States 371US471 (1963).

     b. **The search of the Jeep was illegal:**    On October 24, 2005, the FBI agents used a warrantless and expired court order GPS (surveillance aid) to track and monitor the Jeep Cherokee with their belief that Mr. Jones had contraband in the Jeep Cherokee... Even the Prosecutor stated it in the rebuttal argument, (Document 151 filed 7-24-2006, pg. 51). The government stated on October 23, 2005, "Jones told many of his suspected customers that he was going to make his round because it's here, and the GPS device confirmed that he did just that". All of these facts, taken together, demonstrate ample probable cause that Jones was carrying contraband in the Jeep Cherokee on the morning of October 24, 2005.

     Quoting the probable cause conclusion in the vehicle's search warrant affidavit and the houses' search warrant affidavit. Based on facts the FBI agents believe the following articles are present at the subject premise and in the Jeep Cherokee – controlled substance, cocaine, paraphernalia for packaging, scales, razor blades, plastic bags, heat sealing devices, record keeping books, notes, ledger and other papers relating to distribution of controlled substance, canceled mail, deeds, diaries, utility bills, statements, identification documents, keys, cell phones, telephone bills, telephone numbers.

The FBI agents were expecting to see and seize these items from the Jeep Cherokee and the 10870 Moore Street address.

My argument is once the search started with the warrantless and expired court order GPS (physical surveillance aid) entered the garage. It was an illegal search, the fruit from the poisonous tree. In the Honorable Judge Ellen Huvelle's decision, the agents cannot use the GPS tracking data obtained when the Jeep Cherokee was parked in the garage adjoining Jones' Moore Street property.

Defendant sites US v. Karo, because the residents had a justifiable interest in privacy in their home. Information that was obtained from the tracking device while it was inside the private residence should therefore be suppressed. Defendant argues US v. Karo, a search began at the moment Karo brought the car into his house at hence concealed it from the public view. As a general mater, the private citizen is entitled to assume, and in fact does assume that his possessions are not infected with concealed electronic devices. The concealment of such items or personal property significantly compromises the owner interest in privacy, by making it impossible to conceal that item's possession and location from the Government, despite the fact that the Fourth Amendment protects the privacy interest in the location of personal property not exposed to public view. I find little comfort in the courts notion that no invasion of privacy occurred until a listener obtained some significant information. By use of the device, the expectation of privacy should be measured from the stand point of the citizen whose privacy is at stake, not the Government. It is compromised, the moment when the invasion occurred. The agent did not know who was in possession of the property or when, once it entered Karo's house. Because the beeper enabled the agent to learn the location of the property otherwise concealed from public view, it infringed a privacy interest protected by the Fourth Amendment.

US v. Knotts – was reversed finding for the defendant. The monitoring of the beeper was prohibited by the Fourth Amendment because its use had violated respondent's reasonable expectation of privacy, and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring. When a police agent, track, bugged personal property without first obtaining a warrant, they must do so at the risk that this enhance surveillance intrusive at its best, might push fortuitously and unreasonably into private sphere, prohibit by the Fourth Amendment. The Fourth Amendment protected against Government invasion of a person's reasonable expectation of privacy, even when the thus invasion are not accomplished by physical intrusion.

- 2 -

It is certainly true that a home owner has reasonable expectation of privacy in the contents of his home, <u>Alderson v. US</u>.

On September 27, 2005, the FBI agent knew they installed a GPS on the Jeep Cherokee violating (18§3117 Code) and the (Judge Friedman 10 days execution order). The agent never applied for a search warrant during this time. Monitoring the GPS and with the physical surveillance from the agents, the agent surveyed and knew that the Jeep Cherokee was "<u>always</u>" parked inside of Moore Street garage.

The agents applied for a search warrant on October 22, 2005, planning to execute the search warrant on October 24, 2005 at the Moore Street house. Allowing the warrantless and expired GPS (surveillance aid) to enter Moore Street garage, starting the search on October 24, 2005 once the garage door was closed to the public view, concealing the believed contraband and the Jeep Cherokee. <u>With this sophisticated GPS tracker, the agents knew Mr. Jones' Jeep and any suspected contraband were stationary, located in the garage of Moore Street house.</u>

<u>US v. Berry</u> – Now on the market re GPS devices even more sophisticated. Such devices can be tracked with aid of computers that display a map showing where the devices are in real time. The computer's memory can store the devices movements, moment by moment for days, weeks, or even years. The improved technology may be viewed as a more sophisticated beeper. In trial, the agents testified of the monitor and movement of the GPS on the Jeep during the time span October 23, 2005 through October 24, 2005 (the morning the agents called the "Big take down"). During trial, the GPS expert summarized a GPS as merely record electronically what the agents could learn if they were willing to devote the personnel necessary to tail a car around the clock.

<u>US v. Berry</u> – <u>The Supreme Court might conclude however that the new technology is so intrusive that the police must obtain a court order</u> before its use. FBI agent testimony and evidence show the GPS (physical surveillance aid) entered Moore Street garage before 6 a.m. on October 24, 2005, whereby starting the search once the garage door was closed. Before the agents entered the house with a search warrant, the search had started with the GPS on the Jeep Cherokee.

c. <u>Entering the house before 6 a.m.</u> During trial, Agent _____ testified under oath the agents disconnected the GPS device on the Jeep Cherokee in the garage, the morning of October 24, 2005 (the "Big take down"). Agent _____ testimony read off October 24, 2005, **5:21 a.m.** for the last entry of the GPS data. Evidence demonstrates and was put in record the agents did indeed enter the Moore Street house before 6 a.m. early morning October 24, 2005, violating **Rule 41**.

At trial, Mrs. Jones testified under oath, the agents entered the house at the Moore Street address before 6 a.m. Mrs. Jones testified she recalled the agents entered the house at 4:45 a.m.

Jones also noted his son was available to testify that the agents entered the house before 5 a.m. because they entered the house before his alarm clock signaled his daily 5 a.m. wake-up. Jones' son, who attended college in Baltimore, was accustomed to getting up at 5 a.m. and leaving the house at 6 a.m.

Jones' house was also wired by ADT alarm system. The alarm system did sound when the agents entered in the house. Jones' attorney did subpoena the activity report from ADT for the date of October 24, 2005. The ADT report was clearly altered because the report showed only a 6:13 a.m. entrance into the house on October 24, 2005. The report neglected to show the time Mr. Jones entered the house on October 24, 2005 (before 4:45 a.m. and definitely before 5:21 a.m. when the GPS device was removed from the Jeep Cherokee); nor did the report show when Jones' son entered the house on October 24, 2005 shortly after midnight. This is a clear violation of **Rule 41**.

d. <u>No showing, presenting or leaving of a Search Warrant at the Moore Street house.</u> During the entry and the search, Jones asked numerous times to see a search warrant. None of the agents responded. Throughout the search, one agent (an Asian gentleman) repeatedly asked the other agents if he should take a photograph of the search warrant. (The lead agent – who seemed irritated by the question -- sent him into the garage until the end of the search when he came back into the house and photographed every room of the house and the signed inventory sheet.) Jones was taken away by one of the agents to FBI headquarters in Washington, DC. The other agents continued to search and seize over 40 boxes of personal and private documents and personal property. A search warrant was never presented to

Mrs. Jones or Jones' son.  At the conclusion of the search, Mrs. Jones was given a five page inventory receipt to sign.  There was no Attachment A and no search warrant presented or left at the premises.  **Rule 41 (F)** mandates the officer executing the warrant must give a copy of the warrant and receipt for the property taken to a person from whom, or from whose premises, the property was taken, or … leave a copy of the warrant, Attachment A, and receipt at the place where the officer took the property.

In an e-mail from Ms. Rachel Lieber (prosecutor) to Mr. Eduardo Balarezo (defense attorney for Mr. Jones), Ms. Lieber stated the Jones' had over 40 boxes of inventory, the Jones' save everything.  This has nothing to do with the fact that the agents did not present, leave or obtain a signature on a search warrant.  <u>United States v. Martinez Fuente, US v. Chadwick, Michigan v. Tyler,</u> without a warrant the occupant has "no way of knowing the lawful limits of the inspectors power to search, and no way of knowing, whether the inspector himself is acting under proper authorization (quoting <u>Camara v. Municipal Court</u>).  At no point did the agents present or leave either Mrs. Jones or Jones' son a copy of search warrant or Attachment A, to inform the scope of the warrant, nor did the agents photograph a copy of the warrant in Mrs. Jones' hand, neither was a copy left at the premises.  This failure to provide a copy of the warrant with Attachment A merits suppression of any evidence recorded as results.  See <u>United States v. Gantt</u> 194F.3D987 (9th Cir 1999).  For these reasons, Jones respectfully moves the Honorable court to suppress as evidence at trial.  In this case all evidence obtained as a result of the search of 10870 Moore Street, Waldorf, Maryland is from the fruit of the poisonous tree.

<u>Evidence List</u>

(1)  There was no photo of search warrant nor Attachment A; only a photo of inventory sheets and receipt.

(2)  Brandywine Road house – There was a photo of child occupant holding the search warrant in his hand.

(3)  Potomac Drive – Search Warrant and Attachment A, with inventory sheet was posted on the wall.  A close-up shot and a distance shot.

(4)  Residence of Michael Huggins – Search Warrant and Attachment and three inventory sheets on the table with teenage son present in the photo.

(5)  Residence of John Adams – Search warrant and Attachment A, and two inventory sheets and receipt page photographed in close-up shot on the sofa.  A second photograph showing

Mr. Adams and wife in handcuffs from the back along with the completed search warrant in between both persons.

(6) Residence of Demetrius Johnson – On Mr. Johnson's table two photos of the Search Warrant, Attachment A and inventory sheet.

(7) Club Levels – No photograph of Search Warrant, Attachment A or inventory sheet.

Conclusion – Until this present date, Mr. Jones, Mrs. Jones, nor Jones' son have been presented with the Search Warrant or Attachment A for the Moore Street house; only the inventory sheets and receipt which were presented to Mrs. Jones.

Responding to the Government's Rebuttal <u>The defendant's consent was voluntary.</u> After viewing and reading the motion Mr. Balarezo submitted to the courts, defendant Jones explained the truth of the matter. Mr. Balarezo (defendant's attorney) communicated to the government, in fact, defendant Jones' position is that he did not sign that consent form at all, but rather the signature is a forgery. Defendant Jones is willing to call a handwriting expert to resolve this matter.

Jones was handcuffed (in the usual hands behind his back position) while he was upstairs in the Master Bedroom of the Moore Street house. Jones stated that he was later brought downstairs and sat in a chair where he could view the garage through the open door. Jones states that the agents said they did not find any drugs but they did find cash money in the Jeep Cherokee. The other agents responded "that's better than nothing."

Jones challenges the forged consent form, as well as statements made by lead Agent Norma Horne. Agent Horne testified under oath before the Grand Jury, "he directed agents when they let him know that it was a search, that he had money in his vehicle, and he took them out to the vehicle." Here we have a lead agent testifying under oath to the Grand Jury on January 26, 2006, Jones took the agents out to the Jeep Cherokee and pointed out the money, never mentioning any signed consent from Mr. Jones.

Jones argues if he was handcuffed behind his back, how could he sign a consent form or go into the garage and point out the money in the Jeep Cherokee while being handcuffed. Did the

agents remove the cuffs and have him (Mr. Jones) sign the consent and/or did they remove the cuffs again and take him (Mr. Jones) to the garage and ask him to point to the money?

Jones further argues the Grand Jury testimony of Agent Norma Horne is perjury and the signature on the consent form is a forgery.

Quoting from the Government's response, Jones' criminal history makes clear that this wasn't his first encounter with police, rather his extensive criminal history of drug trafficking demonstrates his familiarity with his Constitutional Rights, including the Rights to Consent... Mr. Jones argues "why would I give my Rights up and sign a consent form, or go out to the Jeep Cherokee and point out cash money especially when Jones contends the cash was receipts from Club Levels.

According to Jones, "the only time any law enforcement officer discussed or read me my Rights was Agent Yanta at the FBI Headquarters." Jones states he declined and asked for an Attorney. At that point, Agent Yanta gave Jones a Miranda Rights Card and a one-page inventory sheet to sign.

In conclusion, every affidavit and every Government document stated the vehicle was registered (solely) to Mrs. Jones and belonged to Mrs. Jones. Mrs. Jones purchased the Jeep Cherokee in early 2001 before she married Mr. Jones and in fact, while Mr. Jones was away in prison. The argument here is: "Why didn't the agents ask Mrs. Jones for permission to search the vehicle which was registered in her name and belonged to her?" The agents searched the Toyota Sequoia (registered to both Mr. & Mrs. Jones) and the Cadillac (registered to Mr. Jones) without obtaining a signature on a consent form. Jones contends vehicle searches were conducted by the agents without consent or permission.... For the record, any child with knowledge of graphic arts, can take a graphics art software program and duplicate a signature. The consent form was not signed by Mr. Jones ant the signature is in fact a forgery.



A

Moore St
House

need
to check
clock
#1

search
warrant

Incomplete



















